# EXHIBIT A



2018071855-23

## INCLUSIONARY DEVELOPMENT COVENANT

THIS INCLUSIONARY DEVELOPMENT COVENANT (this "**Covenant**") is made as of the 30th day of May_____, 20 18 , by 4910 Georgia Avenue LLC_____ , a District of Columbia Limited Liability Company and its successors and assigns (the "**Inclusionary Development Owner**") having an address of 10135 Bacon Dr. Beltsville, MD 20705 , for the benefit of the District of Columbia, a municipal corporation, acting by and through the Department of Housing and Community Development (the "**District**").

## RECITALS

R-1. Inclusionary Development Owner is the fee owner of certain real property located in the District of Columbia as further described in **Exhibit A** (the "**Site**"). The Site is located in a zoning district subject to the Inclusionary Zoning Program (as defined below). The Inclusionary Development Owner intends to construct an Inclusionary Development (as defined below) on the Site.

R-2. District has determined, in accordance with the Inclusionary Zoning Program and its public policy of increasing the affordable housing stock in the District of Columbia, that the Site and the Inclusionary Development (collectively, the "**Property**") shall be subject to this Covenant which requires among other things that the Inclusionary Development contain a certain number of Inclusionary Units (as defined below).

R-3. The Inclusionary Development Owner is hereby entering into this Covenant to set forth the terms, restrictions, and conditions upon which Owner (as defined below) will construct, maintain, rent, and sell the Inclusionary Units.

NOW THEREFORE, in consideration of the foregoing and other good and valuable consideration, the Inclusionary Development Owner hereby covenants as follows:

## ARTICLE I
## DEFINITIONS

For the purposes of this Covenant, the capitalized terms used herein shall have the meanings ascribed to them below and, unless the context clearly indicates otherwise, shall include the plural as well as the singular.

**AMI**: has the meaning given to the term "Area Median Income" in the IZ Implementation Regulations.

**Annual Income**: has the meaning given in the IZ Implementation Regulations.

**Annual Report**: has the meaning given in Section 4.7.

**Applicable Law**: means all applicable District of Columbia and federal laws, codes, regulations, and orders, including, without limitation, environmental laws, laws relating to historic preservation, and laws relating to accessibility for persons with disabilities.

Revised: 2/6/2017



**Business Day**:  means Monday through Friday, inclusive, other than holidays recognized by the District government.

**Capital Improvement Claim**:  means a request and any supporting documentation submitted by an Inclusionary Unit Owner to the District Agency documenting a capital improvement made by the Inclusionary Unit Owner to a For Sale Inclusionary Unit after such unit was purchased by the Inclusionary Unit Owner pursuant to the IZ Implementation Regulations.

**Certificate of Inclusionary Zoning Compliance**:  means the certificate issued by DCRA in accordance with the IZ Implementation Regulations, attached hereto as **Exhibit B**.

**Certification of Income, Affordability, and Housing Size**: has the meaning given in the IZ Implementation Regulations.

**Certifying Entity**: has the meaning given in the IZ Implementation Regulations.

**DCMR**: means the District of Columbia Municipal Regulations, as may be amended from time to time.

**DCRA**:  means the District of Columbia Department of Consumer and Regulatory Affairs.

**Declaration of Eligibility**: has the meaning given in the IZ Implementation Regulations.

**Designated Affordability Level**:  means the maximum percentage of the AMI for a Qualified Purchaser or Qualified Tenant of each Inclusionary Unit as listed in the Certificate of Inclusionary Zoning Compliance and mandated by the IZ Laws.

**District Agency**:  means the agency of the government of the District of Columbia with authority to act under the IZ Laws, whether by Mayor's Order or pursuant to the IZ Laws.

**District Lottery**: means the lottery procedures described in the IZ Implementation Regulations.

**For Sale Inclusionary Development**: means the portion of an Inclusionary Development that includes Inclusionary Units that will be sold to Qualified Purchasers.

**For Sale Inclusionary Unit**: means an Inclusionary Unit that shall be sold to a Qualified Purchaser.

**Foreclosure Notice**:  is defined in Section 8.4.

**Household(s)**:  has the meaning given in the IZ Implementation Regulations.

**HUD**:  means the United States Department of Housing and Urban Development.

**Inclusionary Development**:  has the meaning given in the IZ Implementation

Regulations.

**Inclusionary Development Owner**: is identified in the preamble of this Covenant.

**Inclusionary Units**: are the units indicated in the Certificate of Inclusionary Zoning Compliance.

**Inclusionary Unit Owner**: a member or members of a Qualified Purchaser that own(s) a For Sale Inclusionary Unit.

**Inclusionary Unit Tenant**: a member or members of a Qualified Tenant that lease(s) a Rental Inclusionary Unit.

**Inclusionary Zoning Program:** has the meaning given in D.C. Official Code § 6-1041.01(4) (2008 Supp.), as amended.

**IZ Implementation Regulations**: means the Inclusionary Zoning Implementation regulations published in Chapter 22 of Title 14 of DCMR, as amended.

**IZ Laws**: means, collectively, the (a) Inclusionary Zoning Implementation Amendment Act of 2006, as codified in the D.C. Official Code §§ 6-1041.01 *et seq.* (2008 Supp.), as amended (b) IZ Implementation Regulations and (c) zoning regulations published in Chapter 10 Subtitle C of ZR16, as amended.

**Land Records**: means the real property records for the District of Columbia located in the Recorder of Deeds.

**Market-Rate Unit**: has the meaning given in the IZ Implementation Regulations.

**Maximum Allowable Rent**: is the maximum rental rate of a Rental Inclusionary Unit as determined pursuant to the IZ Implementation Regulations.

**Maximum Resale Price:** is the maximum resale price of a For Sale Inclusionary Unit as determined pursuant to the procedures contained in **Schedule 1** attached hereto.

**Maximum Sales Price**: is the maximum price of a For Sale Inclusionary Unit as determined pursuant to the IZ Implementation Regulations.

**Mortgage**: means a mortgage, deed of trust, mortgage deed, or such other classes of instruments as are commonly given to secure a debt under the laws of the District of Columbia.

**Mortgagee**: means the holder of a Mortgage.

**Notice of Availability**: has the meaning given in the IZ Implementation Regulations.

**OAG**: means the Office of the Attorney General for the District of Columbia.

**Owner**: means the Inclusionary Development Owner and any Inclusionary Unit Owner.

3

**Person**:  means any individual, corporation, limited liability company, trust, partnership, association, or other legal entity.

**Property**: is defined in the Recitals.

**Qualified Purchaser**:  means a Household that satisfies the requirements contained in the IZ Implementation Regulations for a For Sale Inclusionary Unit.

**Qualified Tenant**:  means a Household that satisfies the requirements contained in the IZ Implementation Regulations for a Rental Inclusionary Unit.

**Rent and Price Schedule**:  has the meaning given in the IZ Implementation Regulations.

**Rental Inclusionary Development**:  has the meaning given in the IZ Implementation Regulations.

**Rental Inclusionary Unit**: means an Inclusionary Unit that shall be leased to a Qualified Tenant.

**Rental Inclusionary Unit Lease Rider**: is the lease rider required under the IZ Implementation Regulations in the form approved by the District Agency that shall be attached to a lease agreement for a Rental Inclusionary Unit and shall be executed by the Inclusionary Development Owner and each member of the Inclusionary Unit Tenant who is over the age of eighteen (18) years old.

**Sale**:  is a conveyance of all of the fee simple interest in a For Sale Inclusionary Unit.

**Site**:  is defined in the Recitals.

**Transferee**:  is defined in Section 5.6.

**Waiver**:  the District's written waiver, if any, of certain provisions contained in the IZ Implementation Regulations not required by the Inclusionary Zoning Act (D.C. Official Code § 6-1041, et seq.) or the zoning regulations published in Chapter 26 of Title 11 of DCMR, as amended.  In the event the District has issued a Waiver as of the date of this Covenant, the Waiver shall be attached hereto as **Exhibit C**.

## ARTICLE II
## CONSTRUCTION OF INCLUSIONARY DEVELOPMENT

The Inclusionary Development Owner hereby covenants and agrees to construct the Inclusionary Development in accordance with (a) the building permit(s) issued for the Inclusionary Development, (b) the Certificate of Inclusionary Zoning Compliance, and (c) the IZ Laws.

## ARTICLE III
## USE

3.1 **Use.**  Except as provided herein, all Inclusionary Unit Owners and Inclusionary Unit Tenants shall have the same and equal use and enjoyment of all of the amenities of the Property and services provided at the Inclusionary Development as the owners or tenants of the comparable Market-Rate Units.  No restrictions, requirements or rules shall be imposed on Inclusionary Unit Owners or Inclusionary Unit Tenants that are not imposed equally on the owners or tenants of the comparable Market-Rate Units.  If amenities, services, upgrades, or ownership or rental of parking and other facilities are offered as an option at an additional upfront and/or recurring cost or fee to the comparable Market-Rate Units, such amenities, services, upgrades, or ownership or rental of parking and other facilities shall be offered to the Inclusionary Unit Owners and Inclusionary Unit Tenants of comparable Inclusionary Units at the same upfront and/or recurring cost or fee.  If there is no cost or fee charged to the owners or tenants of the comparable Market-Rate Units for such amenities, services, upgrades, or ownership or rental of parking and other facilities, there shall not be a cost or fee charged to Inclusionary Unit Owners or Inclusionary Unit Tenants of comparable Inclusionary Units.

3.2 **Demolition/Alteration.**  Except for maintenance, upkeep, repairs of interior components and replacement of interior components (including fixtures and appliances) of the Inclusionary Unit with interior components of equal or better quality than those interior components being replaced, an Owner shall not demolish or otherwise structurally alter an Inclusionary Unit or remove fixtures or appliances installed in an Inclusionary Unit without the prior written approval of the District Agency, which approval shall be in the sole discretion of the District Agency; provided, that in the event the changes are comparable to changes made to the Market-Rate Units, no District Agency approval shall be required.

## ARTICLE IV
## RENTAL OF INCLUSIONARY UNITS

4.1 **Lease of Rental Inclusionary Units**.  In the event the Inclusionary Zoning Development contains Rental Inclusionary Units, the provisions of this Article IV shall apply. The Inclusionary Development Owner shall reserve, maintain and lease the Rental Inclusionary Units to Qualified Tenants (a) in accordance with the IZ Law, subject to the Waiver, if any, and the Certificate of Inclusionary Zoning Compliance, and (b) at a rental rate at or below the Maximum Allowable Rent.

4.2 **Rental Inclusionary Unit Lease Requirements**.  The Inclusionary Development Owner hereby covenants that it shall utilize a lease agreement which incorporates and attaches the Rental Inclusionary Unit Lease Rider.

4.3 **Rental Inclusionary Unit Lease Terms.**

4.3.1  Except as authorized by the IZ Implementation Regulations or waived pursuant to the Waiver, if any, the lease term for a Rental Inclusionary Unit shall be for a period of only one (1) year, unless extended by the District Agency in accordance with

the IZ Implementation Regulations. The lease term shall not automatically renew and shall only be renewed in accordance with the IZ Implementation Regulations.

4.3.2    The Maximum Allowable Rent for each Rental Inclusionary Unit shall be determined by the Rent and Price Schedule in accordance with the IZ Implementation Regulations.

4.3.3    An Inclusionary Unit Tenant shall not have its lease renewed unless the Inclusionary Unit Tenant complies with the requirements contained in Section 2216.1 of the IZ Implementation Regulations.

4.4    **No Subleasing of Rental Inclusionary Units.**  An Inclusionary Unit Tenant may not sublease any Rental Inclusionary Unit or assign its lease to any Rental Inclusionary Unit.

4.5    **Representations of Inclusionary Unit Tenant.**  By execution of a lease for a Rental Inclusionary Unit, each Inclusionary Unit Tenant shall be deemed to represent and warrant to the District Agency, Inclusionary Development Owner and the Certifying Entity, as applicable, each of whom may rely thereon, that the Inclusionary Unit Tenant meets, and will continue to meet, all eligibility requirements contained in the IZ Laws for the rental of a Rental Inclusionary Unit.

4.6    **Representations of Inclusionary Development Owner.**  By execution of a lease for a Rental Inclusionary Unit, the Inclusionary Development Owner shall be deemed to represent and warrant to the District Agency, which may rely on the following, that: (i) the Household is a Qualified Tenant pursuant to the executed Certification of Income, Affordability, and Housing Size and Declaration of Eligibility received by the Inclusionary Development Owner, and (ii) the Inclusionary Development Owner is not charging the Inclusionary Unit Tenant more than the Maximum Allowable Rent.

4.7    **Annual Reporting Requirements.**  The Inclusionary Development Owner shall provide an annual report ("**Annual Report**") to the District Agency regarding the Rental Inclusionary Units, which shall be prepared and submitted in accordance with the IZ Implementation Regulations.

4.8    **Confidentiality.**  Except as may be required by Applicable Law, including, without limitation to, the *District of Columbia Freedom of Information Act of 1976*, D.C. Code § 2-531 *et seq.* (2001), the Inclusionary Development Owner and the District Agency shall not disclose to third parties the personal information of the Households, including the identity of the Households, submitted as a part of the Annual Report.

4.9    **Inspection Rights.**  The District Agency or its designee shall have the right to inspect the Rental Inclusionary Units, upon reasonable advance notice to the Inclusionary Development Owner.  The District Agency or its designee shall have the right to inspect a random sampling of the Rental Inclusionary Units to confirm that the units are in compliance with applicable statutory and regulatory housing requirements.  The District Agency or its designee shall have the right to conduct audits of a random sampling of the Rental Inclusionary Units and associated files and documentation to confirm compliance with the requirements of this Covenant.

**ARTICLE V**
**SALE OF INCLUSIONARY UNITS**

**5.1    Sale of For Sale Inclusionary Units**.  In the event the Inclusionary Zoning Development contains For Sale Inclusionary Units, the provisions of this Article V shall apply. The Inclusionary Development Owner, as to initial Sales, and the Inclusionary Unit Owner, for all subsequent Sales, shall reserve and sell the For Sale Inclusionary Units to Qualified Purchasers in accordance with the IZ Laws and the Certificate of Inclusionary Zoning Compliance.  For the initial Sale, the For Sale Inclusionary Unit shall be sold to Qualified Purchasers at a purchase price at or below the Maximum Sales Price.  For all subsequent Sales, the For Sale Inclusionary Unit shall be sold to Qualified Purchasers at a purchase price at or below the Maximum Resale Price.

**5.2    Closing Procedures and Form of Deed**.

**5.2.1** *Owner to Provide Copy of Covenant*.  At the initial closing and all subsequent closings for a For Sale Inclusionary Unit, the Owner shall provide the Qualified Purchaser with a copy of this Covenant.

**5.2.2** *Form of Deed*.  All deeds used to convey a For Sale Inclusionary Unit must have a fully executed Declaration of Eligibility and Certification of Income, Affordability, and Housing Size attached, and shall include the following statement in twelve (12) point or larger type, in all capital letters, on the front page of the deed:

THIS DEED IS DELIVERED AND ACCEPTED SUBJECT TO THE PROVISIONS AND CONDITIONS SET FORTH IN THAT CERTAIN INCLUSIONARY DEVELOPMENT COVENANT, DATED AS OF May 30, 2018 RECORDED AMONG THE LAND RECORDS OF THE DISTRICT OF COLUMBIA AS INSTRUMENT NUMBER 2018071855, ON July 19 2018, WHICH AMONG OTHER THINGS IMPOSES RESTRICTIONS ON THE SALE AND CONVEYANCE OF THE SUBJECT PROPERTY.

**5.2.3** *Post-Closing Obligations*.  The purchasing Inclusionary Unit Owner shall submit to the District Agency within seventeen (17) days after the closing on the Sale of any For Sale Inclusionary Unit a final executed HUD settlement statement and a copy of the deed recorded in the Land Records, including the Declaration of Eligibility and Certification of Income, Affordability, and Housing Size.

**5.3    Representations of Owner**.  By execution of a deed for the For Sale Inclusionary Unit, the Inclusionary Development Owner, for initial Sales, and the Inclusionary Unit Owner, for subsequent Sales, shall be deemed to represent and warrant to, and agree with, the District Agency and, if applicable, the title company, each of whom may rely on the following: that (i) the purchaser is a Qualified Purchaser at the Designated Affordability Level, and (ii) the sale price satisfies the terms of this Covenant and the IZ Laws.

**5.4    Annual Certification of Residency**.  In accordance with the IZ Implementation Regulations, the Inclusionary Unit Owner shall submit to the District Agency annually on the

anniversary of the closing date for a For Sale Inclusionary Unit, a certification that it continues to occupy the For Sale Inclusionary Unit as its principal residence. The certification shall be submitted on or with such form as may be prescribed by District Agency.

5.5    **Leasing For Sale Inclusionary Units**. An Inclusionary Unit Owner may lease a For Sale Inclusionary Unit in accordance with the requirements contained in the IZ Implementation Regulations.

5.6    Transfers. Except as provided in Article VIII, in the event an Inclusionary Unit Owner voluntarily or involuntarily transfers all or part of the For Sale Inclusionary Unit pursuant to operation of law, court order, divorce, death to a transferee, heir, devisee or other personal representative of such owner of a For Sale Inclusionary Unit (each a "**Transferee**"), such Transferee, shall be automatically bound by all of the terms, obligations and provisions of this Covenant; and shall either: (i) occupy the For Sale Inclusionary Unit, or (ii) if the Transferee does not wish or is unable to occupy the For Sale Inclusionary Unit, he or she shall provide the District Agency with a Notice of Availability in accordance with the IZ Implementation Regulations, and sell it in accordance with this Covenant and the IZ Laws, except as otherwise provided in the IZ Implementation Regulations.

## ARTICLE VI
## DEFAULT; ENFORCEMENT AND REMEDIES

6.1    **Default.** The Inclusionary Unit Owner shall be deemed to be in default of this Covenant, if the Inclusionary Unit Owner violates or fails to comply with any provision of the: (i) Inclusionary Zoning Act, (ii) Covenant, and/ or (iii) Certificate of Inclusionary Zoning Compliance, and such violation continues beyond any cure period provided in Section 6.3. Upon an event of default, the District shall have remedies provided in Section 6.2.

**6.2    Remedies.**

6.2.1    The District or District Agency shall have the right to demand that any person found to have sold a For Sale Inclusionary Unit at a price greater than that permitted hereunder shall pay a fine equal to the amount by which the purchase price exceeded the price allowed plus 10%.

6.2.2    The District or District Agency shall have the further right to demand that any person found to have rented an Inclusionary Unit at a rent greater than the Maximum Allowable Rent shall pay a fine equal to the amount by which the rent paid exceeded the Maximum Allowable Rent plus 10%. The fine amount shall continue to be paid until the owner provides proof satisfactory to the District Agency that the rental payment has been reduced to the Maximum Allowable Rent.

6.2.3 Notwithstanding the foregoing, an event of default under this Covenant shall also be a civil infraction for the purposes of the Department of Consumer and Regulatory Affairs Civil Infractions Act of 1985, effective October 5, 1985 (D.C. Law 6-42; D.C. Official Code Sec. 2-1801.01 *et seq.*) and may be grounds for revocation of any building permit and certificate of occupancy for the market rate portions of the Inclusionary Development.

6.3    **Right to Cure Period**.  If a violation occurs under this Covenant or the IZ Laws, the District Agency shall provide the Owner with written notice setting forth with particularity the alleged violation and shall provide at least thirty (30) days to cure the alleged violation, prior to the District Agency declaring an event of default and exercising its remedies.  The District Agency may extend the cure period in its sole discretion.  Failure to send such timely notice shall not be a waiver of any of the District's rights.

6.4    **Right to Attorney Fees**.  If the District shall prevail in any such legal action to enforce this Covenant, then the Owner, Inclusionary Unit Owner, Person or Household against whom the District prevails, shall pay District all of its costs and expenses, including reasonable attorney fees, incurred in connection with District efforts to enforce this Covenant.  If OAG is counsel for the District in such legal action, the reasonable attorney fees shall be calculated based on the then applicable hourly rates established in the most current adjusted Laffey matrix prepared by the Civil Division of the United States Attorney's Office for the District of Columbia and the number of hours employees of OAG prepared for or participated in any such action.

## ARTICLE VII
## COVENANTS BINDING ON SUCCESSORS AND ASSIGNS

This Covenant is and shall be binding upon the Property and each Inclusionary Unit and shall run with the land for the period provided herein.  The rights and obligations of the District, the Inclusionary Development Owner, Inclusionary Unit Owner and their respective successors, heirs, and assigns shall be binding upon and inure to the benefit of the foregoing parties and their respective successors, heirs, and assigns.  Such covenants are not binding upon any party who no longer holds a property interest in the Property, except that a party shall be liable for actions that occurred during the period such party held an interest in the Property. All rights of the District pertaining to the monitoring and/or enforcement of the obligations of the Inclusionary Development Owner or Inclusionary Unit Owner hereunder shall be retained by District, or such designee of the District as the District may so determine.  No Sale or transfer shall affect the validity of this Covenant, except as provided in Article VIII.

## ARTICLE VIII
## MORTGAGES

8.1    **Subordination of Mortgages**.  All Mortgages placed against the Property, or any portion thereof, shall be subject and subordinate to this Covenant, except as provided in Section 8.3.3.

8.2    **Amount of Mortgage**.  In no event shall the aggregate amount of all Mortgages placed against a For Sale Inclusionary Unit exceed an amount equal to one hundred five percent (105%) of the Maximum Resale Price for such unit.  Prior to obtaining any Mortgage or refinancing thereof, the Inclusionary Unit Owner shall request from the Agency the then-current Maximum Resale Price for its For Sale Inclusionary Unit.

8.3    **Default of Mortgage and Foreclosure.**

8.3.1    *Notice of Default.* The Mortgagee shall provide the Agency written notice of any notice of default and notice of intent to foreclose on the For Sale Inclusionary Unit. Notwithstanding the foregoing, in no event shall failure to provide such notices preclude the Mortgagee's right to proceed with its remedies for default under the Mortgage.

8.3.2 *Right of Purchase by the District.* The Agency shall have the right to purchase a For Sale Inclusionary Unit in the event a notice of default or notice of intent to foreclose for a Mortgage in first position was recorded in the Land Records. The purchase price shall be an amount that is the greater of (a) the amount of the debt secured by all Mortgages recorded against the subject For Sale Inclusionary Unit(s), including commercially reasonable costs and expenses, if any, incurred by Mortgagee as a result of a default and due and payable by the Inclusionary Unit Owner under the terms of the Mortgage or (b) the Maximum Resale Price. The Agency shall have thirty (30) days from the date a notice of default or a notice of foreclosure sale was recorded in the Land Records to exercise its option and to purchase the For Sale Inclusionary Unit. The Agency's right to purchase shall automatically expire upon the transfer of the For Sale Inclusionary Unit by foreclosure or deed in lieu thereof. The Agency may designate another District of Columbia agency or third party to take title to the For Sale Inclusionary Unit.

8.3.3    *Termination upon Foreclosure and Assignment.* In the event title to a For Sale Inclusionary Unit is transferred following foreclosure by, or deed in lieu of foreclosure to, a Mortgagee in first position, or a Mortgage in first position is assigned to the Secretary of HUD, the terms of this Covenant applicable to such unit shall be automatically terminated subject to Sections 8.3.4 and 8.4.

8.3.4 *Apportionment of Proceeds.* To the extent allowed by law, in the event title to a For Sale Inclusionary Unit is transferred according to the provisions of Section 8.3.3, the proceeds from such foreclosure or transfer shall be apportioned and paid as follows: first, to the Mortgagee, in the amount of debt secured under the Mortgage, including commercially reasonable costs and expenses, if any, incurred by Mortgagee and due and payable by the Inclusionary Unit Owner under the terms of the Mortgage; second, to any junior Mortgagees, in the amount of the debt secured under such Mortgages; third, to the For Sale Inclusionary Unit Owner, up to the amount of the Maximum Resale Price as of the date of such sale or transfer; and fourth, to the District.

8.3.5 *Effect of Foreclosure on this Covenant.* Except as provided in Section 8.3.3, in the event of foreclosure or deed in lieu thereof, this Covenant shall not be released, and the Mortgagee or any Person who takes title to an Inclusionary Unit through a foreclosure sale shall become a Transferee in accordance with Section 5.6.

8.4    **Assignment of Mortgage to the Secretary of HUD.** In the event a Mortgage recorded in the first position against a For Sale Inclusionary Unit is assigned to the Secretary of HUD, the following shall occur upon the date of assignment: (a) the District's right to purchase,

whether or not such right has been triggered, shall automatically expire and (b) the terms of this Covenant applicable to such unit shall be automatically terminated pursuant to Section 8.3, except that upon sale of such unit by the For Sale Inclusionary Owner or foreclosure or deed in lieu thereof, the proceeds of such sale shall be apportioned as provided in Section 8.3.4.

## ARTICLE IX
## AMENDMENT OF COVENANT

Except as otherwise provided herein, neither this Covenant, nor any part hereof, can be amended, modified or released other than as provided herein by an instrument in writing executed by a duly authorized official of the District Agency on behalf of the District, and by a duly authorized representative of the Owner. Any amendment to this Covenant that alters the terms and conditions set forth herein shall be recorded among the Land Records before it shall be deemed effective.

## ARTICLE X
## TERM OF COVENANTS

All Inclusionary Units in the Inclusionary Development shall be sold or leased in accordance with the terms of this Covenant for so long as the Inclusionary Development and any Inclusionary Unit therein exists. Notwithstanding the foregoing, this Covenant (a) shall be released and extinguished upon the satisfaction of the requirements contained in Section 8.4 in the event of foreclosure or a deed in lieu thereof or (b) may be released upon the reasonable approval of the District Agency.

## ARTICLE XI
## NOTICES

Any notices given under this Covenant shall be in writing and delivered by certified mail (return receipt requested, postage pre-paid), by hand, or by reputable private overnight commercial courier service to the applicable Person at the addresses identified in this Article, or to such other persons or locations as may be designated by the District Agency or Owner from time to time. All notices to be sent to the District Agency shall be sent to the following address:

DISTRICT AGENCY:

Department of Housing and Community Development
1800 Martin Luther King, Jr. Ave., SE
Washington, DC 20020
Attention: Director
Re: Inclusionary Zoning Program

All notices to be sent to the Inclusionary Development Owner shall be sent to the address given in the preamble. All notices to be sent to the Inclusionary Unit Owner shall be sent to the address on record with the District of Columbia Office of Tax and Revenue. All notices to be sent to any Inclusionary Unit Tenant shall be sent to the unit number referenced in its lease. Notices shall be deemed delivered as follows: (i) if hand delivered, then on the date of delivery

or refusal thereof; (ii) if by overnight courier service, then on the next business day after deposit with the overnight courier service; and (iii) if by certified mail (return receipt requested, postage pre-paid), then on the date of actual delivery or refusal thereof.

## ARTICLE XII
## MISCELLANEOUS

12.1 **Applicable Law: Forum for Disputes**.  This Covenant shall be governed by, interpreted under, and construed and enforced in accordance with the laws of the District of Columbia, without reference to the conflicts of laws provisions thereof.  The Owner and the District irrevocably submit to the jurisdiction of the courts of the District of Columbia for the purposes of any suit, action or other proceeding arising out of this Covenant or any transaction contemplated hereby. The Owner and the District irrevocably and unconditionally waive any objection to the laying of venue of any action, suit or proceeding arising out of this Covenant or the transactions contemplated hereby in the courts of the District of Columbia, and hereby further waive and agree not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

12.2 **Counterparts**.  This Covenant may be executed in any number of counterparts, each of which shall be an original but all of which shall together constitute one and the same instrument.

12.3 **Time of Performance**.  All dates for performance (including cure) shall expire at 5:00 p.m. (Eastern Time) on the performance or cure date.  A performance date which falls on a Saturday, Sunday or District holiday is automatically extended to the next Business Day.

12.4 **Waiver of Jury Trial**.  TO THE EXTENT PERMITTED BY LAW, ALL PARTIES HERETO WAIVE THE RIGHT TO TRIAL BY JURY IN CONNECTION WITH ANY LITIGATION ARISING IN RESPECT OF THIS COVENANT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.5 **Further Assurances**.  Each party agrees to execute and deliver to the other party such additional documents and instruments as the other party reasonably may request in order to fully carry out the purposes and intent of this Covenant; provided that such additional documents and instruments do not materially increase the obligations or burdens upon the second party.

12.6 **Severability**.  If any provision of this Covenant is held to be unenforceable or illegal for any reason, said provision shall be severed from all other provisions.  Said other provisions shall remain in effect without reference to the unenforceable or illegal provision.

12.7 **Limitation on Liability**.  Provided that the Owner has exercised reasonable due diligence in the performance of its obligations and duties herein, no Owner shall be liable in the event a Household submits falsified documentation, commits fraud, or breaches any representation or warranty contained in this Covenant.  Notwithstanding the foregoing, the Owner shall be liable if the Owner has knowledge that a Household submitted falsified documentation, committed fraud, or breached any representation or warranty contained in this Covenant.

12.8 **District Agency Limitation on Liability.** Any review or approval by the District or the District Agency shall not be deemed to be an approval, warranty, or other certification by the District or the District Agency as to compliance of such submissions, the Inclusionary Development, any Inclusionary Unit or Property with any building codes, regulations, standards, laws, or any other requirements contained in this Covenant or any other covenant granted in favor of the District that is filed among the Land Records; or otherwise contractually required. The District shall incur no liability in connection with the District Agency's review of any submissions required under this Covenant as its review is solely for the purpose of protecting the District's interest under this Covenant.

12.9 **No Third Party Beneficiary.** Except as expressly set forth in this Covenant, there are no intended third party beneficiaries of this Covenant, and no Person other than District shall have standing to bring an action for breach of or to enforce the provisions of this Covenant.

12.10 **Interpretation.** Except as otherwise provided herein, this Covenant shall be subject to the terms of the IZ Laws, as such requirements may have been waived by the Waiver, if any. If there is conflict between any term of this Covenant and the IZ Laws, the IZ Laws shall control except for the provisions relating to the calculation of the Maximum Resale Price contained in **Schedule 1**.

12.11 **Representations of Inclusionary Development Owner.** The Inclusionary Development Owner hereby represents and warrants to District as follows:

(a) The Inclusionary Development Owner is the fee owner of the Site;

(b) This Covenant has been duly executed and delivered by the Inclusionary Development Owner, and constitutes the legal, valid and binding obligation of the Inclusionary Development Owner, enforceable against the Inclusionary Development Owner, and its successors and assigns, in accordance with its terms;

(c) Neither the entering into of this Covenant nor performance hereunder will constitute or result in a violation or breach by Inclusionary Development Owner of any agreement or order which is binding on the Inclusionary Development Owner; and

(d) To the extent the Inclusionary Development Owner is an entity, the Inclusionary Development Owner (i) is duly organized, validly existing and in good standing under the laws of its state of jurisdiction and is qualified to do business and is in good standing under the laws of the District of Columbia, (ii) is authorized to perform under this Covenant and (iii) has all necessary power to execute and deliver this Covenant.

*[Signatures on Following Pages]*

13

**IN TESTIMONY WHEREOF**, the Inclusionary Development Owner has caused these presents to be signed, acknowledged and delivered in its name by _Matt Scorzafava_, its duly authorized _Agent_, witnessed by _Ian McLaughlin_, its _Architect_

WITNESS

By: _____
Name: _Ian McLaughlin_
Title: _Architect_

INCLUSIONARY DEVELOPMENT OWNER

By: _____ [SEAL]
Name: _Mathew Scorzafava_
Title: _V.P._

_____

ss.

_____

I, _Pranil Acharya_, a Notary Public in and for the _District of Columbia_ DO HEREBY CERTIFY THAT _Mathew Scorzava_ who is personally known to be (or proved by oaths of credible witnesses to be) the person named as _V.P._ for the Inclusionary Development Owner in the foregoing and annexed Inclusionary Development Covenant, bearing the date of the _May 30th 2018_ personally appeared before me in said _District of Columbia_ and as _May 30th 2018_ acting on behalf of Inclusionary Development Owner, as aforesaid, acknowledged the same to be his/her free act and deed.

Given under my hand and seal this _30th_ day of _May, 2018_

_____
Notary Public

My Commission Expires: _01/31/2023_

14

**THIS INCLUSIONARY DEVELOPMENT COVENANT FOR THE DEVELOPMENT AT** _____ **IS APPROVED AND ACCEPTED THIS** 17th **DAY OF** July **, 20**18 :

WITNESS

By: Mozella Boyd Johnson
Name: Mozella Boyd Johnson
Title: Staff Assistant

DISTRICT OF COLUMBIA

By: _____
Name: Mary R. (Polly) Donaldson
Title: Director, Department of Housing and Community Development

Approved as to Legal Sufficiency:

Name: Julia A. Tiley
Date: 7/11/18
By: Office of the General Counsel

District of Columbia, ss:

I, Mae J. White-Jennings, a Notary Public in and for the District of Columbia, do hereby certify that Mary R. (Polly) Donaldson, the Director of the D.C. Department of Housing and Community Development, on behalf of the District of Columbia, personally appeared before me in said jurisdiction, and, being personally known to me (or satisfactorily proven) to the person whose name is subscribed to the foregoing Inclusionary Development Covenant, and that she, in such capacity, being authorized to do so, executed the foregoing instrument for the purposes therein contained, and acknowledged the same to be the act and deed of the District of Columbia.

Given under my hand and seal this 17th day of, July 2018 .

mae J. white Jennings
Notary Public, D.C.

My commission expires: _____

MAE J. WHITE-JENNINGS
Notary Public, District of Columbia
My Commission Expires Nov. 30, 2020

Exhibit A

Legal Description

Lots numbered Fifteen (15) and Sixteen (16) in Square numbered Twenty-nine Hundred Twenty-six (2926), as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber County 24 at folio 11.

Said property being now known for purposes of assessment and taxation as Lot numbered Eighteen (18) in Square numbered Twenty-nine Hundred Twenty-six (2926).

Also

Lot numbered Eighteen (18) in Square numbered Twenty-nine Hundred and Twenty-six (2926) as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber 160 at folio 156.
Said property being formerly known as Lot numbered Fifteen (15) and Sixteen (16) in Square numbered Twenty-nine Hundred and Twenty-six (2926), "SAUL'S ADDITION TO THE CITY OF WASHINGTON", as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber County 24 at folio 11.

Exhibit A

**EXHIBIT B**
**Certificate of Inclusionary Zoning Compliance**

**[See attached]**



**DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS**
**CERTIFICATE OF INCLUSIONARY ZONING COMPLIANCE (CIZC) APPLICATION**



GOVERNMENT OF THE DISTRICT OF COLUMBIA
MURIEL BOWSER, MAYOR

Consult the Instructions Guide to complete this application

## SECTION A – BUILDING PERMIT AND PROJECT INFORMATION (All information must match building permit application, where applicable)

| 1. Name of Inclusionary Development | 2. Address(es) of Inclusionary Development |
|---|---|
| 4910 Georgia Ave | 4910 Georgia Ave NW Washington DC 20011 |

| 3. Square/Suffix | 4. Lot(s) | 5. Ward | 6. Zoning District | 7. Zoning Commission or BZA Order (if applicable) | 8. Building Permit Application |
|---|---|---|---|---|---|
| 2926 | 0018 | 4 | MU-4 | N/A | Date 03 / 28 / 18   Number B1805827 |

| 9. Owner of Building or Property | 10. Owner Address (include ZIP code) | 11. Owner Phone # & Email |
|---|---|---|
| 4910 Georgia Avenue LLC | 10135 Bacon Dr. Beltsville, MD 20705 | 240-762-1657; matt@erbproperties.com |

| 12. Agent for Owner | 13. Agent Address (include ZIP code) | 14. Agent Phone # & Email |
|---|---|---|
| Charles Warren | 515 M St SE Suite 200 | 202-683-6260; charles@teass-warren.com |

| 15. Is the development exempt from IZ per C-1001.6(a)? | 16. Is the development an RF conversion? | 17. Is the development an IZ "opt in" per C-1001.2(e)? | 18. Does the project involve construction of penthouse habitable space? | 19. Construction Type (for Majority of Residential Units) |
|---|---|---|---|---|
| ☐ Yes ☑ No | ☐ Yes ☑ No | ☐ Yes ☑ No | ☑ Yes. Fill out Penthouse Affordable Housing Addendum   ☐ No | ☐ Type 1   ☑ Other |

| 20. Total Land Area of the Lot(s) of the Inclusionary Development | 21. Total Gross Floor Area (all uses) | 22. Total Residential Gross Floor Area | 23. If the IZ requirement applies only to an addition per C-1001.4, the Total Residential Gross Floor Area of addition (or enter N/A) |
|---|---|---|---|
| 9,455 sq. ft. | 28165 sq. ft. | 28165 sq. ft. | N/A sq. ft. |

| 24. Total *Residential Gross* Floor Area Including Residential Add-ons | | 25. Total *Net Residential* Floor Area Including Residential Add-ons | | 26. Ratio of Box 25 ÷ Box 24 (totals) |
|---|---|---|---|---|
| Residential Gross Floor Area (Same as Box 22 or 23) | 28,165 sq. ft. | Net Residential Floor Area (Based on Box 22 or 23) | 21,289 sq. ft. | 0.74 |
| + Gross cellar area (when res. units are in cellar) | 6536 sq. ft. | + Net cellar area (when res. units are in cellar) | 4253 sq. ft. | 27. Factor yielding greater IZ (per C-1003) |
| + Gross enclosed public space projections | 438 sq. ft. | + Net enclosed public space projections | 312 sq. ft. | ☐ 8% or ☐ 10% of GFA   ☐ 50% or ☑ 75% of bonus density |
| Total Residential Gross Floor Area for IZ Analysis (sum) | 35,139 sq. ft. | Total Net Residential Area for IZ Analysis (sum) | 25,854 sq. ft. | |

| 28. Preliminary IZ requirement within the Development (the greater IZ requirement yielded from Box 27 factor in gross and net terms) | 29. If the Development is exclusively ownership units and will devote all IZ units to 60% of MFI, then a 20% reduction to Box 28(b) per C-1003.10 (or enter N/A) | 30. Penthouse IZ Requirement within building (See Penthouse Affordable Housing Addendum) or enter N/A. | 31. Is the Penthouse IZ Requirement fulfilled by payment to housing trust fund? |
|---|---|---|---|
| (a) Residential *Gross* Floor Area    3546 sq. ft. | | 0 sq. ft. | ☑ Yes   ☐ No |
| (b) *Net* Residential Floor Area    2609 sq. ft. | 2088 sq. ft. | 32. Total Net Residential IZ Required Within the Development (Box 28(b) or Box 29) ÷ (Box 30 if provided within the Development))    2088 sq. ft. | |

## SECTION B – IZ UNIT CLASSIFICATION

| Unit or Dwelling Type | | All Units (#) | Market Rate Units (# and % of total Market Rate Units) | | IZ Units (# and % of total IZ units) | | IZ Income Set-Aside (#) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 50% of MFI | 60% of MFI | 80% of MFI |
| Multiple Dwellings | Studio units | 9 | # 9 | % 21.43 | # 0 | % 0 | | | |
| | 1-bedroom units | 23 | # 12 | % 52.38 | # 1 | % 33.33 | | 1 | |
| | 2 or more bedroom units | 13 | # 11 | % 26.19 | # 2 | % 66.67 | | 2 | |
| | Total | 45 | # 42 | % 100 | # 3 | % 100 | | 3 | |
| Single household dwellings and flats | Single household dwellings | | # | % | # | % | | | |
| | Flats | | # | % | # | % | | | |

## SECTION C – IZ ITEMIZATION (If more than 10 units, continue unit information on a supplemental page)

| No. | Inclusionary Unit Number, Dwelling Address, or Lot | Floor Number | Net Square Feet | Number of Bedrooms | Income Set-Aside 50%, 60%, or 80% of MFI, or other | Tenure (Sale/Rental) | Estimated Date of Availability | Square feet added to Unit from Penthouse IZ Requirement |
|---|---|---|---|---|---|---|---|---|
| 1. | 006 | C | 790 | 2 | 60 | SALE | NOV 2019 | |
| 2. | 107 | 1 | 542 | 1 | 60 | SALE | NOV 2019 | |

(rev. 6.5.17)

| No. | Inclusionary Unit Number, Dwelling Address, or Lot | Floor Number | Net Square Feet | Number of Bedrooms | Income Set-Aside 50%, 60%, or 80% of MFI, or other | Tenure (Sale/Rental) | Estimated Date of Availability | Square feet added to Unit from Penthouse IZ Requirement |
|---|---|---|---|---|---|---|---|---|
| 3. | 201 | 2 | 786 | 2 | 60 | SALE | NOV 2019 | |
| 4. | | | | | | | | |
| 5. | | | | | | | | |
| 6. | | | | | | | | |
| 7. | | | | | | | | |
| 8. | | | | | | | | |
| 9. | | | | | | | | |
| 10. | | | | | | | | |

| Total Net Residential IZ Proposed: | 2118 sq. ft. | | | Total Added for Penthouse Requirement: | sq. ft. |
|---|---|---|---|---|---|

## SECTION D – OTHER IZ REQUIREMENTS

1. Do the bedrooms meet the definition (per B-100.2)?
☑Yes   ☐No

2. Tenure of all market rate units:
☑Sale   ☐Rental

3. Will the construction be phased?
☐Yes (attach a phasing plan)   ☑No

4. Are any units reserved for tenant right of return?
☐Yes. If yes, list unit #s: _____
☑No

5. Are any units "off-site units for another IZ development"?
☐Yes. If yes, provide BZA Order and list unit #s: _____
☑No

6. Review Section G and check the box to acknowledge that necessary information and materials for the *Information* and *Analysis* checklists have been provided: ☑

## SECTION E – PROJECT ARCHITECT'S OR PROJECT ENGINEER'S INCLUSIONARY UNIT CERTIFICATION

| 1. Name: Charles Warren | 2. D.C. Lic. No. 100642 | 3. Address: *(include ZIP code)* 515 M St SE Suite 200 Washington DC 20003 | 4. Phone # and Email 202-683-6260; email@teass-warren.com |
|---|---|---|---|

I certify to the best of my knowledge that the size of each Inclusionary Unit is at least ninety-eight percent (98%) of the average size of the same type of Market Rate unit in the Inclusionary Development, or at least ninety-eight percent (98%) of the size indicated on the table found in 14 DCMR Chapter 22 Inclusionary Zoning Implementation §2202.4(f).

Signature of Project Architect/Engineer: _____   Date: 2018.05.16 11:02:25-04'00' Date: 2018-05-29

## SECTION F – APPLICANT'S SIGNATURES

Owner: I hereby certify that I am the owner of the property, that the application and plans are complete and correct to the best of my knowledge, that if a permit (or permits) is issued, construction will conform to the D.C. construction codes, the Zoning Regulations, and other applicable laws and regulations of the District of Columbia.

Signature: _____   Address: 10135 Bacon Design Bethesda, MD 20705 Date: 5/30/18

Agent: I hereby certify that I have the authority of the owner to make this application. I declare that the application and plans are complete and correct to the best of my knowledge, that if a permit (or permits) is issued, construction will conform to the D.C. construction codes, the Zoning Regulations, and other applicable laws and regulations of the District of Columbia.

Signature: _____ 2018.05.16 11:02:25-04'00'   Address: 515 M St SE Ste 200 WDC 20003   Date: 2018-05-29

## SECTION G – ZONING ADMINISTRATOR CHECKLIST (OFFICIAL USE ONLY)

| | | Yes | No | N/A | Comments |
|---|---|---|---|---|---|
| **Information:** Is the application complete? | | | | | |
| 1. | Does CIZC information match the building permit application? | 1. ☐ | 1. ☐ | 1. ☐ | |
| 2. | Floor plans and elevations (with IZ units identified in the floor plans) | 2. ☐ | 2. ☐ | 2. ☐ | |
| 3. | DC surveyor's plat | 3. ☐ | 3. ☐ | 3. ☐ | |
| 4. | DHCD draft Inclusionary Development Covenant approval | 4. ☐ | 4. ☐ | 4. ☐ | |
| 5. | Schedule of interior finishes, fixtures, equipment, and appliances comparing market rate and IZ units | 5. ☐ | 5. ☐ | 5. ☐ | |
| 6. | Copy of phased development plan | 6. ☐ | 6. ☐ | 6. ☐ | |
| 7. | Copy of Board of Zoning Adjustment or Zoning Commission Order | 7. ☐ | 7. ☐ | 7. ☐ | |
| 8. | DHCD letter of exemption from IZ | 8. ☐ | 8. ☐ | 8. ☐ | |
| 9. | $250 application fee (made out to DC Treasurer) | 9. ☐ | 9. ☐ | 9. ☐ | |
| 10. | Penthouse IZ Addendum | 10. ☐ | 10. ☐ | 10. ☐ | |
| 11. | Are all signatures present? | 11. ☐ | 11. ☐ | 11. ☐ | |
| **Analysis:** Does the application demonstrate compliance? | | | | | |
| 1. | Is the net square footage of the Inclusionary Units sufficient? | 1. ☐ | 1. ☐ | 1. ☐ | |
| 2. | Are the exterior design, materials and finishes of the Inclusionary Units comparable to the market rate units? | 2. ☐ | 2. ☐ | 2. ☐ | |
| 3. | Are interior finishes and appliances of the Inclusionary Units comparable to market rate units? | 3. ☐ | 3. ☐ | 3. ☐ | |
| 4. | Are the Inclusionary Units of the appropriate minimum size? | 4. ☐ | 4. ☐ | 4. ☐ | |
| 5. | Is the proportion of Inclusionary studio units less than the proportion of market rate studio units? | 5. ☐ | 5. ☐ | 5. ☐ | |
| 6. | Is the proportion of Inclusionary 1-bedroom units less than the proportion of market rate 1-bedroom units? | 6. ☐ | 6. ☐ | 6. ☐ | |
| 7. | Are Inclusionary Units overly concentrated on any floor? | 7. ☐ | 7. ☐ | 7. ☐ | |
| 8. | Are Inclusionary Units allocated appropriately to 50%, 60%, and 80% of MFI? | 8. ☐ | 8. ☐ | 8. ☐ | |
| 9. | Will the Inclusionary units be constructed at a proportional rate to the market rate units? | 9. ☐ | 9. ☐ | 9. ☐ | |
| 10. | Are any Inclusionary Units located off-site? | 10. ☐ | 10. ☐ | 10. ☐ | |

ZONING ADMINISTRATOR – This certifies that the Certificate of Inclusionary Zoning Compliance is hereby: ☑Approved   ☐Denied due to the items checked above

Signed: _____   Date: 7-11-18

**Schedule 1**

**Provisions Governing Calculation of Maximum Resale Price**

1.    The Maximum Resale Price ("MRP") for a subsequent sale of a For Sale Inclusionary Unit shall be determined through use of the formula MRP = P  x ( F) + V ("Formula"), where:

>    (a)    P = the price the Owner paid for the Inclusionary Unit;
>
>    (b)    V = the sum of the value of the Eligible Capital Improvements and Eligible Replacement and Repair Costs, as determined by the District Agency pursuant to this section; and
>
>    (c)    F = the sum of the Ten Year Compound Annual Growth Rates of the Area Median Income ("AMI") from the year of the Owner's purchase of the For Sale Inclusionary Unit to the year of the sale of the For Sale Inclusionary Unit by the Inclusionary Unit Owner.  This sum may be expressed:
>
>>    (1)    As the result of the formula $F = (1 + [((AMI\ Year\ m\ /AMI\ Year\ m\text{-}10) ^ (1/10) \text{-}1) + ... ((AMI\ Year\ k\ /AMI\ year\ k\text{-}10) ^ (1/10) \text{-}1) / n]) ^ n$, where m = the year in which the Inclusionary Unit was purchased by the Owner, k = the year in which the Inclusionary Unit is sold by the Owner, and n = the number of years the Inclusionary Unit is owned by the Owner; or
>>
>>    (2)    As published by the District Agency.

2.    For the purposes of determining the value of "V" in the Formula, the following improvements made to a For Sale Inclusionary Unit after the date of purchase may be included at the percentage of cost indicated, to the extent they are permanent in nature and add to the market value of the property:

>    (a)    Eligible Capital Improvements, which will be valued at 100% of reasonable cost, as determined by the District Agency; and
>
>    (b)    Eligible Replacement and Repair Costs, which shall be valued at 50% of reasonable cost, as determined by the District Agency.

3.    Ineligible costs shall not be included in the determining the value of "V" in the Formula.

4.    The value of improvements may be determined by the District Agency based upon documentation provided by the Inclusionary Unit Owner or, if not provided, upon a standard value established by the District Agency.

5.    The District Agency may disallow an Eligible Capital Improvement or Eligible Replacement and Repair Cost if the District Agency finds that the improvement diminished or did not increase the fair market value of the For Sale Inclusionary Unit.

6.    The District Agency may reduce the value of a capital improvement if there is evidence of abnormal physical deterioration of, or abnormal wear and tear to, the capital improvement.

7.    The Owner shall permit a representative of the District Agency to inspect the For Sale Inclusionary Unit upon request to verify the existence and value of any capital improvements that are claimed by the Owner.

8.    No allowance shall be made in the Maximum Resale Price for the payment of real estate brokerage fees associated with the sale of the For Sale Inclusionary Unit.

9.    The value of personal property transferred to a purchaser in connection with the resale of a For Sale Inclusionary Unit shall not be considered part of the sales price of the For Sale Inclusionary Unit for the purposes of determining whether the sales price of the For Sale Inclusionary Unit exceeds the MRP.

10.   Any capitalized terms used in this Schedule that are not defined herein shall have the meanings set forth in the Covenant.  As used in this Schedule, the following capitalized terms shall have the meanings indicated below:

**Eligible Capital Improvement**:  major structural system upgrades, special assessments, new additions, and improvements related to increasing the health, safety, or energy efficiency of an Inclusionary Unit.  Such improvements generally include: (i) major electrical wiring system upgrades; (ii) major plumbing system upgrades; (iii) room additions; (iv) installation of additional closets and walls; (v) alarm systems; (vi) smoke detectors; (vii) removal of toxic substances, such as asbestos, lead, mold, or mildew; (viii) insulation or upgrades to double-paned windows or glass fireplace screens; and (ix) upgrade to Energy Star built-in appliances, such as furnaces, water heaters, stoves, ranges, dishwashers, and microwave hoods.  Improvements that meet these criteria will be given 100% credit by the District Agency.

**Eligible Replacement and Repair Cost**:  in-kind replacement of existing amenities and repairs and general maintenance that keep an Inclusionary Unit in good working condition.  Such improvements generally include: (i) electrical maintenance and repair, such as switches and outlets; (ii) plumbing maintenance and repair, such as faucets, supply lines, and sinks; (iii) replacement or repair of flooring, countertops, cabinets, bathroom tile, or bathroom vanities; (viii) non-Energy Star replacement of built-in appliances, including furnaces, water heaters, stoves, ranges, dishwashers, and microwave hoods; (ix) replacement of window sashes; (x) fireplace maintenance or in-kind replacement; (xi) heating system maintenance and repairs; and (xii) lighting system.  Costs that meet these criteria will be given 50% credit for repairs as determined by the District Agency.

**Ineligible Costs:**  means costs of cosmetic enhancements, installations with limited useful life spans and non-permanent fixtures not eligible for capital improvement credit as determined by the District Agency.  These improvements generally include: (i) cosmetic enhancements such as fireplace tile and mantel, decorative wall coverings or hangings, window treatments (blinds, shutters, curtains, etc.), installed mirrors, shelving, refinishing of existing surfaces; (ii) non-permanent fixtures, such as track lighting, door knobs, handles and locks, portable appliances

(refrigerator, microwave, stove/ oven, etc.); and (iii) installations with limited useful life spans, such as carpet, painting of existing surfaces, window glass and light bulbs.

# EXHIBIT C
## Waiver

**[See attached, if any]**

Doc #: 2018071855 Fees: $0.00
07/19/2018 02:16 PM   Pages: 23
Filed and Recorded in Official Records of
WASH DC RECORDER OF DEEDS IDA WILLIAMS

# EXHIBIT B


## Partnership
1 message

**Daniel Huertas** <daniel@wcp.team>                                    Fri, Sep 20, 2019 at 2:54 PM
To: Charles Paret <cpp@colomariver.com>

Received Charlie.

Here is further confirmation that by providing the below capital including future capital to the partnership, this is debt  that will be split 51% Daniel Huertas, 49% Charles Paret.

Charles Paret will manage day to day operation of all projects (construction, development, stabilization) including in this email.

Daniel Huertas will manage all financial aspects related to capital, partnerships, ventures and will have final word related to execution of the real estate.

Charles Paret is responsible solely for all debt and obligations prior to 9/20/19. (payments)

Charles Paret is not going to incur any additional debt or loans against real estate attached to this email or any purchase of any additional real estate.

Please return with Agree and confirm that we will operate as such.

Daniel Huertas | CEO
Washington Capital Partners
www.washingtoncapitalpartners.com
2815 Hartland Road, Suite 200

Falls Church, VA, 22043
+1 7037275464





*This message and its attachments contain confidential information. If you are not the intended recipient of this message, you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately if you have received this e-mail by mistake and delete it from your system.*

**From:** Charles Paret <cpp@colomariver.com>
**Sent:** Friday, September 20, 2019 2:10 PM
**To:** Daniel Huertas <daniel@wcp.team>
**Subject:** REVISED: Construction Breakdown for Immediate Draws To Push Work // Main - Portfolio Draw #101


This is the immediate list so I can make sure people are getting things done.   I did payroll a week ago, so we have until next week to get that done and organized with you.    This is more than $200,000, but everyone has stopped until I give them a deposits.


I'm focusing on the things that we need to pay to get done ASAP - cannot wait and Contractors need to get paid.


**$150,000 - TOTAL  - not including furniture that I sent you break down for.**


HVAC Contractor - $25,000 - deposit for the 1264-1266 Holbrook St. - One Stop Heating and Cooling

Electrical Contractor - $10,000 - deposit for the - Renee Duartes

Concrete Contractor - $25,000 - TEX MEX - deposit for 1264-1268 and concrete work at bladensburg

Concrete Contractor - $35,000 - TEX MEX - deposit for foundation work at bladensburg

Foundation Contractor - Mario and Sons - $15,000 - deposit for P Street work

Utility Contractor - $20,000 - 1264-1268 - AGS Enterprises

Finish Work / Punch Work for 1260 Holbrook St NE and Trinidad Ave NE- $10,000. ( still need around $65,000 to finish)- Mario and Sons - NEEDS TO BE PAID - All people have stopped.

DCRA - Permit Due - $10,000 for 2507 I ST NW - Velocity Permit Process. - need to pay this ASAP to get it out ASAP.

We have a 4pm meeting with entire team to work on the new schedule for next week to bring all of these to the finish line.

I REALLY need to make sure you and I meet this weekend to go over all of this.   I'm going to be 100% focused on bringing all of these to a close.   We have a huge opp with Common.com now and they could master-lease ALL of the properties in Trinidad, but they need to get done.

–

Charles Paxton Paret

Managing Partner

e.  cpp@colomariver.com

m.  202.834.7673

D C  |  N Y C  |  A T L  |  L A

This communication, including attachments, is for the exclusive use of

the named recipient and may contain proprietary, confidential or

privileged information. If you are not the intended recipient, any

use, copying, disclosure, dissemination or distribution is strictly

prohibited. If you are not the intended recipient, please notify the

sender immediately by return email and delete this communication and

destroy all copies. Unless specifically noted, the views, opinions and

statements contained within this communication should not be construed

to be the official position of

Coloma River Holdings

, LLC.

**Copy of Coloma River Assets Debt Construction ARV_FULL Project_Pipeline_DANIEL.xlsx**
15K

# EXHIBIT C

# OPERATING AGREEMENT

# OF

# 4910 GEORGIA AVE HOLDINGS LLC

<u>LIMITED LIABILITY COMPANY OPERATING AGREEMENT</u>

<u>4910 GEORGIA AVE HOLDINGS LLC</u>

THIS OPERATING AGREEMENT, effective as of September 12th, 2018, is entered into by Charles Paret ("Paret") each of which is referred to individually as "Member" and collectively as "Members." In consideration of the mutual promises contained in this Operating Agreement (this, "Agreement"), the Members agree as follows:

## ARTICLE 1

## THE LIMITED LIABILITY COMPANY

Section 1.1    <u>Formation</u>. The Members hereby form a limited liability company upon the terms and conditions provided in this Agreement, subject to the provisions of Section 18-101 of the Washington D.C. Limited Liability Act as the same may be amended from time to time and any successor to such Act.

Section 1.2    <u>Name</u>. The name of the limited liability company shall be 4910 GEORGIA AVE HOLDINGS LLC (the "Company").

Section 1.3    <u>Articles of Organization</u>. On September 12th, 2018, the Members caused the Articles of Organization for 4910 GEORGIA AVE HOLDINGS LLC, a limited liability company under the laws of the Washington D.C., to be filed with the Washington D.C.'s Division of Corporations.  In the future, the Members shall execute such further documents and take such further action as shall be appropriate or necessary to comply with the requirements of law for the formation and operation of a limited liability company in all jurisdictions where the Company elects to carry on its business.

Section 1.4    <u>Business</u>. The purposes for which the Company is organized are (i) the investment, ownership and management of real property, (ii) the investment, ownership and management of personal property, (iii) other lawful investments, (iv) to engage in all other lawful activities as are reasonably necessary to carry out the foregoing purposes of the Company and (v) to engage in all activities pursuant to and in accordance with §13.1-1008 of the Washington D.C. Limited Liability Act. Title to any property held by the Company may, by unanimous agreement of the Managers, be held by a nominee on behalf of the Company. The Company may sell or otherwise dispose of all or substantially all of its assets and any such sale or disposition shall be considered to be within the scope of the Company's business.

Section 1.5    <u>Additional Members</u>. Additional Members shall not be admitted to the Company without the prior written consent of all of the Members**.**

2

## ARTICLE 2

## DEFINITIONS

Section 2.1    Cash Flow. "Cash Flow" shall mean the excess of all cash receipts of the Company over all cash disbursements of the Company except that cash flow shall not include any amount that represents a return of the capital invested by the Company that is being held for reinvestment or for return to the Members under Section 4.2(a).

Section 2.2    Code. "Code" shall mean the Internal Revenue Code of 1986, as amended, or any successor statute.

Section 2.3    Manager or Managers. "Manager" or "Managers" shall mean a person or persons elected by the Members to manage the Company.  The Managers shall be "Charles Paret".

Section 2.4    Profit or Loss. "Profit" or "Loss" shall mean the profit or loss of the Company as determined under the capital accounting rules of Treasury Regulation §1.704-1(b)(2)(iv) for purposes of adjusting the capital accounts of the Members, including, without limitation, the provisions of paragraphs (b), (f), and (g) of those regulations relating to the computation of items of income, gain, deduction, and loss.

Section 2.5    Total Cost and Investment. "Total Cost and Investment" shall mean, with respect to each project (a "Project"), the total expenditures to acquire, improve, develop, remodel, rehabilitate, hold, and otherwise prepare any property for sale including, without limitation, money used to purchase the property (including closing costs) and to renovate the property but does not include selling costs.

Section 2.6    Sharing Ratio.  The "Sharing Ratio" of each Member shall be as follows:

Charles Paret                                100%

Section 2.7    Treasury Regulations. "Treasury Regulations" shall mean regulations promulgated by the Department of Treasury under the Code.  Any reference to a specific section or sections of the Treasury Regulations shall be deemed to include a reference to any corresponding provision of future regulations promulgated under the Code.

Section 2.8    Voting Interest. "Voting Interest" shall mean a number of votes equal to a Member's Sharing Ratio multiplied by 100.

## ARTICLE 3

3

## CAPITAL CONTRIBUTIONS

Section 3.1    <u>Initial Capital Contributions</u>. Upon execution of this Agreement, the Members shall make initial capital contributions to the Company in the following amounts:

|  |  |
|---|---|
| Paret | $240,000.00 |

Section 3.2    <u>Additional Capital Contributions</u>.  If additional capital contributions are required at any time, any of the following steps may be taken:

(a) the necessary amount may be contributed by one or more of the existing Members in such shares as they may agree upon and the Sharing Ratios may be adjusted accordingly;

(b) a new Member may be admitted to the Company and make part or all of the required contribution and the Sharing Ratios may be adjusted accordingly; or

(c) the funds may be borrowed from any source, including any existing Member or Members.

Section 3.3    <u>Return of Capital Contributions</u>. Capital contributions shall be expended in furtherance of the business of the Company. All costs and expenses of the Company shall be paid from its funds. No Manager shall have any personal liability for the repayment of any capital contribution to a Member.

## ARTICLE 4

## DISTRIBUTIONS

Section 4.1    <u>Nonliquidating Distributions</u>.  Except as provided in Section 4.2 or otherwise agreed to by the Members, the Company shall make distributions of Cash Flow to the Members after each Project (reconciled annually) as follows:

(a) first to Charles Paret until it has received an amount of Cash Flow equal to its Capital Contribution.

Section 4.3    Liquidating Distributions. All distributions made in connection with the dissolution of the Company pursuant to Article 12, shall be made to the Members in the following order of priority:

(a) first, to the Members in proportion to each Member's initial capital contributions set forth under Article 3, until each Member's capital contributions have been returned in full under this paragraph.

## ARTICLE 5

## ALLOCATION OF PROFIT AND LOSS

Section 5.1    Determination of Profit and Loss.  Profit or Loss shall be determined on an annual basis and for such other periods as may be required.

Section 5.2    Profit Allocation.

(a)    Except as provided in Sections 5.2(b) and 5.4, Profit shall be allocated to Members as follows:

(i.)    first, to the Members, until they have been allocated an amount of Profit under this clause (i) on a cumulative basis equal to the Losses previously allocated to them on a cumulative basis under Section 5.3; then

(ii.)    the balance, to the Members in proportions equal to their membership in the company.

(b)    Any Profit or Loss with respect to the sale, exchange or other disposition of all or substantially all of the Company's assets or with respect to the sale, exchange or other disposition of assets in connection with the liquidation of the Company shall be allocated among the Members, so as to cause the balance in each Member's capital account to equal the amount that Member would be entitled to receive under Section 4.2 if all the assets of the Company (after the payment of liabilities) were distributed to the Member under that Section (the "Target Amounts").  If the Profit or Loss allocable under this Section 5.2(b) is not sufficient to cause the balances in the Members' capital accounts to be the Target Amounts, then items of income, gain, deduction and loss making up such Profit or Loss shall be allocated among the Members in the manner that would most nearly (on an aggregate basis) bring the balances in the Member's capital accounts to the Target Amounts.

(c)    For purposes of Section 5.2(b), the capital accounts of the Members shall be determined (i) before giving effect to distributions under Section 4.2, (ii) after

allocating all other items of Profit and Loss, and (iii) after making all distributions pursuant to Section 4.1.

(d)      If the Profit with respect to the sale of all or substantially all of the Company assets is reported on the installment sale method for federal income tax purposes, the portion of the Profit allocated to each Member under the provisions of paragraph 5.2(b) for each year shall be determined by the accountants for the Company under such reasonable standards, consistently applied, as will result in an allocation of the total Profit from the sale among the Members in accordance with the provisions of paragraph 5.2(b).

Section 5.3      <u>Allocation of Losses</u>.  Except as provided in Section 5.3(b) and Section 5.4, all Losses shall be allocated among the Members in accordance with their Sharing Ratios.

Section 5.4      <u>Regulatory Allocations and Curative Provision</u>.

The "qualified income offset" provisions of Treasury Regulation section 1.704-1(b)(2)(ii)(d) are incorporated herein by reference and shall apply to adjust the allocation of Profit and Loss otherwise provided for under Sections 5.2 and 5.3 to the extent provided in that regulation.

The "minimum gain" provisions of Treasury Regulation section 1.704-2 are incorporated herein by reference and shall apply to adjust the allocation of Profit and Loss otherwise provided for under Sections 5.2 and 5.3 to the extent provided in that regulation.

Notwithstanding the provisions of Section 5.3, if during any fiscal year of the Company the allocation of any loss or deduction, net of any income or gain, to a Member would cause or increase a negative balance in a Member's capital account as of the end of that fiscal year, only the amount of such loss or deduction that reduces the balance to zero shall be allocated to the Member and the remaining amount shall be allocated to the other Members in accordance with their respective Sharing Ratios. For purposes of the preceding sentence, a capital account shall be reduced by the adjustments, allocations, and distributions described in Treasury Regulation sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6), and increased by the amount, if any, of the negative balance in the Member's capital account that the Member is obligated to restore within the meaning of Treasury Regulation section 1.704-1(b)(2)(ii)(c) as of that time or is deemed obligated to restore under Treasury Regulation section 1.704-2(g)(1) or section 1.704-2(i)(5).

All allocations pursuant to the foregoing provisions of this Section 5.4 (the "Regulatory Allocations") shall be taken into account in computing allocations of other items under Sections 5.2 and 5.3, including, if necessary, allocations in subsequent fiscal years, so that the net amounts reflected in the Members' capital accounts and the character for income tax purposes of the taxable income recognized (for example, as capital or ordinary) will, to the extent possible, be the same as if no Regulatory Allocations had been given effect.

**ARTICLE 6**

6

## ALLOCATION OF TAXABLE INCOME AND LOSS

Section 6.1    In General.

        (a) Except as provided in paragraph 6.1(b) and Section 6.2, each item of income, gain, loss, and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such item is allocated for capital account purposes under Article 5.

        (b) To the extent of any recapture income (as defined below) resulting from the sale or other taxable disposition of a Company asset, the amount of any gain from such disposition allocated to (or recognized by) a Member (or its successor in interest) for federal income tax purposes shall be deemed to consist of recapture income to the extent such Member (or such Member's predecessor in interest) has been allocated or has claimed any deduction directly or indirectly giving rise to the treatment of such gain as recapture income. For this purpose "recapture income" shall mean any gain recognized by the Company (but computed without regard to any adjustment required by sections 734 and 743 of the Code) upon the disposition of any property or asset of the Company that does not constitute capital gain for federal income tax purposes because such gain represents the recapture of deductions previously taken with respect to such property or assets.

Section 6.2    Allocation of Section 704(c) Items.  The Members recognize that with respect to property contributed to the Company by a Member and with respect to property revalued in accordance with Treasury Regulation section 1.704-1(b)(2)(iv)(f), there will be a difference between the agreed values or "carrying values" of such property at the time of contribution or revaluation and the adjusted tax basis of such property at that time.  All items of tax depreciation, cost recovery, amortization, amount realized, and gain or loss with respect to such assets shall be allocated among the Members to take into account the book-tax disparities in accordance with the provisions of sections 704(b) and 704(c) of the Code and the Treasury Regulations under those sections.

Section 6.3    Integration With Section 754 Election.  All items of income, gain, loss, deduction, and credit recognized by the Company for federal income tax purposes and allocated to the Members in accordance with the provisions of this Agreement, and all basis allocations to the Members, shall be determined without regard to any election under section 754 of the Code that may be made by the Company; provided, however, that such allocations, once made, shall be adjusted as necessary or appropriate to take into account the adjustments permitted by sections 734 and 743 of the Code.

Section 6.4    Allocation of Tax Credits.  All tax credits with respect to the Company's expenditure of funds shall be allocated in the same manner as the allocation of Profit for the period during which the expenditures giving rise to the tax credit are incurred.  If there is no

Profit during such period, tax credits shall be allocated in accordance with the Members' respective Sharing Ratios.

## ARTICLE 7

## MANAGEMENT

Section 7.1    <u>Management Authority</u>.

    (a) Management of the Company shall be vested in the Managers. The Managers shall have the power and authority to conduct the business of the Company and are hereby expressly authorized on behalf of the Company to make all decisions with respect to the Company's business and to take all actions necessary to carry out such decisions.

    (b) Any document executed on behalf of the Company for the purpose of buying or selling properties on behalf of the Company must be signed by the Managers.

Section 7.2    <u>Management Responsibilities</u>.  Charles Paret shall have the authority to manage the day-to-day operations of the Company including the renovation of properties owned by the Company.

Section 7.3    <u>Duties</u>.  The Managers shall carry out their duties in good faith, in a manner that it believes to be in the best interests of the Company and with such care as an ordinarily prudent person in a like position would use under similar circumstances. If the Managers so performs its duties, they shall not have any liability by reason of being or having been a Manager of the Company. The Managers shall devote such time to the business of the Company as the Managers, in their discretion, deem necessary for the efficient carrying on of the Company's business. The Managers shall at all times be free to engage in any business for its own account.

Section 7.4    <u>Number</u>. Initially, there shall be two Managers. The number of Managers may be increased or decreased by the vote of Members with aggregate Voting Interests of more than fifty-percent (50%), but no decrease shall have the effect of shortening the term of any incumbent Manager.

Section 7.5    <u>Tenure and Removal</u>. The initial Managers shall be "Charles Paret". The initial Managers shall hold office until the first annual meeting of the Members and until a successor has been elected and qualified. At the first annual meeting of Members and at each annual meeting thereafter, the Members shall elect Managers to hold office until the next succeeding annual meeting. Each Manager shall hold office for the term for which it is elected and until its successor has been elected and qualified.  At a properly called meeting, any Manager may be removed, with or without cause, by the vote of Members with aggregate Voting Interests of more than 50 percent.

Section 7.6    <u>Reliance by Third Parties</u>.  No third party dealing with the Company shall be required to ascertain whether the Manager is acting in accordance with the provisions of this Agreement. All third parties may rely on a document executed by the Manager as binding the Company. The foregoing provisions shall not apply to third parties who are affiliates of a Member or the Manager. If the Manager acts without authority, it shall be liable to the Members for any damages arising out of its unauthorized actions.

Section 7.7    <u>Resignation</u>.   The Managers may resign at any time by giving written notice of resignation to the Members. Unless otherwise specified in the notice, the resignation shall take effect upon receipt by the Members and the acceptance of the resignation shall not be necessary to make it effective.

Section 7.8    <u>Newly Created Manager Positions and Vacancies</u>.  Newly created Manager positions resulting from an increase in the number of Managers shall be filled by the vote of Members with aggregate Voting Interests of more than fifty-percent (50%).  A Manager elected to fill a position resulting from an increase in the number of Managers shall hold office until the next annual meeting of Members and until its successor has been elected and qualified. Vacancies occurring for any reason shall be filled by the vote of Members with aggregate Voting Interests of more than fifty-percent (50%). A Manager elected to fill a vacancy shall be elected to hold office for the unexpired term of its predecessor.

Section 7.9    <u>Transactions Between Company and Manager</u>.  Any Manager, on behalf of the Company, may contract and deal with itself and may cause any person or entity affiliated with the Manager to contract or deal with the Company; provided, however, that such contracts and dealings must be on terms comparable to and competitive with those available to the Company from others dealing at arm's length or must be approved in writing by all of the Members.

Section 7.10    <u>Management Fees and Reimbursements</u>. The Manager shall not be entitled to a management fee or salary for managing the operations of the Company. The Manager shall, however, be reimbursed by the Company for reasonable out-of-pocket costs incurred on behalf of the Company.

Section 7.11    <u>Insurance</u>. The Company shall maintain, for the protection of the Company and all of its Members, such insurance as the Managers, in its sole discretion, deems necessary for the operations being conducted.

Section 7.12    <u>Exculpation</u>. The Manager shall not be liable to the Company nor to any Member for any act or failure to act, nor for any errors of judgment, but only for willful misconduct or gross negligence. The Company shall indemnify and hold harmless the Managers and the agents and employees of the Managers against and from any personal loss, liability, or damage incurred as a result of any act or omission, or any error of judgment, unless such loss, liability, or damage results from such person's willful misconduct or gross negligence. Any such indemnification shall be paid only from the assets of the Company, and no Manager or third party shall have recourse against the personal assets of any Member for such indemnification.

ARTICLE 8

**MEMBERS**

Section 8.2    Quorum. A majority of the outstanding Voting Interests, represented in person or by proxy, shall be necessary to constitute a quorum at meetings of the Members.  Each of the Members hereby consents and agrees that one or more Members may participate in a meeting of the Members by means of conference telephone or similar communication equipment by which all persons participating in the meeting can hear each other at the same time, and such participation shall constitute presence in person at the meeting. If a quorum is present, the affirmative vote of the majority of the Voting Interests represented at the meeting and entitled to vote on the subject matter shall be the act of the Members, unless a greater number is required by the Act or this Agreement. In the absence of a quorum, those present may adjourn the meeting for any period, but in no event shall such period exceed sixty (60) days.

Section 8.3    Informal Action. Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting if the action is evidenced by a written consent describing the action taken, signed by each Member entitled to vote. Action taken under this section is effective when all Members entitled to vote have signed the consent, unless the consent specifies a different effective date.

Section 8.4    Annual Meeting.  The annual meeting of the Members shall be held on the first Wednesday in September 1st beginning in 2019, at the hour of 1:00 PM, local time, or at such other time and on such other day within such month, as shall be fixed by the Managers, for the purpose of electing Managers and for the transaction of such other business as may come before the meeting. If the day fixed for the annual meeting shall be a legal holiday, such meeting shall be held on the next succeeding business day. If the election of Managers shall not be held on the day designated for an annual meeting of the Members, or at any adjournment thereof, the Managers shall cause the election to be held at a special meeting of the Members as soon as may be convenient.

Section 8.5    Special Meetings.  Special meetings of the Members for any purpose or purposes may be called by either Managers or by holders of not less than one-tenth (1/10) of all Voting Interests.

Section 8.6    Place of Meeting. The Manager may designate the place of meeting for any annual meeting and the person calling a special meeting may designate the place for such special meeting. If no designation is made, the place of meeting shall be the registered office of the Company.

Section 8.7    Notice of Meeting. Written notice, given five (5) days in advance of a meeting, stating the date, time and place of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered either personally or by mail, by or at the direction of any Manager or other person calling the meeting, to each Member of record entitled to vote at such meeting. If mailed, such notice shall be deemed delivered as

provided in the Act. Waiver of notice and actions taken at a meeting shall be effective as provided in the Act.

Section 8.8    <u>Proxies</u>.  At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by the Member's duly authorized attorney-in-fact. Such proxy shall be filed with any Manager before or at the time of the meeting.  No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

Section 8.9    <u>Conduct of Meeting</u>.  At each meeting of the Members, a Chairperson for that particular meeting shall be elected.  The Chairperson shall be the Member in attendance who has received the vote of the majority of the Voting Interests represented at the meeting.  The Chairperson shall preside over and conduct the meeting and shall appoint someone in attendance to make accurate minutes of the meeting.  Following each meeting, the minutes of the meeting shall be sent to the Managers and each Member.

Section 8.10    <u>Tax Matters Partner</u>.  Pursuant to section 6231(a) of the Code, Charles Paret is hereby designated as the tax matters partner for the Company. Charles Paret is authorized to perform, on behalf of the Company or any Managers, any act that may be necessary to make this designation effective.

# ARTICLE 9

## ACCOUNTING AND REPORTING

Section 9.1    <u>Books</u>. The Company shall maintain complete and accurate books of account at the registered office of the Company. The Company shall provide any Member any information requested relating to the business of the Company.  During ordinary business hours, any Member or that Member's authorized representative shall have access to all books, records, and materials regarding the Company and its activities.

Section 9.2    <u>Capital Accounts</u>. The Company shall maintain a separate capital account for each Member in accordance with the Treasury Regulations under section 704(b) of the Code and such other accounts as may be necessary or desirable to comply with the requirements of applicable laws and regulations.

Section 9.3    <u>Transfers During Year</u>. In order to avoid an interim closing of the Company's books, the share of profits and losses under Article 5 of a Member who transfers part or all of its interest in the Company during the Company's accounting year may be determined by taking the transferring Member's pro rata share of the amount of such profits and losses for the year.  The proration shall be based on the portion of the Company's accounting year which has elapsed prior to the transfer, or may be determined under any other reasonable method; provided, however, that any gain or loss from the sale of Company assets shall be allocated to the owner of the transferred interest at the time of such sale.  The balance of the profits and losses attributable to the transferred interest shall be allocated to the transferee of such interest.

11

Section 9.4     Reports. Within Forty-Five (45) days after the end of each calendar quarter (the "Prior Quarter") the Manager shall deliver to each Member a written report detailing the assets and liabilities of the Company as of the end of the Prior Quarter and setting forth the profits and losses of the Company for the Prior Quarter and for the Company year. The books of account shall be closed promptly after the end of each fiscal year. As soon as practicable thereafter, a Manager shall deliver a written report to each Member which shall include a statement of receipts, expenditures, profits, and losses for the year, a statement of each Member's capital account, and such additional statements with respect to the status of the Company's assets and the distribution of Company funds as are necessary to advise the Members properly about their investment in the Company.  Prior to March 15th of each year, the Members shall also be provided with a copy of the Company federal income tax return (Form 1065) to be filed for the preceding year.

Section 9.5     Section 754 Election.  If requested by a Member, the Company shall make the election provided for under section 754 of the Code. Any costs attributable to making such election shall be borne solely by the requesting Member.

## ARTICLE 10

## TRANSFERS – RIGHT OF FIRST REFUSAL

Section 10.1     Restrictions.  Notwithstanding anything to the contrary contained in this Agreement, no Member shall sell, assign, pledge, or otherwise transfer or dispose of any portion of its interest in the Company without (i) complying with the terms of and procedures set forth in Sections 10.2 through 10.8 or (ii) first obtaining the prior written approval of all of the Members (which approval shall be within the sole and absolute discretion of each Member).

Section 10.2     Offer to Other Members. If at any time any Member proposes to sell, assign, or otherwise dispose of all or any portion of its interest in the Company, such Member ("Offeror") shall make a written offer to sell such interest (the "Offered Interest") to the other Members on the same terms and conditions as those on which Offeror proposes to transfer the Offered Interest.  Such offer shall state the name of the proposed transferee and all of the terms and conditions of the proposed transfer, including the price to the proposed transferee.

Section 10.3     Acceptance of Offer. The other Members shall have the right for a period of 30 days after receipt of the offer from Offeror, or such longer period as may be required under Section 10.5, to elect to purchase all of the Offered Interest. In exercising their right to purchase, the other Members may divide the Offered Interest in any manner to which they all agree, and in the absence of agreement, the Offered Interest shall be divided among the Members in proportion to the relative Sharing Ratios of the Members who choose to participate. To exercise their rights to purchase, the participating Members shall give written notice to Offeror prior to the end of the period provided for in the first sentence of this Section 10.3. Upon the exercise of a right to purchase, and provided the right is exercised with respect to all of the Offered Interest, the purchase shall be closed and payment made on the same terms and conditions as those on which Offeror proposes to transfer the Offered Interest.

12

Section 10.4   Failure to Accept Offer.  If the other Members do not elect to purchase all of the Offered Interest, Offeror may transfer the Offered Interest to the proposed transferee named in the offer delivered to the other Members. However, if that transfer is not made within 90 days after the end of the period provided for in Section 10.3, a new offer shall be made to the other Members and the provisions of Sections 10.1, 10.2, and 10.3 shall again apply.

Section 10.5   Cash Equivalents.  If the proposed offer under Section 10.2 is for consideration other than cash or cash plus deferred payments of cash, the purchasing Members may pay the cash equivalent of such other consideration. The Offeror and the purchasing Members shall attempt to agree upon a cash equivalent of such other consideration. If they cannot agree within Twenty (20) days after the beginning of the 30-day period under Section 10.3, any of such Members may, by five days' written notice to the others, initiate arbitration proceedings for determination of the cash equivalent without regard to income tax consequences to the Offeror as a result of receiving cash rather than the other consideration. The purchasing Members may elect to purchase the interest at the determined cash equivalent by notice of such election to the Offeror within ten days after the arbitrator's decision.

Section 10.6   Direct and Indirect Transfers.  For purposes of this Agreement, restrictions upon the sale, assignment, or other disposition of a Member's interest shall extend to any direct or indirect transfer including, without limitation, an involuntary transfer (such as a transfer pursuant to a foreclosure sale) or a transfer resulting by operation of law.

Section 10.7   Substitution of a Member.

(a) No assignee, legatee, or transferee (by conveyance, operation of law, or otherwise) of the whole or any portion of a Member's interest in the Company shall have the right to become a substituted Member without the prior written consent of all of the Members. The granting or denial of a request for such written consent shall be within the sole and absolute discretion of each Member. A substituted Member shall succeed to all the rights and interest of its assignor in the Company. An assignee of a Member who is not admitted as a Member shall be entitled only to the distributions to which its assignor would otherwise be entitled.

(b) With the exception of the Managing Member, if a Member shall die, the executor, administrator, or trustee of such Member, or if a Member shall be adjudicated insane or incompetent, the committee, conservator, or representative of such Member, or if a Member shall be dissolved, merged, or consolidated, the successor in interest to such Member, shall have the same rights and obligations that such Member would have had if such Member had not died, been adjudicated insane or incompetent, or been dissolved, merged, or consolidated, except that the executor, administrator, trustee, committee, conservator,

13

representative, or successor (as the case may be) shall not become a substituted Member without the prior written consent of all of the other Members. The granting or denial of a request for such written consent shall be within the sole and absolute discretion of each Member.

(c) No transfer of any interest in the Company otherwise permitted under this Agreement shall be effective for any purpose whatsoever until the transferee shall have assumed the transferor's obligations to the extent of the interest transferred and shall have agreed to be bound by all the terms and conditions of this Agreement, by written instrument, duly acknowledged, in form and substance reasonably satisfactory to the Manager.

Section 10.8   <u>Conditions to Substitution</u>. With the exception of the Managing Member, as conditions to its admission as a Member, (i) any assignee, legatee, transferee, or successor of a Member shall execute and deliver such instruments, in form and substance satisfactory to the Manager, as the Manager shall deem necessary and (ii) such assignee, legatee, transferee, or successor shall pay all reasonable expenses in connection with its admission as a substituted Member.

## ARTICLE 11

## <u>TERM</u>

Section 11.1   <u>Events of Dissolution</u>. The Company shall continue until dissolved by any of the following events:

(a) the unanimous written consent of all of the Members;

(b) the death, retirement, resignation, expulsion, bankruptcy, or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company; or

(c) any other event causing dissolution of a limited liability company under the Act.

Section 11.2   <u>Continuity of Company</u>. Notwithstanding the foregoing provisions of Section 11.1, upon the occurrence of an event described in Section 11.1(b), the remaining Members shall have the right to continue the business of the Company. Such right may be exercised only if a majority in interest of the remaining Members consent in writing, within 90 days after the occurrence of the event described in Section 11.1(b), to continue the business of the Company. If a majority in interest of the remaining Members do not consent to continue the Company, the right of the Members to continue the business of the Company shall expire, the Manager shall file a statement of intent to dissolve, and the Company's affairs shall be wound up as provided in Article 12.

## ARTICLE 12

## DISSOLUTION AND TERMINATION

Section 12.1    Final Accounting. In the event of the dissolution of the Company, a proper accounting shall be made as provided in Section 9.4 from the date of the last previous accounting to the date of dissolution.

Section 12.2    Liquidation. Upon the dissolution of the Company, any Manager, or if either Manager is unable to act, some person selected by the Members whose Sharing Ratios comprise 51 percent or more of the Sharing Ratios of the Members, shall act as liquidator to wind up the Company.  The liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and businesslike manner. All proceeds from liquidation shall be distributed in the following order of priority:  (i) to the payment of debts and liabilities of the Company and the expenses of liquidation; (ii) to the setting up of such reserves as the liquidator may reasonably deem necessary for any contingent liabilities of the Company; and (iii) to the Members in accordance with Article 4.

Section 12.3    Distribution in Kind. If the liquidator shall determine that a Company asset should be distributed in kind, the liquidator shall obtain an independent appraisal of the fair market value of the asset as of a date reasonably close to the date of liquidation.  Any unrealized appreciation or depreciation with respect to such asset shall be allocated among the Members (in accordance with the provisions of Article 5, assuming that the asset was sold for the appraised value) and taken into consideration in determining the balance in the Members' capital accounts as of the date of liquidation. Distribution of any such asset in kind to a Member shall be considered a distribution of an amount equal to the asset's fair market value for purposes of Section 12.2. The liquidator, in its sole discretion, may distribute any percentage of any asset in kind to a Member even if such percentage exceeds the percentage in which the Member shares in distributions, as long as the sum of the cash and fair market value of all the assets distributed to each Member equals the amount of the distribution to which each Member is entitled.

Section 12.4.  The liquidator, in its sole discretion, may distribute any percentage of any asset in kind to a Member even if such percentage exceeds the percentage in which the Member shares in distributions, as long as the sum of the cash and fair market value of all the assets distributed to each Member equals the amount of the distribution to which each Member is entitled.

Section 12.5    Waiver of Right to Court Decree of Dissolution. The Members agree that irreparable damage would be done to the Company if any Member brought an action in court to dissolve the Company. Accordingly, each of the Members accepts the provisions of this Agreement as its sole entitlement on termination of its membership in the Company.  Each Member hereby waives and renounces its right to seek a court decree of dissolution or to seek the appointment by a court of a liquidator for the Company.

15

Section 12.6    Articles of Dissolution. Upon the completion of the distribution of Company assets as provided in this Article 12, the Company shall be terminated and the person acting as liquidator shall file articles of dissolution and shall take such other actions as may be necessary to terminate the Company.

## ARTICLE 13

## NOTICES

Section 13.1    Method of Notices. All notices required or permitted by this Agreement shall be in writing and shall be hand delivered or sent by registered or certified mail, postage prepaid, and shall be effective upon receipt or, if mailed, upon the earlier of (i) the date set forth on the return receipt of registered or certified mail or (ii) the fifth day after mailing.

Section 13.2    Computation of Time. In computing any period of time under this Agreement, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, Sunday, or legal holiday, in which event the period shall run until the end of the next day which is not a Saturday, Sunday, or legal holiday.

## ARTICLE 14

## INVESTMENT REPRESENTATIONS

Section 14.1    Investment Purpose. In acquiring an interest in the Company, each Member represents and warrants that it is acquiring such interest for its own account for investment and not with a view to sale or distribution. Each Member recognizes that investments such as those contemplated by the Company are speculative and involve substantial risk. Each Member further represents and warrants that the Manager has not made any guaranty or representation upon which it has relied concerning the possibility or probability of profit or loss as a result of its acquisition of an interest in the Company.

Section 14.2    Investment Restriction. Each Member recognizes that: (i) the membership interests have not been registered under the Securities Act of 1933, as amended, in reliance upon an exemption from such registration, (ii) a Member may not sell, offer for sale, transfer, pledge, or hypothecate all or any part of its interest in the Company in the absence of an effective registration statement covering such interest under the Securities Act unless such sale, offer of sale, transfer, pledge, or hypothecation is exempt from registration under the Securities Act of 1933, as amended, (iii) the Manager has no obligation to register any Member's interest for sale, or to assist in establishing an exemption from registration for any proposed sale, and (iv) the restrictions on transfer may severely affect the liquidity of a Member's investment.

16

**ARTICLE 15**

**ADDITIONAL COVENANTS**

    Section 14.1  <u>Additional Covenants by Charles Paret</u>.  Charles Paret covenants and agrees to provide to the Company, for no additional consideration, the development services set forth in Exhibit A (the "Services") for each Project of the Company.

## ARTICLE 16

## <u>BUSINESS OPPORTUNITIES</u>

Except as otherwise specifically set forth herein, any Member or Manager, or any officer, director, employee, shareholder or other Person holding a legal or beneficial interest in any Member or Manager which is a member or manager of the Company, may engage in or possess an interest in other business ventures of every nature and description, independently or with others, including such business ventures as may be in direct competition with the Company's business, and neither the Company nor the Members shall have any right by virtue of this Agreement in or to such independent ventures or to the income or profits derived therefrom.

## ARTICLE 17

## <u>GENERAL PROVISIONS</u>

Section 18.1    <u>Entire Agreement</u>. This Agreement embodies the entire understanding and agreement among the parties concerning the Company and supersedes any and all prior negotiations, understandings, or agreements in regard thereto.

Section 18.2    <u>Amendment</u>. This Agreement may not be amended without the unanimous written consent of all Members. No rights under this Agreement may be waived except by an instrument in writing signed by the party sought to be charged with such waiver.

Section 18.3    <u>Applicable Law</u>. This Agreement shall be construed in accordance with and governed by the laws of the Commonwealth of District of Columbia.

Section 18.4    <u>Waiver of Jury Trial</u>. The Members agree that, in the event of a dispute, the Members hereby waive their right to a jury trial and shall submit to binding arbitration.

Section 18.5    <u>Pronouns</u>. References to a Member or a Manager, including by use of a pronoun, shall be deemed to include the masculine or feminine gender, singular or plural, and individuals, trusts, partnerships, corporations, or other legal entities where applicable.

Section 18.6    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be considered an original.

**IN WITNESS WHEREOF**, the Members have executed this Agreement to be effective as of the date first set forth above.


Date:  September 12th, 2018

4910 GEORGIA AVE HOLDINGS LLC


_____

By: Charles Paret
Its: Managing Partner

19

**EXHIBIT A**

1.      **Design Phase Services.**  Charles Paret shall assist the Company in determining the Company's program requirements for each Project to be constructed.

a.      Charles Paret shall arrange and conduct meetings with all design consultants jointly deemed essential by the parties and coordinate the requirements of the Project and design development.

b.      Charles Paret, in conjunction with the Project team, shall advise the Company on site use and improvements, selection of materials, building systems and equipment, and provide recommendations to the Company on relative construction feasibilities, applicability of materials and labor, time requirements for installation and construction, and factors relating to costs, including comparative costs of alternate designs or materials, preliminary budgets and possible economies.  Coloma River Holdings LLC shall review with the Company, the Manager, the architect and the contractor, as applicable, the cost of various design and construction alternatives.

c.      Charles Paret shall review and advise the Company with respect to draft plans and specifications prepared by the architect and recommend alternatives whenever it is apparent that design details affect construction feasibility or schedules, or may be improved for cost reductions and shall advise the Company when Coloma River Holdings LLC has knowledge of non-compliance of the same with applicable codes, laws, regulations, or ordinances or with industry standards.

d.      Charles Paret shall review drawings and specifications that are being prepared to ensure that the Company's requirements are incorporated and shall advise the Company when the design details may affect the budget or Project schedule.

2.      **Preconstruction Phase Services.**  Charles Paret, the architect and the contractor shall coordinate, meet and assist with the appropriate governmental authority to ensure required permits are obtained at the appropriate times. Coloma River Holdings LLC or the manager or manager's representative shall represent the Company at all meetings and hearings necessary to obtain all required permits.

a.      To the extent not previously provided by the Company and deemed necessary by the manager, Charles Paret shall arrange for applicable tests, surveys and/or inspections including, but not limited to, geotechnical, environmental, warranted by site conditions and appropriate due diligence requirements.  The Company shall approve in writing in advance all testing companies.

b.      Charles Paret shall review lists of prospective subcontractors provided by

the contractor and assist in the review of bids. Charles Paret shall obtain information from the contractor to identify the financial condition and project experience of the proposed subcontractors to perform the work and make recommendations to the Company as to the preferred subcontractors based on price and qualifications.

     3.    **Construction Phase Services.**  Subject to requirements of lender and review by the Managers, shall develop and implement procedures for the review and processing of applications by the contractor and subcontractors for progress and final payments. Coloma River Holdings LLC, after consulting with the Manager, shall make recommendations to the architect for certification of the contractor payment applications.

     a.    Charles Paret, with input from the Manager, shall oversee the efforts of the sub contractors in maintaining the budget and cost accounting of the Project suitable to the Company's needs. Charles Paret shall review cost detail reports to assist in the proper allocation of invoices and payment applications to the proper budget categories.

     b.    Charles Paret, with input from the Manager, shall facilitate the resolution of any questions or requests for interpretation that may arise in connection with the plans and specifications.

     c.    Charles Paret, with input from the Manager, shall develop and implement procedures for review and processing of change orders.

     d.    Charles Paret, with input from the Manager, shall oversee the efforts of the sub contractors who shall establish and implement adequate procedures for processing, approval and filing of shop drawings, product data, samples and other submittals.

     e.    Charles Paret, with input from the Managers, shall maintain appropriate record copies of all subcontracts, drawings, plans and specifications, shop drawings, and approved addenda, change orders and other modifications in good order. Charles Paret shall monitor the efforts of the contractor who shall mark up drawings and specifications to reflect as-built changes as they occur. Such plans shall be turned over to the Company upon completion of the Project.

     f.    Charles Paret, with input from the Manager, shall monitor the sub contractor's suppliers.

     g.    Charles Paret shall coordinate with the Managers the inspections by the Architect.

     h.    Charles Paret shall coordinate the efforts of the Managers, the Company, the architect, and the contractor in punchlist compilation. Coloma River Holdings LLC, with input from the Manager, shall monitor the efforts of the contractor in final completion of the punchlist items. Coloma River Holdings LLC shall assist the Manager and the Company in final inspection.

       i.      Charles Paret shall secure from the sub-contractors all warranties and guaranties, manuals, record drawings, submittals and as-built plans, and keys upon final completion for turnover to the Company.

Section 2.17  <u>Project</u>.  "Project" shall mean a 3-unit residential condominium development to be located on the Property.

Section 2.187 <u>Total Cost and Investment</u>. "Total Cost and Investment" shall mean the total expenditures to acquire, improve, develop, remodel, rehabilitate, hold, and otherwise prepare any property for sale including, without limitation, money used to purchase the property (including closing costs) and to renovate the property, but does not include selling costs.

Section 2.19  <u>Sharing Ratio</u>.  The "Sharing Ratio" of each Member shall be as follows:

Charles Paret                          100.00%

Section 2.20  <u>Substituted Member</u>: That Person or those Persons admitted to the Company as an additional or substitute Member(s), in accordance with the provisions hereof. A Substituted Member, upon his/her admission as such, shall succeed to the rights, privileges and liabilities of his/her predecessor in interest as a Member.

Section 2.21  <u>Transfer</u>: Transfer means, as a verb, to transfer, sell, assign, exchange, pledge, give, hypothecate or otherwise convey or encumber all or any portion of a Membership Interest and, as a noun, any transfer, sale assignment, exchange, charge, gift, hypothecation or other conveyance or encumbrance of all or any portion of a Membership Interest.

Section 2.22  <u>Treasury Regulations</u>. "Treasury Regulations" shall mean regulations promulgated by the Department of Treasury under the Code.  Any reference to a specific section or sections of the Treasury Regulations shall be deemed to include a reference to any corresponding provision of future regulations promulgated under the Code.

Section 2.23  <u>Voting Interest</u>. "Voting Interest" shall mean a number of votes equal to a Member's Sharing Ratio multiplied by 100.

### ARTICLE 3
### CAPITAL CONTRIBUTIONS

Section 3.1    Capital Contributions. The Members, their addresses, cash, Sharing Ratios, and their Capital Contributions are set forth on Exhibit C attached hereto. Except as set forth on Exhibit C or in this Article 3, or as may otherwise be required by law, no Member shall have any obligation to make any additional Capital Contributions to the Company unless there is Majority Approval for the issuance of a call for such additional Capital Contribution(s).  Each Member shall make or shall have made their respective Capital Contribution to the Company as set forth on Exhibit A within two (2) business days of the effective date of this Agreement.  The Members will obtain the Loan for the balance of the Total Cost and Investment required for the Company's business.

Section 3.2    Additional Capital Contributions.  If additional Capital Contributions are required at any time under Section 3.1, any of the following steps may be taken after Majority Approval:

(d) the necessary amount may be contributed by one or more of the existing Members by causing the Company to enter into a promissory note(s), that shall accrue simple interest at the rate of twelve percent (12%) per annum, with the Member(s) with all balances outstanding under such promissory note(s) being paid out by the Company prior to making any distribution of Cash Flow to the Members under Articles 4, 5 or 6; or

(e) a new Member may be admitted to the Company and make part or all of the required contribution and the Sharing Ratios may be adjusted accordingly.

Section 3.3    Return of Capital Contributions. Capital Contributions shall be expended only in furtherance of the business of the Company as set forth under Section 1.4 above. All costs and expenses of the Company shall be paid from its funds. No Manager or Member shall have any personal liability for the repayment of any Capital Contribution to the Manager or a Member.

Section 3.4    Capital Accounts.  The Company shall establish and maintain a separate Capital Account for each Member in accordance with applicable federal laws and regulations. In the event any Membership Interest is transferred in accordance with the terms of this Agreement, the assignee or Substituted Member shall succeed to the Capital Account of the transferor Member to the extent it relates to the transferred Membership Interest(s).

23

## ARTICLE 4

## DISTRIBUTIONS

Section 4.1    Nonliquidating Distributions.    Except as provided in Section 4.2 or otherwise agreed to by the Members, the Company shall make distributions of Cash Flow to the Members after each Project (reconciled annually) as follows:

> (b) first to Paret until it has received an amount of Cash Flow equal to its Capital Contribution.

Section 4.3    Liquidating Distributions. All distributions made in connection with the dissolution of the Company pursuant to Article 12, shall be made to the Members in the following order of priority:

> (b) first, to the Members in proportion to each Member's initial capital contributions set forth under Article 3, until each Member's capital contributions have been returned in full under this paragraph.

## ARTICLE 5

## ALLOCATION OF PROFIT AND LOSS

Section 5.1    Determination of Profit and Loss.    Profit or Loss shall be determined on an annual basis and for such other periods as may be required.

Section 5.2    Profit Allocation.

> (a)    Except as provided in Sections 5.2(b) and 5.4, Profit shall be allocated to Members as follows:

> > (iii.)    first, to the Members, until they have been allocated an amount of Profit under this clause (i) on a cumulative basis equal to the Losses previously allocated to them on a cumulative basis under Section 5.3; then

24

(b)    Any Profit or Loss with respect to the sale, exchange or other disposition of all or substantially all of the Company's assets or with respect to the sale, exchange or other disposition of assets in connection with the liquidation of the Company shall be allocated among the Members, so as to cause the balance in each Member's capital account to equal the amount that Member would be entitled to receive under Section 4.1 if all the assets of the Company (after the payment of liabilities) were distributed to the Member under that Section (the "Target Amounts"). If the Profit or Loss allocable under this Section 5.2(b) is not sufficient to cause the balances in the Members' capital accounts to be the Target Amounts, then items of income, gain, deduction and loss making up such Profit or Loss shall be allocated among the Members in the manner that would most nearly (on an aggregate basis) bring the balances in the Member's capital accounts to the Target Amounts.

(c)    For purposes of Section 5.2(b), the capital accounts of the Members shall be determined (i) before giving effect to distributions under Section 4.1, (ii) after allocating all other items of Profit and Loss, and (iii) after making all distributions pursuant to Section 4.1.

(d)    If the Profit with respect to the sale of all or substantially all of the Company assets is reported on the installment sale method for federal income tax purposes, the portion of the Profit allocated to each Member under the provisions of paragraph 5.2(b) for each year shall be determined by the accountants for the Company under such reasonable standards, consistently applied, as will result in an allocation of the total Profit from the sale among the Members in accordance with the provisions of paragraph 5.2(b).

Section 5.3    Allocation of Losses. Except as provided in Section 5.4, all Losses shall be allocated among the Members in accordance with their Sharing Ratios.

Section 5.4    Regulatory Allocations and Curative Provision.

The "qualified income offset" provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) are incorporated herein by reference and shall apply to adjust the allocation of Profit and Loss otherwise provided for under Sections 5.2 and 5.3 to the extent provided in that regulation.

The "minimum gain" provisions of Treasury Regulation Section 1.704-2 are incorporated herein by reference and shall apply to adjust the allocation of Profit and Loss otherwise provided for under Sections 5.2 and 5.3 to the extent provided in that regulation.

Notwithstanding the provisions of Section 5.3, if during any fiscal year of the Company the allocation of any loss or deduction, net of any income or gain, to a Member would cause or increase a negative balance in a Member's capital account as of the end of that fiscal year, only the amount of such loss or deduction that reduces the balance to zero shall be allocated to the Member and the remaining amount shall be allocated to the other Members in accordance with their respective Sharing Ratios. For purposes of the preceding sentence, a capital account shall be reduced by the adjustments, allocations, and distributions described in Treasury Regulation

25

Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6), and increased by the amount, if any, of the negative balance in the Member's capital account that the Member is obligated to restore within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(c) as of that time or is deemed obligated to restore under Treasury Regulation Section 1.704-2(g)(1) or Section 1.704-2(i)(5).

All allocations pursuant to the foregoing provisions of this Section 5.4 (the "Regulatory Allocations") shall be taken into account in computing allocations of other items under Sections 5.2 and 5.3, including, if necessary, allocations in subsequent fiscal years, so that the net amounts reflected in the Members' capital accounts and the character for income tax purposes of the taxable income recognized (for example, as capital or ordinary) will, to the extent possible, be the same as if no Regulatory Allocations had been given effect.

## ARTICLE 6

## ALLOCATION OF TAXABLE INCOME AND LOSS

Section 6.1    In General.

(c)    Except as provided in Section 6.1(b) and Section 6.2, each item of income, gain, loss, and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such item is allocated for capital account purposes under Article 5.

(d)    To the extent of any recapture income (as defined below) resulting from the sale or other taxable disposition of a Company asset, the amount of any gain from such disposition allocated to (or recognized by) a Member (or its successor in interest) for federal income tax purposes shall be deemed to consist of recapture income to the extent such Member (or such Member's predecessor in interest) has been allocated or has claimed any deduction directly or indirectly giving rise to the treatment of such gain as recapture income. For this purpose "recapture income" shall mean any gain recognized by the Company (but computed without regard to any adjustment required by sections 734 and 743 of the Code) upon the disposition of any property or asset of the Company that does not constitute capital gain for federal income tax purposes because such gain represents the recapture of deductions previously taken with respect to such property or assets.

Section 6.2    Allocation of Section 704(c) Items.  The Members recognize that with respect to property contributed to the Company by a Member and with respect to property revalued in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(f), there will be a difference between the agreed values or "carrying values" of such property at the time of contribution or revaluation and the adjusted tax basis of such property at that time.  All items of tax depreciation, cost recovery, amortization, amount realized, and gain or loss with respect to such assets shall be allocated among the Members to take into account the book-tax disparities in

accordance with the provisions of Sections 704(b) and 704(c) of the Code and the Treasury Regulations under those sections.

Section 6.3    Integration with Section 754 Election.  All items of income, gain, loss, deduction, and credit recognized by the Company for federal income tax purposes and allocated to the Members in accordance with the provisions of this Agreement, and all basis allocations to the Members, shall be determined without regard to any election under Section 754 of the Code that may be made by the Company; provided, however, that such allocations, once made, shall be adjusted as necessary or appropriate to take into account the adjustments permitted by Sections 734 and 743 of the Code.

Section 6.4    Allocation of Tax Credits.  All tax credits with respect to the Company's expenditure of funds shall be allocated in the same manner as the allocation of Profit for the period during which the expenditures giving rise to the tax credit are incurred.  If there is no Profit during such period, tax credits shall be allocated in accordance with the Members' respective Sharing Ratios.

## ARTICLE 7

## MANAGEMENT

Section 7.1    Management Authority.

(c) Except as otherwise expressly limited by this Agreement, day-to-day management of the Company shall be vested in the Manager. Except as otherwise expressly limited by this Agreement, the Manager shall have the power and authority to conduct the business of the Company and is hereby expressly authorized on behalf of the Company to make all decisions with respect to the Company's business and to take all actions necessary to carry out such decisions.

(d) Any document executed on behalf of the Company for the purpose of binding the Company thereto must be signed by the Manager.

Section 7.2    Management Responsibilities.  Paret shall have the authority to manage the day-to-day operations of the Company, including (but not limited to) those duties and responsibilities set forth on Exhibit A.

Section 7.3    Duties.  The Manager shall carry out its duties in good faith, in a manner that it believes to be in the best interests of the Company and with such care as an ordinarily prudent real estate developer in a like position would use under similar circumstances. If the Manager so performs its duties, it shall not have any liability by reason of being or having been a Manager of the Company. The Manager shall devote such time to the business of the Company as the Manager, in its discretion, deems necessary for the efficient carrying on of the Company's business. The Manager shall at all times be free to engage in any business for its own account.

27

Manager shall diligently pursue and apply its general skills to the Company's business and devote as much time as reasonably necessary to manage the development of the Project.

Section 7.4     Number. Initially, there shall be one Manager. The number of Managers may be increased or decreased by the vote of Members with aggregate Voting Interests of more than fifty-percent (50%), but no decrease shall have the effect of shortening the term of any incumbent Manager.

Section 7.5     Tenure and Removal. The initial Manager shall be Paret. The initial Manager shall hold office until the first annual meeting of the Members and until a successor has been elected and qualified. At the first annual meeting of Members and at each annual meeting thereafter, the Members shall elect Managers to hold office until the next succeeding annual meeting. Each Manager shall hold office for the term for which it is elected and until its successor has been elected and qualified.  At a properly called meeting, any Manager may be removed, without cause, by the vote of Members with aggregate Voting Interests of more than fifty percent (50%).   Any Manager may be removed, with cause, by the vote of Members with aggregate Voting Interests of more than fifty percent (50%), not including the Member who is the Manager (or the Manager's affiliate).

Section 7.6     Reliance by Third Parties.  No third party dealing with the Company shall be required to ascertain whether the Manager is acting in accordance with the provisions of this Agreement. All third parties may rely on a document executed by the Manager as binding the Company. The foregoing provisions shall not apply to third parties who are affiliates of a Member or the Manager. If the Manager acts without authority, it shall be liable to the Members for any damages arising out of its unauthorized actions.

Section 7.7     Resignation.  The Manager may resign at any time by giving written notice of resignation to the Members. Unless otherwise specified in the notice, the resignation shall take effect upon receipt by the Members and the acceptance of the resignation shall not be necessary to make it effective.

Section 7.8     Newly Created Manager Positions and Vacancies.  Newly created Manager positions resulting from an increase in the number of Managers shall be filled by the vote of Members with aggregate Voting Interests of more than fifty-percent (50%).  A Manager elected to fill a position resulting from an increase in the number of Managers shall hold office until the next annual meeting of Members and until its successor has been elected and qualified. Vacancies occurring for any reason shall be filled by the vote of Members with aggregate Voting Interests of more than fifty-percent (50%). A Manager elected to fill a vacancy shall be elected to hold office for the unexpired term of its predecessor.

Section 7.9     Transactions Between Company and Manager.  After Majority Approval, any Manager, on behalf of the Company, may contract and deal with itself and may cause any person or entity affiliated with the Manager to contract or deal with the Company; provided, however, that such contracts and dealings must be on terms comparable to and competitive with

28

those available to the Company from others dealing at arm's length and must be approved in writing by all of the Members.

Section 7.10    Management Fees and Reimbursements. The Manager shall not be entitled to a management fee or salary for managing the operations of the Company. The Manager shall, however, be reimbursed by the Company for reasonable out-of-pocket costs incurred on behalf of the Company.

Section 7.11    Insurance. The Company shall maintain, for the protection of the Company and all of its Members, such insurance as the Manager, in its sole discretion, deems necessary for the operations being conducted.

Section 7.12    Exculpation. The Manager shall not be liable to the Company nor to any Member for any act or failure to act, nor for any errors of judgment, but only for willful misconduct or gross negligence. The Company shall indemnify and hold harmless the Manager and the agents and employees of the Manager against and from any personal loss, liability, or damage incurred as a result of any act or omission, or any error of judgment, unless such loss, liability, or damage results from such person's willful misconduct or gross negligence. Any such indemnification shall be paid only from the assets of the Company, and no Manager or third party shall have recourse against the personal assets of any Member for such indemnification.

Section 7.13    Limitations on Authority.

(a) No Member or the Manager shall have the authority to perform (i) any act in violation of any applicable law or regulation thereunder, (ii) any act in contravention of this Agreement or failing to do any act required by this Agreement, (iii) any act which would make it impossible to carry on the Business of the Company, or (iv) any act without any consent or ratification which is required to be consented to or ratified by the Members pursuant to any provisions of this Agreement.

(b) For purposes of this Agreement, the Manager Member shall be required to obtain Majority Approval in order to make any Major Decision. In the event that any Member shall fail to respond within ten (10) days to a written request for such consent, he/she shall conclusively be deemed to have consented to the proposed action.  The term "Major Decisions" shall mean and refer to the following (including any modifications, amendments or changes thereto):

(i)    any transactions with an Affiliate of Managing Member or Managing Member with respect to Company Assets or the business of the Company.

(ii)    any change of the Business or purpose of the Company as set forth in Section 1.4 above.

29

(iii) any payment to the Manager other than for reimbursement for out-of-pocket expenses.

(iv) any amendment to this Agreement.

(v) the initial pre-development budget for the Project, which is attached hereto and incorporated herein as Exhibit "B", and any variance(s) thereto resulting in an aggregate cumulative increase in the amount of the initial budget for the Project of ten percent (10%) or more.

(vi) any Member loan to the Company.

(vii) any amendment to the Company's Articles of Organization.

(viii) commencing in the name of or relating to the Company, any action or proceeding in bankruptcy or seeking reorganization, liquidation, dissolution, arrangement or readjustment of the debts of the Company.

(ix) the admission of any Person as an additional Member of the Company.

(x) monthly draw request submissions made to the Bank for Loan funding.

(xi) the Company acquiring any material asset or making any material investment that is unrelated to the Project.

(xii) a pledge or mortgage or grant of security interest in any Company Asset.

(xiii) except for Capital Calls made pursuant to Section 14.1 below, a call by the Company for an additional Capital Contribution from the Members.

(xiv) entering into a property management agreement or operating lease agreement.

(xv) causing the Company to elect to be taxed as a corporation for federal income tax purposes.

 Section 7.14 Arbitration. In the event of any dispute or disagreement between the Manager and a Member(s) concerning any business decision about the Company's affairs arises, the Manager and Member(s) who have the dispute or disagreement shall make a good faith effort to resolve the dispute or disagreement amongst themselves.  If the dispute is not settled at the

expiration of twenty (20) business days from the date there has been created a written record identifying the dispute, the entire matters shall be submitted to the McCammon Group for binding arbitration for a ruling as to what is in the best interests of the Company. The decision of the arbitrator shall constitute a final, binding decision on the Company. The arbitration shall take place in the District of Columbia. The Arbitrator shall be bound to the strict interpretation and observation of the terms of this Agreement and the Rules promulgated by the American Arbitration Association. To the extent such post arbitration action may be warranted, the judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

# ARTICLE 8

# MEMBERS

Section 8.1    Participation. A Member, in its capacity as a Member, shall take no part in the control, management, direction, or operation of the affairs of the Company and shall have no power to bind the Company.

Section 8.2    Quorum. A majority of the outstanding Voting Interests, represented in person or by proxy, shall be necessary to constitute a quorum at meetings of the Members. Each of the Members hereby consents and agrees that one or more Members may participate in a meeting of the Members by means of conference telephone or similar communication equipment by which all persons participating in the meeting can hear each other at the same time, and such participation shall constitute presence in person at the meeting. If a quorum is present, the affirmative vote of the majority of the Voting Interests represented at the meeting and entitled to vote on the subject matter shall be the act of the Members, unless a greater number is required by the Act or this Agreement. In the absence of a quorum, those present may adjourn the meeting for any period, but in no event shall such period exceed sixty (60) days.

Section 8.3    Informal Action. Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting if the action is evidenced by a written consent describing the action taken, signed by each Member entitled to vote. Action taken under this section is effective when all Members entitled to vote have signed the consent, unless the consent specifies a different effective date.

Section 8.4    Annual Meeting. The annual meeting of the Members shall be held on the first Saturday in January beginning in 2017, at the hour of 1:00 PM, local time, or at such other time and on such other day within such month, as shall be fixed by the Manager, for the purpose of electing the Manager and for the transaction of such other business as may come before the meeting. If the day fixed for the annual meeting shall be a legal holiday, such meeting shall be held on the next succeeding business day. If the election of the Manager shall not be held on the day designated for an annual meeting of the Members, or at any adjournment thereof, the Manager shall cause the election to be held at a special meeting of the Members as soon as may be convenient.

Section 8.5    <u>Special Meetings</u>.  Special meetings of the Members for any purpose or purposes may be called by the Manager or by holders of not less than one-tenth (1/10) of all Voting Interests.

Section 8.6    <u>Place of Meeting</u>. The Manager may designate the place of meeting for any annual meeting and the person calling a special meeting may designate the place for such special meeting. If no designation is made, the place of meeting shall be the registered office of the Company.

Section 8.7    <u>Notice of Meeting</u>. Written notice, given five (5) days in advance of a meeting, stating the date, time and place of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered either personally or by mail, by or at the direction of the Manager or other person calling the meeting, to each Member of record entitled to vote at such meeting. If mailed, such notice shall be deemed delivered as provided in the Act. Waiver of notice and actions taken at a meeting shall be effective as provided in the Act.

Section 8.8    <u>Proxies</u>.  At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by the Member's duly authorized attorney-in-fact. Such proxy shall be filed with the Manager before or at the time of the meeting.  No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

Section 8.9    <u>Conduct of Meeting</u>.  At each meeting of the Members, a Chairperson for that particular meeting shall be elected.  The Chairperson shall be the Member in attendance who has received the vote of the majority of the Voting Interests represented at the meeting.  The Chairperson shall preside over and conduct the meeting and shall appoint someone in attendance to make accurate minutes of the meeting.  Following each meeting, the minutes of the meeting shall be sent to the Manager and each Member.

Section 8.10   <u>Tax Matters Partner</u>.  Pursuant to section 6231(a) of the Code, Charles Paret is hereby designated as the tax matters partner for the Company. Charles Paret is authorized to perform, on behalf of the Company or any Member, any act that may be necessary to make this designation effective.

## **ARTICLE 9**

## **ACCOUNTING AND REPORTING**

Section 9.1    <u>Books</u>. The Company shall maintain complete and accurate books of account at the registered office of the Company. The Company shall promptly provide any Member any information requested relating to the business of the Company.  During ordinary business hours, any Member or that Member's authorized representative shall have access to all books, records, and materials regarding the Company and its activities.

Section 9.2    <u>Capital Accounts</u>. The Company shall maintain a separate capital account for each Member in accordance with the Treasury Regulations under section 704(b) of the Code and such other accounts as may be necessary or desirable to comply with the requirements of applicable laws and regulations.

Section 9.3    <u>Transfers During Year</u>. In order to avoid an interim closing of the Company's books, the share of profits and losses under Article 5 of a Member who transfers part or all of its interest in the Company during the Company's accounting year may be determined by taking the transferring Member's pro rata share of the amount of such profits and losses for the year. The proration shall be based on the portion of the Company's accounting year which has elapsed prior to the transfer, or may be determined under any other reasonable method; provided, however, that any gain or loss from the sale of Company assets shall be allocated to the owner of the transferred interest at the time of such sale. The balance of the profits and losses attributable to the transferred interest shall be allocated to the transferee of such interest.

Section 9.4    <u>Section 754 Election</u>. If requested by a Member, the Company shall make the election provided for under section 754 of the Code. Any costs attributable to making such election shall be borne solely by the requesting Member.

**ARTICLE 10**

**<u>TRANSFERS – RIGHT OF FIRST REFUSAL</u>**

Section 10.1    <u>Restrictions</u>. Notwithstanding anything to the contrary contained in this Agreement, no Member shall sell, assign, pledge, or otherwise transfer or dispose of any portion of its interest in the Company without (i) complying with the terms of and procedures set forth in Sections 10.2 through 10.8 or (ii) first obtaining the prior written approval of all of the Members (which approval shall be within the sole and absolute discretion of each Member).

Section 10.2    <u>Offer to Other Members</u>. If at any time any Member proposes to sell, assign, or otherwise dispose of all or any portion of its interest in the Company, such Member ("Offeror") shall make a written offer to sell such interest (the "Offered Interest") to the other Members on the same terms and conditions as those on which Offeror proposes to transfer the Offered Interest. Such offer shall state the name of the proposed transferee and all of the terms and conditions of the proposed transfer, including the price to the proposed transferee.

Section 10.3    <u>Acceptance of Offer</u>. The other Members shall have the right for a period of thirty (30) days after receipt of the offer from Offeror, or such longer period as may be required under Section 10.5, to elect to purchase all of the Offered Interest. In exercising their right to purchase, the other Members may divide the Offered Interest in any manner to which they all agree, and in the absence of agreement, the Offered Interest shall be divided among the Members in proportion to the relative Sharing Ratios of the Members who choose to participate. To exercise their rights to purchase, the participating Members shall give written notice to Offeror prior to the end of the period provided for in the first sentence of this Section 10.3. Upon the exercise of a right to purchase, and provided the right is exercised with respect to all of the

33

Offered Interest, the purchase shall be closed and payment made on the same terms and conditions as those on which Offeror proposes to transfer the Offered Interest.

Section 10.4    Failure to Accept Offer.  If the other Members do not elect to purchase all of the Offered Interest, Offeror may transfer the Offered Interest to the proposed transferee named in the offer delivered to the other Members. However, if that transfer is not made within ninety (90) days after the end of the 30-day period provided for in Section 10.3, a new offer shall be made to the other Members and the provisions of Sections 10.1, 10.2, and 10.3 shall again apply.

Section 10.5    Cash Equivalents.  If the proposed offer under Section 10.2 is for consideration other than cash or cash plus deferred payments of cash, the purchasing Members may pay the cash equivalent of such other consideration. The Offeror and the purchasing Members shall attempt to agree upon a cash equivalent of such other consideration. If they cannot agree within twenty (20) days after the beginning of the 30-day period under Section 10.3, any of such Members may, by five days' written notice to the others, initiate arbitration proceedings for determination of the cash equivalent without regard to income tax consequences to the Offeror as a result of receiving cash rather than the other consideration. The purchasing Members may elect to purchase the interest at the determined cash equivalent by notice of such election to the Offeror within ten days after the arbitrator's decision.

Section 10.6    Direct and Indirect Transfers.  For purposes of this Agreement, restrictions upon the sale, assignment, or other disposition of a Member's interest shall extend to any direct or indirect Transfer including, without limitation, an involuntary Transfer (such as a transfer pursuant to a foreclosure sale) or a Transfer resulting by operation of law.

Section 10.7    Substitution of a Member.

(d) No assignee, legatee, or transferee (by conveyance, operation of law, or otherwise) of the whole or any portion of a Member's interest in the Company shall have the right to become a substituted Member without the prior written consent of all of the Members. The granting or denial of a request for such written consent shall be within the sole and absolute discretion of each Member. A substituted Member shall succeed to all the rights and interest of its assignor in the Company. An assignee of a Member who is not admitted as a Member shall be entitled only to the distributions to which its assignor would otherwise be entitled.

(e) If a Member shall die, the executor, administrator, or trustee of such Member, or if a Member shall be adjudicated insane or incompetent, the committee, conservator, or representative of such Member, or if a Member shall be dissolved, merged, or consolidated, the successor in interest to such Member, shall have the same rights and obligations that such Member would have had if such Member had not died, been

34

adjudicated insane or incompetent, or been dissolved, merged, or consolidated, except that the executor, administrator, trustee, committee, conservator, representative, or successor (as the case may be) shall not become a substituted Member without the prior written consent of all of the other Members.  The granting or denial of a request for such written consent shall be within the sole and absolute discretion of each Member.

(f) No Transfer of any interest in the Company otherwise permitted under this Agreement shall be effective for any purpose whatsoever until the transferee shall have assumed the transferor's obligations to the extent of the interest transferred and shall have agreed to be bound by all the terms and conditions of this Agreement, by written instrument, duly acknowledged, in form and substance reasonably satisfactory to the Manager.

Section 10.8   <u>Conditions to Substitution</u>.  As conditions to its admission as a Member, (i) any assignee, legatee, transferee, or successor of a Member shall execute and deliver such instruments, in form and substance satisfactory to the Manager, as the Manager shall deem necessary and (ii) such assignee, legatee, transferee, or successor shall pay all reasonable expenses in connection with its admission as a substituted Member.

## ARTICLE 11

## <u>TERM</u>

Section 11.1   <u>Events of Dissolution</u>. The Company shall continue until dissolved by any of the following events:

(d) the unanimous written consent of all of the Members;

(e) the death, retirement, resignation, expulsion, bankruptcy, or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company; or

(f) any other event causing dissolution of a limited liability company under the Act.

Section 11.2   <u>Continuity of Company</u>. Notwithstanding the foregoing provisions of Section 11.1, upon the occurrence of an event described in Section 11.1(b), the remaining Members shall have the right to continue the business of the Company.  Such right may be exercised only if a majority in interest of the remaining Members consent in writing, within ninety (90) days after the occurrence of the event described in Section 11.1(b), to continue the business of the Company. If a majority in interest of the remaining Members do not consent to continue the Company, the right of the Members to continue the business of the Company shall

expire, the Manager shall file a statement of intent to dissolve, and the Company's affairs shall be wound up as provided in Article 12.

# ARTICLE 12

## DISSOLUTION AND TERMINATION

Section 12.1    Final Accounting. In the event of the dissolution of the Company, a proper accounting shall be made as provided in Section 9.4 from the date of the last previous accounting to the date of dissolution.

Section 12.2    Liquidation. Upon the dissolution of the Company, the Manager, or if the Manager is unable to act, some person selected by the Members with aggregate Voting Interests of more than fifty percent (50%), shall act as liquidator to wind up the Company.  The liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and businesslike manner. All proceeds from liquidation shall be distributed in the following order of priority:  (i) to the payment of debts and liabilities of the Company and the expenses of liquidation; (ii) to the setting up of such reserves as the liquidator may reasonably deem necessary for any contingent liabilities of the Company; and (iii) to the Members in accordance with Article 4.

Section 12.3    Distribution in Kind. If the liquidator shall determine that a Company asset should be distributed in kind, the liquidator shall obtain an independent appraisal of the fair market value of the asset as of a date reasonably close to the date of liquidation.  Any unrealized appreciation or depreciation with respect to such asset shall be allocated among the Members (in accordance with the provisions of Article 5, assuming that the asset was sold for the appraised value) and taken into consideration in determining the balance in the Members' capital accounts as of the date of liquidation. Distribution of any such asset in kind to a Member shall be considered a distribution of an amount equal to the asset's fair market value for purposes of Section 12.2. The liquidator, in its sole discretion, may distribute any percentage of any asset in kind to a Member even if such percentage exceeds the percentage in which the Member shares in distributions, as long as the sum of the cash and fair market value of all the assets distributed to each Member equals the amount of the distribution to which each Member is entitled.

Section 12.4.  The liquidator, in its sole discretion, may distribute any percentage of any asset in kind to a Member even if such percentage exceeds the percentage in which the Member shares in distributions, as long as the sum of the cash and fair market value of all the assets distributed to each Member equals the amount of the distribution to which each Member is entitled.

Section 12.5    Waiver of Right to Court Decree of Dissolution. The Members agree that irreparable damage would be done to the Company if any Member brought an action in court to dissolve the Company. Accordingly, each of the Members accepts the provisions of this Agreement as its sole entitlement on termination of its membership in the Company.  Each

Member hereby waives and renounces its right to seek a court decree of dissolution or to seek the appointment by a court of a liquidator for the Company.

Section 12.6  Articles of Dissolution. Upon the completion of the distribution of Company assets as provided in this Article 12, the Company shall be terminated and the person acting as liquidator shall file articles of dissolution and shall take such other actions as may be necessary to terminate the Company.

## ARTICLE 13

## NOTICES

Section 13.1  Method of Notices. All notices required or permitted by this Agreement shall be in writing and shall be hand delivered or sent by registered or certified mail, postage prepaid, and shall be effective upon receipt or, if mailed, upon the earlier of (i) the date set forth on the return receipt of registered or certified mail or (ii) the fifth (5th) day after mailing.

Section 13.2  Computation of Time. In computing any period of time under this Agreement, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, Sunday, or legal holiday, in which event the period shall run until the end of the next day which is not a Saturday, Sunday, or legal holiday.

## ARTICLE 14

## INVESTMENT REPRESENTATIONS

Section 14.1  Investment Purpose. In acquiring an interest in the Company, each Member represents and warrants that it is acquiring such interest for its own account for investment and not with a view to sale or distribution.  Each Member recognizes that investments such as those contemplated by the Company are speculative and involve substantial risk.  Each Member further represents and warrants that the Manager has not made any guaranty or representation upon which it has relied concerning the possibility or probability of profit or loss as a result of its acquisition of an interest in the Company.

Section 14.2  Investment Restriction. Each Member recognizes that: (i) the membership interests have not been registered under the Securities Act of 1933, as amended, in reliance upon an exemption from such registration, (ii) a Member may not sell, offer for sale, transfer, pledge, or hypothecate all or any part of its interest in the Company in the absence of an effective registration statement covering such interest under the Securities Act unless such sale, offer of sale, transfer, pledge, or hypothecation is exempt from registration under the Securities Act of 1933, as amended, (iii) the Manager has no obligation to register any Member's interest for sale, or to assist in establishing an exemption from registration for any proposed sale, and (iv) the restrictions on transfer may severely affect the liquidity of a Member's investment.

## ARTICLE 15

## BUSINESS OPPORTUNITIES

Except as otherwise specifically set forth herein, any Member or Manager, or any officer, director, employee, shareholder or other Person holding a legal or beneficial interest in any Member or Manager, may engage in or possess an interest in other business ventures of every nature and description, independently or with others, including such business ventures as may be in direct competition with the Company's business, and neither the Company nor the Members shall have any right by virtue of this Agreement in or to such independent ventures or to the income or profits derived therefrom.

## ARTICLE 16

## GENERAL PROVISIONS

Section 16.1    Entire Agreement. This Agreement embodies the entire understanding and agreement among the parties concerning the Company and supersedes any and all prior negotiations, understandings, or agreements in regard thereto.

Section 16.2    Amendment. This Agreement may not be amended without the unanimous written consent of all Members. No rights under this Agreement may be waived except by an instrument in writing signed by the party sought to be charged with such waiver.

Section 16.3    Applicable Law. This Agreement shall be construed in accordance with and governed by the laws of the District of Columbia.

Section 16.4    Waiver of Jury Trial. The Members agree that, in the event of a dispute, the Members hereby waive their right to a jury trial and shall submit to binding arbitration.

Section 16.5    Pronouns. References to a Member or a Manager, including by use of a pronoun, shall be deemed to include the masculine or feminine gender, singular or plural, and individuals, trusts, partnerships, corporations, or other legal entities where applicable.

Section 16.6    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be considered an original.

Section 16.7    Enforcement Costs.   In the event of any legal action arising under this Agreement or any asserted breach thereof by a party, the substantially prevailing party shall be entitled to recover all costs and expenses, including reasonable attorneys' fees, incurred in enforcing, attempting to enforce, or defending any of the terms, covenants or conditions of this Agreement, including costs incurred prior to commencement of legal action and in any appeal.

**IN WITNESS WHEREOF**, the Members have executed this Agreement to be effective as of the date first set forth above.


Date: September 12th, 2018


By: _____

Charles Paret
4910 Georgia Ave Holdings LLC

**EXHIBIT A**

1.    **Design Phase Services.**    Paret shall assist the Company in determining the Company's program requirements for each project to be constructed.

a.    Paret shall arrange and conduct meetings with all design consultants jointly deemed essential by the parties and coordinate the requirements of the project and design development.

b.    Paret, in conjunction with the project team, shall advise the Company on site use and improvements, selection of materials, building systems and equipment, and provide recommendations to the Company on relative construction feasibilities, applicability of materials and labor, time requirements for installation and construction, and factors relating to costs, including comparative costs of alternate designs or materials, preliminary budgets and possible economies.  Paret shall review with the Company, the Manager, the architect and the contractor, as applicable, the cost of various design and construction alternatives.

c.    Paret shall review and advise the Company with respect to draft plans and specifications prepared by the architect and recommend alternatives whenever it is apparent that design details affect construction feasibility or schedules, or may be improved for cost reductions and shall advise the Company when Paret has knowledge of non-compliance of the same with applicable codes, laws, regulations, or ordinances or with industry standards.

d.    Paret shall review drawings and specifications that are being prepared to ensure that the Company's requirements are incorporated and shall advise the Company when the design details may affect the budget or project schedule.

2.    **Preconstruction Phase Services.**    Paret, the architect and the contractor shall coordinate, meet and assist with the appropriate governmental authority to ensure required permits are obtained at the appropriate times. Paret or the manager or manager's representative shall represent the Company at all meetings and hearings necessary to obtain all required permits.

a.    To the extent not previously provided by the Company and deemed necessary by the manager, Paret shall arrange for applicable tests, surveys and/or inspections including, but not limited to, geotechnical, environmental, warranted by site conditions and appropriate due diligence requirements.  The Company shall approve in writing in advance all testing companies.

b.    Paret shall review lists of prospective subcontractors provided by the contractor and assist in the review of bids.  Paret shall obtain information from the contractor to identify the financial condition and project experience of the proposed subcontractors to perform the work and make recommendations to the Company as to the preferred subcontractors based on

price and qualifications.

3.    **Construction Phase Services.**  Subject to requirements of lender and review by the Manager, Paret shall develop and implement procedures for the review and processing of applications by the contractor and subcontractors for progress and final payments.  Paret, after consulting with the Manager, shall make recommendations to the architect for certification of the contractor payment applications.

a.    Paret, with input from the Manager, shall oversee the efforts of the sub contractors in maintaining the budget and cost accounting of the project suitable to the Company's needs.  Paret shall review cost detail reports to assist in the proper allocation of invoices and payment applications to the proper budget categories.

b.    Paret, with input from the Manager, shall facilitate the resolution of any questions or requests for interpretation that may arise in connection with the plans and specifications.

c.    Paret, with input from the Manager, shall develop and implement procedures for review and processing of change orders.

d.    Paret, with input from the Manager, shall oversee the efforts of the sub contractors who shall establish and implement adequate procedures for processing, approval and filing of shop drawings, product data, samples and other submittals.

e.    Paret, with input from the Manager, shall maintain appropriate record copies of all subcontracts, drawings, plans and specifications, shop drawings, and approved addenda, change orders and other modifications in good order.  Paret shall monitor the efforts of the contractor who shall mark up drawings and specifications to reflect as-built changes as they occur.  Such plans shall be turned over to the Company upon completion of the project.

f.    Paret, with input from the Manager, shall monitor the subcontractor's suppliers.

g.    Paret shall coordinate with the Manager the inspections by the Architect.

h.    Paret shall coordinate the efforts of the Manager, the Company, the architect, and the contractor in punchlist compilation.  Paret, with input from the Manager, shall monitor the efforts of the contractor in final completion of the punchlist items.  Paret shall assist the Manager and the Company in final inspection.

i.    Paret shall secure from the sub contractors all warranties and guaranties, manuals, record drawings, submittals and as-built plans, and keys upon final completion for turnover to the Company.

41

# EXHIBIT D

# NEW CONSTRUCTION PRE-SALES AGREEMENT

1.  **Purchase and Sale.** For and in consideration of the mutual covenants herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned buyer _____Kim Georgia Ave , LLC or its assigns_____ ("Buyer") agrees to buy and the undersigned seller 4910 Georgia Ave Holdings LLC ("Seller") agrees to sell the land described below, with such improvements as are located thereon:

    Lot #____0018____ of _____Square 2926_____ subdivision

    ____4910 Georgia Ave NW, 3 Units_____ ___ _____ (Street Address)
    __Washington_____ (City), DC _____20011____ (Zip Code)

    together with all fixtures, landscaping, improvements, and appurtenances, all being hereinafter collectively referred to as the "Property."
    Buyer will receive an average value of approximately $400,000 per Unit.

2.  **Purchase Price, Method of Payment and Closing Expenses.** Buyer warrants that, except as may be otherwise provided herein, Buyer will at Closing have sufficient cash to complete the purchase of the Property under the terms of this New Construction Purchase and Sale Agreement (hereinafter "Purchase and Sale Agreement" or "Agreement"). The purchase price to be paid is:

    $____600,00.00____, _____ U.S.
    Dollars, ("Purchase Price")

    which shall be disbursed at Buyer's expense and paid to Seller or Seller's Closing Agency          by: wire transfer or cashier's check; OR (iii) such other form as is approved by the Seller in writing.

    **A. APPRAISAL:** This Agreement IS CONTINGENT upon the appraised value either equaling or exceeding the agreed upon the Units being valued at approximately $400,000 per Unit (the "Unit Value"). If the appraised value does not equal or exceed the Unit Value, Buyer may terminate this Agreement by providing written notice to Seller and providing written proof of the same (for example, this written proof could include, but is not limited to, a copy of appraisal or a signed letter from Lender). Upon Termination, Buyer is entitled to refund of the Purchase Price plus a 25% penalty unless the appraised value to equal or exceed the Unit Value may be attributed to Change Orders and/or Upgrades and/or Closing Costs requested by the Buyer. The Buyer is not entitled to a refund of any money deposited for Change Orders and/or Upgrades and/or Closing Costs. In the event the Property does not appraise due to Change Orders and/or Upgrades and/or Closing Costs, Buyer shall either assume responsibility for producing the additional funds necessary to Close or may either terminate the Agreement. **Closing Costs and Discount Points.**

    1.  **Seller Expenses.** Seller shall pay all existing loans and/or liens affecting the Property, including all penalties, release preparation costs, and applicable recording costs; any accrued and/or outstanding association dues or property management companies, mortgage holders or other liens affecting the Property; Seller's closing fee, document preparation fee and/or attorney's fees; fee for preparation of deed; and
        notary fee on deed; fees; fees (if any) to obtain lien payoff/estoppel letters/statement of accounts from any and all associations, Seller is not a foreign person subject to tax withholding under the Foreign Investment and Real Property Tax Act and shall sign, as a condition of Closing, appropriate affidavits certifying that Seller is not subject to the same.

    2.  **Buyer Expenses.** Seller shall pay up to $_____ of Buyer's closing cost expenses _____ including pre-paids. If these expenses are less than the amount provided for by the preceding sentence, Buyer cannot apply any surplus funds to any other fee not considered a closing cost (i.e., origination fee, discount points, rate points,

1

etc.).  Buyer shall pay all other expenses and any closing costs in excess of the amount paid by Seller to include transfer taxes and recording fees on deed of conveyance and deed of trust; document preparation fee and/or attorney's fees; preparation of note, deed of trust, and other loan documents; mortgage loan inspection or boundary line survey; credit report; required premiums for private mortgage, hazard and flood insurance; required reserved deposits for insurance premiums and taxes; prepaid interest; re-inspection fees pursuant to appraisal; and any costs incident to obtaining and closing a loan, including but not limited to: appraisal, origination, discount points, application, commitment, underwriting, document review, courier, assignment, photo, tax service and notary fees.  Buyer's closing fee

3.  **Title Expenses.** Cost of title search of abstract, mortgagee's policy and owner's policy shall be paid by Buyer.

Title Company for Buyer: _**District Title**_

Closing Agency/Title Company for Seller: _Southland Title_

C.  **Financial Contingency – Loan To Be Obtained**: This Agreement is conditioned upon Buyer's ability to obtain a loan(s) in the principal amount up to _____% of the Purchase Price listed above to be secured by a deed of trust on the Property.  "Ability to obtain" as used herein means that Buyer is qualified to receive the loan based upon Lender's customary and standard underwriting criteria.  In the event Buyer, having acted in good faith, is unable to obtain financing by the Closing Date, Buyer may terminate this Agreement by providing written notice and a copy of Lender's loan denial letter.  Upon termination, Buyer is entitled to a refund of the Purchase Price less the cost of any unfunded Change Orders or Upgrades already performed, installed, or in the process of being performed or installed by the Seller on or for the Property.

Buyer shall be obligated to Close this transaction if Buyer has the ability to obtain a loan for which Buyer has applied and been approved.

**Type of loan (select box)**
☐ FHA: Addendum attached  ☐ USDA  ☐ Conventional  ☐ VA: Addendum attached  ☒ OTHER: _____

Loan Obligations: The Buyer agrees and/or certifies as follows:

(1)    Within _____ days after the Agreement Date, Buyer shall make application for the loan and shall instruct Lender to order a credit report.  Buyer shall immediately notify Seller or Seller's representative, in writing, of having applied for the loan, provide Lender's name and contact information, and verify that Buyer has instructed Lender to order a credit report;

(2)    Within _____ days after the Agreement Date, Buyer shall provide Seller with a pre-approval letter from the Lender for an amount not less than the Purchase Price.  In the event Buyer fails to timely provide the pre-approval letter to Seller, Buyer acknowledges and agrees that the Purchase Price shall be nonrefundable should Buyer ultimately be unable to obtain financing by the Closing Date.

(3)    Within 15 (fifteen) days before Closing Date, Buyer shall warrant and represent to Seller in writing that:
a.  Buyer has secured evidence of hazard insurance which will be effective at Closing and Buyer shall notify Seller of the name of the hazard insurance company;
b.  Buyer has notified Lender of an Intent to Proceed with Lender and has available funds to Close per the signed Loan Estimate; and
c.  Buyer has requested that the appraisal be ordered and affirms that the appraisal fee has been paid.

(4)    Buyer shall pursue qualification for and approval of the loan diligently and in good faith;

(5)    Buyer shall continually and immediately provide requested documentation to Lender;

(6)    Unless otherwise stated in this Agreement, Buyer represents that this loan is not contingent upon the lease or sale of any other real property and the same shall not be used as the basis for loan denial; and

(7)    Buyer shall not intentionally make any material changes in Buyer's financial condition which would adversely affect Buyer's ability to obtain the loan referenced herein.

Buyer's failure to timely comply with Sections 2.C.(1) or 2.C.(3) above and to provide required notices to Seller shall be considered a default by the Buyer and Seller's obligation to sell shall be terminated.

2

KEK
CP

**THE BELOW FINANCING CONTINGENCY WAIVER SHALL ONLY BE A PART OF THIS AGREEMENT IF THE BOX IS CHECKED.**

☐  Financing Contingency Waived (e.g. "All Cash", etc.): Buyer's obligation to close shall not be subject to any financial contingency. Buyer reserves the right to obtain a loan. Buyer will furnish proof of available funds to close by either bank statement or Lender's commitment letter within five (5) days after Agreement Date. Should Buyer fail to do so, Buyer shall be considered in default and Seller's obligation to sell shall be terminated. Failure to Close due to lack of funds shall be considered default by Buyer.

3. **Purchase Price.** Buyer has paid or will pay within <u>3</u> days after the Agreement Date to <u>District Title</u> (name of Holder) ("Holder") located at <u>1150 Connecticut Ave NW, WDC 20036</u> (address of Holder) a deposit of $ <u>600,000</u> by wire ("Purchase Price"). In the event the transaction does not close on July 31, 2020 the Purchase Price shall be returned to Buyer.

   A. **Failure to Receive Purchase Price.** In the event Purchase Price is not timely received by Holder or Purchase Price check or other instrument is not honored for any reason by the bank upon which it is drawn, Holder shall promptly notify Buyer and Seller of Buyer's failure to deposit the agreed upon Purchase Price. Buyer shall then have one (1) day to deliver Purchase Price in immediately available funds to Holder. In the event Buyer does not deliver such funds, Buyer is in default and Seller shall have the right to terminate this Agreement by notifying Buyer in writing. In the event Buyer delivers the Purchase Price in immediately available funds to Holder before Seller elects to terminate, Seller shall be deemed to have waived his right to terminate, and the Agreement shall remain in full force and effect.

   B. **Handling of Purchase Price upon Receipt by Holder.** Purchase Price is to be deposited promptly after the Agreement Date or as specified in the Special Stipulations paragraph contained at paragraph 21 herein. Holder shall disburse Purchase Price only as follows:

   (a) at Closing to be applied as a credit toward Buyer's Purchase Price;
   (b) upon a written agreement signed by all parties having an interest in the funds;
   (c) upon a reasonable interpretation of the Agreement; or
   (d) upon order of a court having jurisdiction over the matter or to the clerk upon the filing of an interpleader action.

   In the event of an interpleader action, Holder shall be reimbursed for, and may deduct from any funds interpleaded, its costs and expenses, including reasonable attorney's fees. Purchase Price shall not be disbursed prior to fourteen (14) days after deposit unless written evidence of clearance by bank is provided.

4. **Closing, Prorations, Special Assessments and Warranties Transfer.**
   A. **Closing Date; Third Party Delays.** Unless otherwise provided herein, the consummation of the purchase and sale of the Property shall occur upon "Completion" of the Improvements as provided herein, which is to be on <u>July 31, 2020</u>, (the "Closing" or "Closing Date"), which shall be evidenced by delivery of ~~warranty deed~~ Deed of Trust and payment of Purchase Price). Buyer has the right to choose any mortgage company or title company for this transaction; however, if Buyer chooses a title company other than Southland Title or a mortgage company other than Movement Mortgage and the chosen title company causes a delay or the mortgage company cannot fund the loan and complete the transaction on Closing Date, at Seller's discretion, Seller has the option to not extend this Agreement and Property shall be re-listed on the market.

   B. **Possession.** Possession of the Property is to be given with delivery of warranty deed and payment of Purchase Price. If the parties agree to permit early occupancy by stipulation in Paragraph 21 below, such occupancy shall be conditioned upon Buyer having obtained appropriate hazard insurance and transferring all utilities into the name of Buyer prior to such occupancy.

   C. **Household Goods.** The movement of any household goods or other materials by Buyer into the Property will not be permitted until the Property has been completed and Seller gives written permission for Buyer to move household goods prior to closing date.

3

D. **Prorations.** Real estate taxes, rents, dues, maintenance fees, and association fees on said Property for the calendar year in which the sale is Closed shall be prorated as of the Closing Date. In the event of a change or reassessment of taxes for the calendar year after Closing, the parties agree to pay their recalculated share. Real estate taxes, rents, dues, maintenance fees, and association fees for prior years and roll back taxes, if any, will be paid by Seller.

E. **Impact Fees or Adequate Facilities Taxes.** Seller has paid 0$ (zero dollars) in adequate facility taxes or impact fees on the property.

F. **Special Assessments.** Special assessments approved or levied prior to the Closing Date shall be paid by the Seller at or prior to Closing.

G. **Closing Certifications.** Buyer and Seller shall execute and deliver such certifications, affidavits, and statements as are required at Closing to meet the requirements of the Lender and of federal and state law.

H. **Warranties Transfer.** Seller, at the option of Buyer and at Buyer's cost, agrees to transfer Seller's interest in any manufacturer's warranties, service contracts, termite bond or treatment guarantee and/or similar warranties which by their terms may be transferable to Buyer.

5. **Title and Conveyance.**
   A.   Seller warrants that at the time of Closing, Seller will convey or cause to be conveyed to Buyer good and marketable title to the Property by general warranty deed, subject only to:

   (1)   Zoning;
   (2)   Setback requirements and general utility, sewer, and drainage easements of record on the Agreement Date upon which the improvements do not encroach; and
   (3)   Subdivision declarations, covenants, restrictions, and easements of record on the Agreement Date.

   If title examination, closing or loan survey, boundary line survey, or other information discloses material defects, Buyer may, at Buyer's discretion:

   (1)   accept the Property with the defects OR
   (2)   require Seller to remedy such defects prior to the Closing Date. Buyer shall provide Seller with written notice of such defects. If defects are not remedied by the Closing Date or any mutually agreed upon extension thereof, this Agreement shall terminate, and Buyer shall be entitled to refund of Purchase Price.

   Good and marketable title as used herein means title which a title insurance company licensed to do business in _DC_ will insure at its regular rates, subject only to standard exceptions. Seller agrees to execute such appropriate affidavits and instruments as may be required by the issuing title insurance company.

   B.   Deed is to be made in the name(s) of ____*TBD*_____.

6. **Limitations.** The home shall be constructed in accordance with good building practices and substantial accordance with the plans and specifications selected and approved by the Buyer. Seller expressly reserves the right to make such changes or substitutions in the construction of the home:

   (a) as may be required, authorized, or approved by governmental agencies having jurisdiction therefore, without the Buyer's consent;
   (b) as Seller may deem appropriate so long as materials of equal or better quality are used, without the Buyer's consent; and/or
   (c) as may be otherwise reasonably required as long as changes which affect the aesthetics or livability of the home shall be subject to Buyer's written approval.

4

7. **Contractors and/or Suppliers.** All work and materials to be performed or supplied under this Agreement shall be performed and supplied by Seller's own contractors, subcontractors, employees, agents, materialmen and suppliers. Buyer shall not have the right to have any work performed or supplies delivered to the Property at Buyer's own direction prior to Closing without written approval and consent of Seller. Seller agrees to transfer to Buyer, at Closing, subject to Buyer's acceptance thereof, Seller's interest in any manufacturer's warranties, service contracts, and/or other similar warranties which by their terms may be transferable to Buyer.

8. **Decorative Selections.** If there are decorative selections yet to be selected in the completion of the residence, Buyer shall have the option to make those selections from available stock at Seller's normal sources of supply. Buyer understands that it is Buyer's responsibility to make all selections on or before _____ (if left blank, Buyer will be informed via phone call, email, or text by Seller or Seller's decorator of date) and further understands that if the selections have not been made by said date, that Seller may make such selections. Seller choices are hereby deemed agreed to and acceptable to Buyer.

9. **Nonrefundable Deposits.** Buyer agrees that any request for changes or alterations ("Change Orders") to the residence will be set forth in writing and delivered to Seller. Any requested Change Order must be in writing and signed by Buyer and Seller in order to be binding. No subcontractor, workman or materialman has authority to agree on behalf of Seller to any Change Order. Buyer agrees that all Change Order requests must be presented to Seller so as to allow Seller adequate lead time to schedule the Change Orders into the normal building sequence. Seller has the right to refuse to make requested changes or alterations. Buyer agrees to pay Seller in advance of the performance of work necessitated by agreed Change Orders which will include the cost for both labor and materials and further understands that there will be no refunds, under any circumstances, of payments made by Buyer for Change Orders. Buyer further acknowledges that any work done on the home pursuant to Change Orders or additions may not increase the appraised value of the Property. Seller shall not be responsible if increases in the price of the Property due to Change Orders or additions are not reflected in the appraised value of (and resulting available loan for) the Property. In the event the Property does not appraise due to Change Orders and upgrade items, Buyer shall be responsible for producing the additional funds needed to Close.

10. **Delays.** Seller shall have no liability for any delays in construction caused by strikes, acts of God or nature, or delays directly caused by Buyer's Change Orders and/or selection of materials. In the event of such delays, the Closing Date may be extended by the number of days resulting from such delays, not to exceed <u>10</u> calendar days; Seller shall notify Buyer of any such delays.

11. **Homeowner Association.** TBD

12. **Inspection by Buyer.** At a point in time when Seller deems the Improvements upon the Property to be complete, Seller shall give Buyer notice of such. Buyer and/or Buyer's designated inspector/representative shall, at a mutually agreeable time within <u>five (5)</u> days of Closing, completely inspect the improvements ("Improvements"). Following the inspection, Buyer shall submit a written list of matters which Buyer reasonably deems to be incomplete or defective, hereinafter referred to as the "Punch List". Subject to Seller's acceptance, Seller shall diligently attempt to complete or repair items identified on the Punch List within <u>seven (7)</u> days of receipt. In the event Seller does not agree with Buyer's Punch List items, the parties agree to negotiate in good faith to resolve such disagreement. No changes to the Punch List may be made after its submission to Seller. If Buyer subsequently discovers any matter s/he believes incomplete or defective, Buyer may identify such defects to Seller for repair under the Builder's Limited Warranty as provided in Paragraph 16 below.

13. **Completion.** Seller will provide Buyer with copies of all building codes inspections and the final Use and Occupancy Letter from the appropriate Codes Authority, if applicable. The construction shall be deemed to be completed at such time as such inspections and approvals have been supplied and Buyer has inspected and confirmed that the contract is substantially completed. "Substantial Completion" shall mean that all matters of substance except minor touch-up matters have been completed. The construction shall be completed in accordance with all applicable governmental regulations, ordinances and codes, and shall be in compliance with all applicable restrictions, covenants and

conditions, including, without limitation, any public or private architectural controls and restrictions. If the reasonable cost of completion of the Punch List items exceeds $1,000.00, the job shall not be deemed to be substantially complete.

14. **Insurability.** It is the right and responsibility of Buyer to determine the insurability, coverage and the cost of insuring the Property. It is also the responsibility of Buyer to determine whether any exclusions will apply to the insurability of said Property.

15. **Limited Builder Warranty.** Seller warrants the Property against defective workmanship or materials (normal wear and tear excepted) for a period of one (1) year from Closing Date and against major structural defects. Seller agrees to correct any covered defects identified by Buyer by repair list timely submitted via Seller's website or mail during one of two allotted callback periods. The first callback period shall be ninety (90) days following Closing. The second callback period shall begin thirty (30) days prior to the one-year period ending on the first anniversary of Closing and end on the first anniversary of Closing. Seller shall deliver a copy of this warranty in written form to Buyer at Closing. Seller, at option of Buyer, shall further transfer all warranties and guaranties of manufacturers covering any of the Property which are, by their nature, transferable to Buyer. After receiving Buyer's 90 Day List via website submittal or mail, Seller will contact Buyer to schedule repairs. Repairs will take place during regular business hours Monday-Friday.

16. **Brokers Disclaimer.** It is understood and agreed that the real estate firms and real estate licensee(s) representing or assisting Seller and/or Buyer, their brokers, and the real estate firms (collectively referred to as "Brokers") are not parties to this Agreement and do not have or assume liability for the performance or nonperformance of Seller or Buyer.

17. **Default.** Should Buyer default hereunder, the Earnest Money shall be forfeited as damages to Seller and shall be applied as a credit against Seller's damages. Seller may elect to sue, in contract or tort, for additional damages or specific performance of the Agreement, or both. Should Seller default, Buyer's Earnest Money shall be refunded to Buyer. In addition, Buyer may elect to sue, in contract or tort, for damages or specific performance of this Agreement, or both. In the event that any party hereto shall file suit for breach or enforcement of this Agreement (including suits filed after Closing which are based on or related to the Agreement), the prevailing party shall be entitled to recover all costs of such enforcement, including reasonable attorney's fees. In the event that any party exercises its right to terminate due to the default of the other pursuant to the terms of this Agreement, the terminating party retains the right to pursue any and all legal rights and remedies against the defaulting party following termination. In the event the Units are delivered more than 32 months after the commencement of construction, Seller shall pay Buyer a penalty of 1% of the Purchase Price per month.

18. **Other Provisions.**

A. **Binding Effect, Entire Agreement, Modification, Assignment, and Agreement Date.** This Agreement shall be for the benefit of, and be binding upon, the parties hereto, their heirs, successors, legal representatives and assigns. This Agreement constitutes the sole and entire agreement between the parties hereto and no modification of this Agreement shall be binding unless signed by all parties or assigns to this Agreement. No representation, promise, or inducement not included in this Agreement shall be binding upon any party hereto. Any assignee shall fulfill all the terms and conditions of this Agreement. The Agreement Date shall be the date upon which this Agreement is signed by the last party thereto.

B. **Survival Clause.** Any provision contained herein, which by its nature and effect is required to be performed after Closing shall survive the Closing and delivery of the deed, and shall remain binding upon the parties to this Agreement and shall be fully enforceable thereafter.

C. **Governing Law and Venue.** This Agreement is intended as a contract for the purchase and sale of real property and shall be interpreted in accordance with the laws and in the courts of the State of Tennessee.

D. **Time of Essence.** Time is of the essence in this Agreement.

E. **Terminology.** As the context may require in this Agreement: (1) the singular shall mean the plural and vice versa; (2) all pronouns shall mean and include the person, entity, firm or corporation to which they relate; (3) the masculine shall mean the feminine and vice versa; and (4) the term day(s) used throughout this Agreement shall be deemed to be calendar day(s) ending at 11:59 p.m. local time unless otherwise specified in this Agreement.

6

KEK
CP

Local time shall be the current time applicable to Knoxville, Tennessee. In the event a performance deadline, other than the Closing Date (as defined in paragraph 4 herein) or Date of Possession (as defined in paragraph 4 herein), occurs on a Saturday, Sunday or legal holiday, the performance deadline shall extend to the next following business day. Holidays as used herein are those days deemed federal holidays. In calculating any time period under this Agreement, the commencement day shall be the day following the initial date (e.g. Agreement Date).

F. **Responsibility to Cooperate.** Buyer and Seller agree to timely take such actions and produce, execute, and/or deliver such information and documentation as is reasonably necessary to carry out the responsibilities and obligations of this Agreement. Except as to matters which are occasioned by clerical errors or omissions or erroneous information, the approval of the Closing documents by the parties shall constitute their approval of any differences between this Agreement and the Closing. Buyer and Seller agree that if requested after Closing, they will correct any documents and pay any amounts due where such corrections or payments are appropriate by reason of mistake, clerical errors or omissions, or the result of erroneous information.

G. **Notices.** Except as otherwise provided herein, all notices and demands required or permitted hereunder shall be in writing and delivered either (1) in person, (2) by a prepaid overnight delivery service, (3) by facsimile transmission (FAX), (4) by the United States Postal Service, postage prepaid, registered or certified, return receipt requested or (5) Email. NOTICE shall be deemed to have been given as of the date and time it is actually received. Receipt of notice by the real estate licensee or their Broker assisting a party as a client or customer shall be deemed to be notice to that party for all purposes under this Agreement as may be amended, unless otherwise provided in writing.

H. **Risk of Loss.** The risk of hazard or casualty loss or damage to Property shall be borne by Seller until transfer of title. If casualty loss prior to Closing exceeds 10% of the Purchase Price, Seller or Buyer may elect to terminate this Agreement with a refund of Purchase Price to Buyer.

I. **Equal Housing.** This Property is being sold without regard to race, color, sex, religion, handicap, familial status, or national origin.

J. **Severability.** If any portion or provision of this Agreement is held or adjudicated to be invalid or unenforceable for any reason, each such portion or provision shall be severed from the remaining portions or provisions of this Agreement, and the remaining portions or provisions shall be unaffected and remain in full force and effect. In the event that the contract fails due to the severed provisions, then the offending language shall be amended to be in conformity with state and federal law.

K. **Contract Construction.** This Agreement or any uncertainty or ambiguity herein shall not be construed against any party but shall be construed as if all parties to this Agreement jointly prepared this Agreement.

L. **Other.** A party seeking to invoke his/her right to terminate this Agreement pursuant to a contingency stated herein shall, upon request of the other party, provide copies of documentation supporting the invoking party's right to exercise said contingency. Such supporting documents shall be for the use of the requesting party to determine if the conditions of the contingency have been met and shall not be disseminated to third parties.

19. **Exhibits and Addenda.** All exhibits and/or addenda attached hereto, listed below, or referenced herein are made a part of this Agreement:

Addendum 1: Confirmation of Agency Status
Addendum 2: Residential Property Condition Exemption Notification
Addendum 3: Affiliated Business Disclosure Statement
Addendum 4: Construction Policy (Buyer contact information is required)

20. **Special Stipulations.** The following Special Stipulations, if conflicting with any preceding paragraph, shall control:

_____
_____
_____
_____
_____

21. **Contingency Contract:** If the parties stipulate to an additional contingency making the Buyer's obligation to finalize the purchase of Property contingent upon the sale of Buyer's current home, Seller shall have the right to terminate this Agreement and sell the Property to another buyer if Buyer fails to waive this contingency within twenty-four (24) hours of receiving notification via email or text that Seller has received a competing offer on Property. In the event of Seller's termination, Buyer shall receive a full refund of Earnest Money. It is acknowledged that payments to Seller for "Change Orders" which include any upgraded items shall be non-refundable and retained by Seller.

If applicable; List, the address of the buyer's contingent property and choose one of the following options:

Address of Buyer's Contingent Property:

_____(Street Address)
_____(City), _____(State),_____ (Zip Code)

☐    Buyer's Contingent Property is NOT currently listed on local MLS.

☐    Buyer's Contingent Property is currently listed on local MLS but not under contract.

☐    Buyer's Contingent Property is currently listed on the local MLS and/or is under contract with a closing date of_____.

22. **Method of Execution.** The parties agree that signatures and initials transmitted by facsimile, other photocopy transmittal, or by transmittal of digital signature as defined by the applicable State or Federal law will be acceptable and may be treated as originals and that the final Purchase and Sale Agreement containing all signatures and initials may be executed partially by original signature and partially on facsimile, other photocopy documents, or by digital signature as defined by the applicable State or Federal law.

23. **Time Limit of Offer:** This offer may be withdrawn at any time before the acceptance with Notice. Offer terminates if not counted or accepted by ___ o'clock ___ on _____.

NOTE: Any provisions of this Agreement which are preceded by a box "☐" must be marked to be a part of this Agreement. By affixing your signature below, you also acknowledge that you have reviewed each page and have received a copy of this Agreement.

Buyer hereby makes this offer:

_____    DATE  4/21/20    EUNG KWON KIM    DATE  9/21/20
BUYER                                    BUYER

Seller hereby:

☒ ACCEPTS    ☐ COUNTERS    ☐ REJECTS

4910 Georgia Ave Holdings LLC
SELLER
By: _____    Executed by: _____    DATE_____

8

# EXHIBIT E

Doc #: 2020097981
08/13/2020 09:54 AM

4910 Georgia Ave NW Washington DC 20011

## DEED OF TRUST

**THIS DEED OF TRUST**, made effective as of July 31, 2020, by and between **4910 Georgia Ave Holdings LLC**, a District of Columbia Limited Liability Company, hereinafter referred to as the "Grantor" (index as Grantor), with an address of 1140 3rd St NE , Washington, DC 20002, and **Daniel Huertas**, hereinafter referred to as the "Trustee" (index as Grantee), with an address of 2815 Hartland Road, Suite 200, Falls Church, VA 22043.

WHEREAS, Grantor is justly indebted to **WCP Fund I LLC**, a Delaware Limited Liability Company, hereinafter referred to as the "Beneficiary," with an address of 2815 Hartland Road, Suite 200, Falls Church, VA 22043, for money borrowed in the amount of **$852,872.00** ("Loan Amount"), for which amount the said Grantor has made and delivered a certain Commercial Deed of Trust Note of even date herewith, in the original principal amount of the Loan Amount payable to the order of the Beneficiary; and

WHEREAS, the Grantor desires to secure the Beneficiary and any subsequent holder of the Note secured hereby the full and punctual payment of said debt, when and as the same shall become due and payable, as well as any and all renewals and extensions of said Note, or any part thereof, together with interest thereon, and the performance of the covenants and agreements herein and therein contained, and also to secure the reimbursement to the holder or holders of said Note or to the Trustee or substitute Trustee, and any purchaser or purchasers of said Note from the Lender, or grantee or grantees under any sale or sales conducted by the Trustee or Substitute Trustee under the provisions of this Deed of Trust for all money which may be advanced as herein provided for, and for any and all costs and expenses incurred or paid on account of any litigation at law or in equity which may arise in respect to this Deed of Trust, or in respect to the indebtedness or the property herein described, or in obtaining possession of the Mortgaged Property either before or after any sale which may be made as hereinafter provided for.

## ARTICLE I

## DEFINITIONS

1.0 Definitions.

Grantor, Trustee and Beneficiary agree that, unless the context otherwise specifies or requires, the following terms shall have the meaning herein specified, such definitions to be applicable equally to the singular and the plural forms of such terms and to all genders:

(a) Beneficiary - The party hereinabove designated as such, its successors and assigns.

4910 Georgia Ave NW Washington DC 20011

(b) Event(s) of Default - Any of the happenings, events, circumstances or occurrences described in Article VII of this Deed of Trust.

(c) Grantor - The party hereinabove designated as such, and that party's heirs, survivors, administrators, executors, successors and assigns.

(d) Impositions - All (i) real estate taxes, and other taxes of every kind and character; and (ii) all water and sewer rents and charges; and (iii) all other public charges, taxes, homeowners association assessments, fees, governmental and non-governmental charges, to the extent any of the foregoing are imposed or assessed upon the Grantor or the Mortgaged Property or arising in respect of the occupancy, use or possession thereof.

(e) Improvements - Any and all buildings, structures, improvements, alterations or appurtenances now erected or at any time hereafter constructed, renovated, or placed upon the Mortgaged Property or any portion thereof and any replacements thereof.

(f) Indebtedness - The principal of and the interest on, and all other amounts, payments and premiums due on account of the Note and all other indebtedness of the Grantor to the Beneficiary payable pursuant to the Note.

(g) Land - The real estate described in "<u>EXHIBIT A</u>" attached hereto and by this reference made a part hereof.

(h) Mortgaged Property - The Land and the Improvements.

(i) Note - The Commercial Deed of Trust Note made by the Grantor payable to the order of the Beneficiary of even date herewith, in the original principal amount of the Loan Amount, and all modifications, renewals, substitutions, and extensions of the aforesaid Note.

(j) Obligations - Any and all of the covenants, promises and other obligations (other than the Indebtedness) made or owing by the Grantor to the Beneficiary pursuant to or as otherwise set forth in this Deed of Trust.

(k) Trustee - The parties hereinabove designated as such, their successors and substitutes.

<u>ARTICLE II</u>

<u>GRANT</u>

2.0 Grant.

NOW, THEREFORE, the Grantor, in consideration of the premises and of the sum of TEN and NO/100 DOLLARS ($10.00) lawful money of the United States of America, the receipt of which is hereby acknowledged by the Grantor, and in order to secure the payment of the Indebtedness and the Note and the performance and discharge of the

4910 Georgia Ave NW Washington DC 20011

Obligations, does by these presents, grant, give, bargain, sell, assign, convey, release, warrant, mortgage, transfer, hypothecate, pledge, set over and confirm unto the Trustee, their successors and assigns forever, in fee simple, the Mortgaged Property, TO HAVE AND TO HOLD the said Mortgaged Property unto the said Trustee, their successors and assigns, forever;

IN TRUST, to secure (a) the payment to the Beneficiary of the Indebtedness and all other sums due under the Note and/or this Deed of Trust, (b) the performance and discharge of the Obligations and of all covenants and agreements in the Note, (c) the performance and discharge of all covenants and agreements in all documents and/or instruments evidencing, securing, or otherwise relating to the Indebtedness (collectively, "Loan Documents") other than the Note and this Deed of Trust, (d) any and all future or additional advances (whether or not obligatory) made by Beneficiary (i) to protect or preserve the Mortgaged Property or the lien or security interest created hereby on the Mortgaged Property, or (ii) for taxes, assessments, or insurance premiums as hereinafter provided, or (iii) for performance of any of Grantor's obligations hereunder or under the other Loan Documents, or (iv) for any other purpose provided herein or in the other Loan Documents (whether or not the original Grantor remains the owner of the Mortgaged Property at the time of such advances), together with interest thereon as provided for in the Note, and (e) any and all other indebtedness now owing or which may hereafter be owing by Grantor to Beneficiary, however and whenever incurred or evidenced, whether express or implied, direct or indirect, absolute or contingent, or due or to become due, and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, and extensions thereof.

2.1 Possession.

Until the occurrence of an Event of Default, the Beneficiary shall promptly permit the Grantor to possess and enjoy the Mortgaged Property.

2.2 Condition of Grant.

The condition of these presents is such that if Grantor shall pay or cause to be paid the Indebtedness as and when the same shall become due and payable under the Note, and shall observe, perform and discharge the Obligations, then Beneficiary and the Trustee shall release and reconvey unto and at the cost of Grantor the Mortgaged Property whereupon this Deed of Trust shall cease and be void and the Mortgaged Property shall be released from the lien hereof at the cost of the Grantor.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

3.0 Representations and Warranties.

Grantor hereby represents and warrants to Beneficiary that:

Rev 5.2016                                                                 **Page 3 of 22**

4910 Georgia Ave NW Washington DC 20011

3.1 Validity of Loan Instruments.

     (a) The execution, delivery and performance by Grantor of the Note and this Deed of Trust, (i) are within the legal powers of Grantor, and (ii) will not violate any provision of law, any order of any court or other agency of government, or any indenture, agreement or other instrument to which Grantor is a party or by which they or any of their property is bound or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its property or assets, except as contemplated herein; and (b) the Note does, and this Deed of Trust when executed and delivered by Grantor will, constitute the legal, valid and binding obligations of in accordance with their respective terms, subject to the limiting effect of applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws of general applicability relating to creditor's rights, and the exercise of judicial discretion which may limit certain remedies therein provided.

3.2 Mortgaged Property and Other Property.

     Grantor has good and marketable title in fee simple to the Mortgaged Property free and clear of any liens, charges, encumbrances, security interests and adverse claims whatsoever. This Deed of Trust is and will remain a valid and enforceable first lien on the Mortgaged Property. The Grantor has full power and lawful authority to subject the Mortgaged Property to the lien of this Deed of Trust in the manner and form herein contemplated. The Grantor will preserve such title, and will forever warrant and defend the same to the Trustee and will forever warrant and defend the validity and priority of the lien hereof against the claims of all persons and parties whomsoever.

ARTICLE IV

AFFIRMATIVE COVENANTS

4.0 Affirmative Covenants.

     Until the entire Indebtedness shall have been paid in full, Grantor hereby covenants and agrees as follows:

4.1 Compliance with Laws.

     Grantor will promptly, fully and faithfully comply with, conform to and obey all present and future laws, ordinances, rules, regulations, requirements which may be applicable to the manner of use, occupancy, possession, operation, maintenance, alteration, and repair of the Mortgaged Property.

4.2 Payment of Impositions.

Rev 5.2016

4910 Georgia Ave NW Washington DC 20011

Grantor will pay and discharge, or cause to be paid and discharged, not later than the due date thereof or the date any fine, penalty, interest or cost may be added thereto or imposed by or pursuant to law for the nonpayment thereof (whichever date shall first occur) or, at the direction of the Beneficiary, as soon as the same become liens, whether or not then due and payable, any Impositions upon or assessed against the Mortgaged Property or arising in respect of the occupancy, use or possession thereof. The Grantor will, upon the request of the Beneficiary, deliver to the Beneficiary from time to time receipts evidencing the payment of all such Impositions.

4.3 Repairs and Waste.

Grantor will at all times keep and maintain the Mortgaged Property in good order, condition and repair and will promptly make, from time to time, all repairs, renewals, replacements, additions and improvements, interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen, as may be necessary or desirable to accomplish the purposes of this Section. The Grantor will not commit any waste upon the Mortgaged Property or make or permit any change in the use of the Mortgaged Property which will in any way increase any ordinary fire or other hazard arising out of the operation thereof.

4.4. Insurance.

Grantor will keep the Improvements insured against loss by fire, casualty and such other hazards as may from time to time be required by the Beneficiary for the benefit of the Beneficiary. The Grantor shall maintain such public liability and indemnity insurance as may from time to time be reasonably required by the Beneficiary. All such insurance shall be written in forms, amounts and by companies satisfactory to the Beneficiary and losses thereunder, shall be payable to the Beneficiary pursuant to a standard mortgagee's endorsement. Duplicate originals of each such policy of insurance shall be delivered to the Beneficiary and the Grantor shall provide the Beneficiary with such evidence of the payment of premiums due on account of such insurance as may from time to time be required by the Beneficiary. All such policies shall provide that the same shall not be invalidated by any waiver of the right of subrogation by any insured and shall provide that the carrier shall have no right to be subrogated to the Beneficiary. All such policies shall provide for at least thirty (30) days' prior written notice to all insureds named thereon (including, without limitation, the Beneficiary) prior to any cancellation, surrender or modification thereof, including without limitation, cancellation for nonpayment of premium. The Grantor shall give the Beneficiary prompt notice of any loss covered by such insurance and the Beneficiary shall have the right to join the Grantor in adjusting any loss. Any funds received as payment for any loss under any such insurance shall be paid over to the Beneficiary and shall be applied by the Beneficiary, should there then exist any Event of Default hereunder that is continuing and not cured by Grantor, to the prepayment of the Indebtedness, without premium or penalty, or, should no Event of Default have occurred and be continuing uncured hereunder, then to the reimbursement of Grantor for expenses actually incurred by the Grantor in the restoration or replacement of the Improvements.

4910 Georgia Ave NW Washington DC 20011

4.5 Restoration Following Casualty.

In the event of the happening of any casualty (including, without limitation, any casualty for which insurance was not obtained or obtainable) resulting in damage to or destruction of the Mortgaged Property or any part thereof, the Grantor shall give prompt written notice of the time, nature and extent thereto to the Beneficiary and, as long as no Event of Default exists hereunder that is continuing and not cured by Grantor, then the Beneficiary shall apply the proceeds of insurance to the restoration, repair or replacement of the Mortgaged Property or in the event the casualty was not insured, the Grantor shall, at the sole cost and expense of the Grantor and whether or not the proceeds of insurance, if any, are sufficient for the purpose, promptly commence and diligently continue to restore, repair and replace the Mortgaged Property as nearly as possible to its condition immediately prior to such casualty.

4.6 Performance of Other Agreements.

Grantor will comply in a timely way, and otherwise abide by and perform, all of the terms, agreements, obligations, covenants, restrictions and warranties binding upon the Grantor under any easement, right-of-way, covenant, restriction, or other agreement with respect to or in any manner affecting the Mortgaged Property or any part thereof.

4.7 Further Assurances.

Grantor, at his/her/its sole cost and expense, will make, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfer and assurances as the Trustee or the Beneficiary shall from time to time reasonably require, for the better assuring, conveying, assigning, transferring and confirming unto the Trustee the property and rights hereby conveyed or assigned or intended now or hereafter so to be, or which the Grantor may be or may hereafter become bound to convey or assign to the Trustee, or for carrying out the intention or facilitating the performance of the terms of this Deed of Trust or for filing, registering or recording this Deed of Trust.

4.8 Advances.

In the event the Grantor shall fail to perform any of the covenants contained herein then the Beneficiary, with or without notice to the Grantor, may, but shall not be required to, make advances to perform the same in its behalf, and all sums so advanced shall be a lien upon the Mortgaged Property and shall be secured hereby. Any advance so made shall be charged interest at the default rate provided herein.

4.9 Deposits for Taxes and Related Matters.

Beneficiary shall not require the Grantor to deposit with Beneficiary in escrow those amounts sufficient to discharge over time the Impositions and the premiums on the insurance required pursuant hereto unless an Event of Default has occurred.

4910 Georgia Ave NW Washington DC 20011

4.10 Indemnity - Hold Harmless.

Grantor shall forever indemnify and save the Beneficiary and the Trustee harmless from all loss, liability, damage, costs and expenses, including, without limitation, reasonable attorneys' fees, and title and survey costs, incurred by reason of any action, suit, proceeding, hearing, motion or application before any Court or administrative body in or which the Beneficiary or the Trustee may be or become a party by reason of this Deed of Trust, whether as holder of this Deed of Trust, as mortgagee-in-possession, as successor-in-interest to Grantor, by foreclosure deed or deed in lieu of foreclosure, including, without limitation, with respect to (a) any accident to, injury to or death of persons or loss of or damage to property occurring on or about the Mortgaged Property, (b)any failure on the part of the Grantor to perform or comply with any of the terms, covenants, conditions and agreements set forth in the this Deed of Trust, (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Mortgaged Property or any other part thereof for construction or maintenance or otherwise, (d) any action brought against any party attacking the validity, priority or enforceability of this Deed of Trust, and/or (e) bankruptcy. All money paid or expended by Beneficiary or Trustee in connection with any of the foregoing, together with interest thereon from day of such payment at the default rate set forth in the Note, shall be so much additional indebtedness secured hereby and, except as otherwise provided herein, shall be immediately and without notice due and payable by Grantor. The obligations of the Grantor under this Section shall survive any foreclosure, deed in lieu of foreclosure, release, termination or satisfaction of this Deed of Trust.

4.11 Lockbox Access.

Grantor to install a combination lockbox on the subject Mortgaged Property and provide said lockbox combination to the Beneficiary. Lockbox is to remain located on property at all times during term of this Deed of Trust. Grantor irrevocably grants permission to Beneficiary and/or Trustee to enter into any improvement on the Mortgaged Property at any time and for any purpose consistent with ensuring Grantor's compliance with the terms and conditions of this Deed of Trust.

4.12 Sign Installation.

Grantor hereby allows Grantee to install a 18x24 sign in the yard of the Mortgaged Property during term of this Deed of Trust.

<u>ARTICLE V</u>

<u>NEGATIVE COVENANTS</u>

5.0 Negative Covenants

4910 Georgia Ave NW Washington DC 20011

Until the Indebtedness shall have been paid in full, Grantor covenants and agrees as follows:

5.1 Other Liens - Transfers

Grantor will not, without the prior written consent of the Beneficiary, create or permit to be created or remain, any mortgage, pledge, lien, lease, encumbrance or charge or security interest, or conditional sale or other title retention agreement, with respect to the Mortgaged Property or any part thereof or income therefrom, whether prior or subordinate to the lien of this Deed of Trust, except as otherwise consented to in writing by Beneficiary. Except for any grant, conveyance, sale, assignment or transfer of the Mortgaged Property which is conditioned upon the release of record of this Deed of Trust, the Grantor will not, without the prior written consent of the Beneficiary, make, create or consent to any grant, conveyance, sale, assignment or transfer of the Mortgaged Property or any part thereof, other than as consented to by Beneficiary.

5.2 Impairment of Security

Grantor will take no action which will in any manner impair the value of the Mortgaged Property or the security of this Deed of Trust.

5.3 Occupancy.

Unless otherwise agreed to in writing by the Beneficiary, Grantor shall not allow any person or persons to occupy the Mortgaged Property during the term of the Note.

## ARTICLE VI

## EMINENT DOMAIN – CONDEMNATION

6.0 Notice.

Grantor shall give the Trustee and the Beneficiary prompt written notice of the actual or threatened commencement of any proceedings under the power of condemnation or eminent domain affecting all or any part of the Mortgaged Property, and the Grantor will deliver to the Trustee and the Beneficiary true and complete copies of any and all documents and papers served upon the Grantor in connection with any such proceedings promptly following receipt thereof by the Grantor.

6.1 Assignment of Condemnation Awards.

Grantor hereby irrevocably assigns, transfers and sets over unto the Beneficiary all right, title, interest and estate of the Grantor in and to any award or payment made in respect of any proceeding under the power of condemnation or eminent domain relating to the Mortgaged Property and initiated subsequent to the recordation of this Deed of Trust.

4910 Georgia Ave NW Washington DC 20011

6.2 Application of Proceeds.

All proceeds received by or for the account of the Beneficiary as a result of, or by agreement in anticipation or in lieu of, any exercise of the power of condemnation or eminent domain with respect to the Mortgaged Property, shall be applied by the Beneficiary in the following order of priority: (a) to reimburse the Beneficiary for all costs and expenses actually and reasonably incurred by the Beneficiary in connection with the collection of such award or payment, including, without limiting the generality of the foregoing, reasonable attorney's fees; and (b) to the prepayment of the amount then due on account of the Indebtedness, without premium or penalty; and (c) to the Grantor. In the event, however, that in the opinion of the Beneficiary such taking will not materially affect the value of the Mortgaged Property, then the Beneficiary may disburse the entire proceeds of the taking to the Grantor; provided, however, that the Beneficiary shall then have the right to specify the manner in which such proceeds shall be disbursed by the Grantor; and, provided further, that the payment of the proceeds to the Grantor shall not affect the lien hereof or reduce the amount of Indebtedness.

<u>ARTICLE VII</u>

<u>EVENTS OF DEFAULT</u>

7.0 Events of Default.

The term "Event(s) of Default" shall mean the occurrence or happening, from time to time, of any one or more of the following or any other occurrences to/by the Grantor (both severally and/or jointly):

7.1 Payment of Indebtedness.

If the Grantor shall default in the payment of any portion of the Indebtedness when and as the same shall become due and payable under the Note.

7.2 Performance of Obligations.

If the Grantor shall default in the due observance or performance of any of the Obligations under the Note or this Deed of Trust.

7.3 Appointment by Receiver.

If by the order of a court of competent jurisdiction, a trustee, receiver or liquidator of the Mortgaged Property or any part thereof, or of the Grantor, shall be appointed and such order shall not be discharged or dismissed within ninety (90) calendar days after such appointment.

7.4 Voluntary Bankruptcy.

4910 Georgia Ave NW Washington DC 20011

If the Grantor shall file a petition in bankruptcy or for an arrangement or for reorganization pursuant to the Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, or if, by decree of a court of competent jurisdiction, the Grantor shall be adjudicated a bankrupt, or be declared insolvent, or shall make an assignment for the benefit of creditors, or shall admit in writing his inability to pay his debts generally as they become due, or shall consent to the appointment of a receiver or receivers of all or any part of its property.

7.5 Involuntary Bankruptcy.

If any of the creditors of the Grantor shall file a petition in bankruptcy against the Grantor, pursuant to the Federal Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, and if such petition shall not be discharged or dismissed within ninety (90) calendar days after the date on which such petition was filed.

7.6 Judgments.

If final judgment for the payment of money or the establishment of a mechanic's lien shall be rendered against the Grantor and the Grantor shall not discharge the same or cause it to be discharged within thirty (30) calendar days from the entry thereof, or shall not appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered, and secure a stay of execution pending such appeal.

7.7 Transfer of Mortgaged Property.

With the exception of the sale of the Mortgaged Property, which sale is conditioned upon the release of the Mortgaged Property from the lien of this Deed of Trust, if Grantor shall transfer, or agree to transfer, in any manner, either voluntarily or involuntarily, by operation of law or otherwise, all or any portion of the Mortgaged Property, or any interest therein without, in any such case, the prior written consent of Beneficiary. NOTICE – THE INDEBTEDNESS SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY HEREIN CONVEYED IN TRUST.

7.8 Occupancy.

Grantor represents and covenants to Trustee and Beneficiary that, as of the effective date of this Deed of Trust (at the latest), the Mortgaged Property is vacant. Grantor further covenants to Trustee and Beneficiary that, so long as this Deed of Trust remains a lien against the Mortgaged Property, the Mortgaged Property will remain vacant and Grantor will not permit the Mortgaged Property to be occupied by anyone, including Grantor. Grantor further covenants that, to the extent that the Mortgaged Property was tenanted prior to the effective date of this Deed of Trust, Grantor properly adhered to all tenants rights laws with proper notices and procedures.

4910 Georgia Ave NW Washington DC 20011

7.9 Other Indebtedness

Any default under or breach of any document or instrument evidencing or securing any indebtedness, obligation, or liability of any kind or nature – other than the Indebtedness and the Obligations secured hereby – of Grantor or any guarantor of the Indebtedness, or any of their affiliates, to Beneficiary, whether now existing or hereafter created or arising, direct or indirect, material or immaterial, and whether absolute or contingent, joint, several or joint and severally and howsoever owned, held, or acquired.

7.10 Death or Incapacity

Upon the death or incapacity of the Grantor (if applicable) or of any guarantor of the Indebtedness (if applicable).

**ARTICLE VIII**

**DEFAULT AND FORECLOSURE**

8.0 Remedies.

If an Event of Default shall occur, then the Trustee or the Beneficiary may, at the option of the Beneficiary, exercise any or all of the following remedies:

(a) Foreclosure Sale. During the continuance of any such Event of Default, the Trustee personally or by its agents or attorneys, upon the instruction of the Beneficiary, may sell the Mortgaged Property, or any part or parts thereof, and all estate, right, title, interest, claims and demand therein, at public auction at such time and place and upon such terms and conditions as the Trustee may deem appropriate or as may be required or permitted by applicable law or rule of court, having first given, advertised, and published such notice of the time, place and terms of foreclosure/public auction by publication in at least one newspaper published or having a general circulation in the county, city or jurisdiction in which the Mortgaged Property is located, once a week for two successive weeks, or by such other methods, if any, as the Trustee or any title insurance company, insuring the lien hereof, may deem appropriate.

(b) Other Remedies. During the continuance of any Event of Default, the Trustee and the Beneficiary may take such other steps to protect and enforce their respective rights, whether by action, suit or proceeding in equity or at law, or in aid of any power granted in the Note or this Deed of Trust, or for the enforcement of any other appropriate legal or equitable remedy, or otherwise, as the Trustee or the Beneficiary may elect.

8.1 Adjournment of Sale.

The Trustee may adjourn from time to time any sale to be made under, or by virtue of this Deed of Trust by announcement at the time and place appointed for such sale or for such adjourned sale; and, except as otherwise provided by any rule of law, the Trustee,

4910 Georgia Ave NW Washington DC 20011

without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

8.2 Conveyance by Trustee.

Upon the completion of any sale or sales made by the Trustee under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Trustee or an officer of the court empowered so to do, shall execute and deliver to the purchaser or purchasers a good and sufficient instrument, or instruments, conveying, assigning and transferring all estate, right, title and interest in and to the Mortgaged Property and rights sold. The Trustee is hereby appointed the irrevocable true and lawful attorney of the Grantor in its name and stead to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold and for that purpose the Trustee may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, the Grantor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Any such sale or sales made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of the Grantor in and to the properties and rights so sold, and shall be a perpetual bar, both at law and in equity, against the Grantor and against any and all persons claiming or who may claim the same, or any part thereof from, through or under the Grantor.

8.3 Purchase by Beneficiary.

In the event of the sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Beneficiary shall be competent to bid for and acquire the Mortgaged Property or any part thereof.

8.4 Waiver of Redemption - Exemptions Waived.

Grantor will not at any time insist upon, or plead, or in any manner whatever claim or take any benefit or advantage of any stay or extension or moratorium law, any exemption from attachment, execution or sale of the Mortgaged Property or any part thereof, wherever enacted, now or at any time hereafter in force, which may affect the covenants and terms of performance of this Deed of Trust, nor claim, take or insist upon any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisal of the Mortgaged Property, or any part thereof, prior to any sale or sales thereof which may be made pursuant to any provision herein, or pursuant to the decree, judgment or order of any court of competent jurisdiction; or after any such sale or sales, claim or exercise any right under any statute heretofore or hereafter enacted to redeem the property so sold or any part thereof, and the Grantor hereby expressly waives all benefit or advantage of any such law or laws, and covenants not to hinder, delay or impede the execution of any right, power or

4910 Georgia Ave NW Washington DC 20011

remedy herein granted or delegated to the Trustee or the Beneficiary, but to suffer and permit the execution of every power as though no such law or laws had been made or enacted. The Grantor, for herself and all who claim under her, waives, to the extent that it lawfully may, the benefit of any homestead exemption and any and all right to have the Mortgaged Property marshaled upon any sale or foreclosure hereunder.

8.5 Remedies Cumulative and Concurrent.

No remedy conferred upon or reserved to the Trustee or the Beneficiary is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute. Every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary shall be concurrent and may be pursued separately, successively or together against the Grantor; and every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary may be exercised from time to time as often as may be deemed expedient by the Trustee or the Beneficiary.

8.6 Application of Proceeds.

The proceeds of any sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, together with any other sums which may then be held by the Trustee or the Beneficiary pursuant to this Deed of Trust, shall be applied as follows:

(a) First, to the payment of the costs and expenses of such sale, including, without limitation, compensation to the Trustee and the Beneficiary, their respective agents and counsel, and of any judicial or other proceeding wherein the same may be made, and of all expenses, liabilities and advances made or incurred by the Trustee or the Beneficiary under this Deed of Trust, and all taxes and assessments due upon the Mortgaged Property at the time of such sale and to discharge any other lien prior to this Deed of Trust, except any taxes, assessments or other liens subject to which the Mortgaged Property shall have been sold.

(b) Second, to the payment of whatever may then remain unpaid on account of the Indebtedness, with interest thereon to the date of payment or as otherwise provided in the Note.

(c) Third, to the payment of any other sums required to be paid by the Grantor pursuant to any provision of the Note or this Deed of Trust, including, without limitation, all expenses, liabilities and advances made or incurred by the Beneficiary under this Deed of Trust or in connection with the enforcement thereof, together with interest on all such advances.

4910 Georgia Ave NW Washington DC 20011

(d) Fourth, to the payment of the surplus, if any, to whomsoever may be lawfully entitled to receive the same upon the delivery and surrender of the Mortgaged Property sold and conveyed.

## ARTICLE IX

## THE TRUSTEE

### 9.0 Acceptance - Standard of Conduct

Trustee, by acceptance hereof, hereby covenants faithfully to perform and fulfill the trusts herein created; provided, however, that the Trustee shall be liable hereunder only for gross negligence, willful misconduct or bad faith. In any event, the Trustee shall be indemnified and forever held harmless by the Beneficiary for any action which the Trustee may take pursuant to and in reliance upon the written instructions of the Beneficiary.

### 9.1 Fees and Expenses.

Grantor shall pay all reasonable costs, fees and expenses of the Trustee, its agents and counsel, incurred in connection with the performance of the Trustee's duties hereunder. Nothing contained in this Deed of Trust shall be construed to require the Trustee to make any advances of funds for the benefit of either the Grantor or the Beneficiary for any reason or purpose.

### 9.2 Commissions on Sale.

In the event of any sale made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to retain as compensation a commission of 5.00% of the proceeds of such sale.

### 9.3 Commission on Advertisement.

Immediately upon the first publication of an advertisement of any sale to be made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceeding or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to receive as compensation from the Grantor a commission of 2.50% of the total amount then due on account of the Indebtedness and, upon the first publication of any such advertisement, such commission shall be considered earned by the Trustee, payable by the Grantor, and a part of the Indebtedness. The commissions provided for in Sections 9.2 and 9.3 shall not be cumulative.

### 9.4 Resignation.

Trustee may resign at any time after thirty (30) calendar days' notice in writing to the Grantor and the Beneficiary.

4910 Georgia Ave NW Washington DC 20011

9.5 Acts of Trustee.

In the event more than one person is designated as Trustee herein, then either or any of them may act without the other when the circumstances shall so require and the act of either or any of them shall be considered as the act of both or all.

9.6 Successor Trustee - Substitution.

The Beneficiary may remove the Trustee at any time or from time to time, with or without reason or cause. In the event of the death, removal, resignation, refusal to act or inability to act of the Trustee, or in the sole discretion of the Beneficiary for any reason, without notice to any party, and without application to any court, a successor or substitute Trustee may be appointed by the Beneficiary by a designation in writing of a successor Trustee by the filing for record in the office where this Deed of Trust is recorded of a Deed of Appointment. Such power of appointment may be exercised whenever and as often as the Beneficiary may consider it advisable and the exercise of such power of appointment, no matter how frequently, shall not be considered a termination thereof. Upon the recordation of any such Deed of Appointment, the successor or substitute trustee so appointed shall thereupon without further act or deed, become fully vested with the same title and estate in and to the Mortgaged Property as the Trustee, as aforesaid, and have all of the rights, powers, trusts, duties and authority of the Trustee. Whenever in the Note or this Deed of Trust reference is made to the Trustee, such reference shall be held and construed to mean the Trustee for the time being, whether original successor or substitute.

## ARTICLE X

## RELEASE

10.0 Release of Lien.

The lien of this Deed of Trust shall be released at the expense of the Grantor upon payment in full of the Indebtedness and satisfaction and discharge of the Obligations.

## ARTICLE XI

## MISCELLANEOUS

11.1 Notices.

All notices, demands, requests and other communications pursuant to the provisions of the Note and this Deed of Trust shall be in writing and shall be deemed to have been properly given or served for all purposes when presented personally, or one business day after having been sent by a nationally recognized overnight delivery service or a local courier service, charges prepaid, or three (3) calendar days after having been sent

4910 Georgia Ave NW Washington DC 20011

by United States Registered or Certified Mail - Return Receipt Requested, postage prepaid, to the respective addresses as follows:

(a) If to the Grantor, then to: **1140 3rd St NE , Washington, DC 20002**

(b) If to the Beneficiary, then to: **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

(c) If to the Trustee, then to them at: **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

Any of the parties may designate a change of address by notice in writing to the other parties. Whenever in this Deed of Trust the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the person or persons entitled to receive such notice.

11.2 Severability.

In the event any one or more of the provisions of this Deed of Trust shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or operates or would prospectively operate to invalidate this Deed of Trust, then and in either of those events, at the option of the Beneficiary, such provision or provisions only shall be held for naught and the remaining provisions of the Deed of Trust shall remain operative and in full force and effect and shall in no way be affected, prejudiced or disturbed thereby.

11.3 Successors and Assigns.

All of the grants, covenants, terms, provisions and conditions of the Note and this Deed of Trust shall run with and bind the Mortgaged Property and shall apply, bind and inure to the benefit of, the successors and assigns of the Grantor, the successors in trust of the Trustee and the endorsers, transferees, successors and assigns of the Beneficiary, and all persons claiming under or through any of them.

11.4 Modification - Waiver.

None of the terms or provisions of the Deed of Trust may be changed, waived, modified, discharged or terminated except by instrument in writing executed by the party or parties against which enforcement of the change, waiver, modification, discharge or termination is asserted.

4910 Georgia Ave NW Washington DC 20011

11.5 Captions and Headings.

The captions and headings contained in this Deed of Trust are included herein for convenience of reference only and shall not be considered a part hereof and are not in any way intended to limit or enlarge the terms hereof.

11.6 Warranty.

The Grantor warrants generally the title to the Mortgaged Property.

11.7 Applicable Law.

This Deed of Trust shall be governed by and construed, interpreted and enforced in accordance with and pursuant to the laws of the jurisdiction in which the Mortgaged Property is located.

11.8 Time of Essence.

Time shall be of the essence of each and every provision of this Deed of Trust of which time is an element.

11.9 Business Purpose.

Grantor warrants that the proceeds of the Note and any and all other secured Indebtedness shall be used exclusively for the acquisition or conduct of a business or commercial enterprise and that the loan evidenced by the Note is a "commercial loan."

11.10 Tenant Leases and Rents.

(a) Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all rents, issues, income and profits from the Mortgaged Property (collectively, "Income"). Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to collect, not more than one month in advance, and as trustee for the benefit of Beneficiary, the Income. Grantor shall apply the Income so collected first to payment of any and all amounts due under the Loan Documents and second to the funding of any escrows required under the Loan Documents. Thereafter, so long as no Event of Default exists, Grantor may use the Income in any manner not inconsistent with its obligations under the Loan Documents. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(b) All leases, licenses, and rental agreements now or hereafter covering the Mortgaged Property or any part thereof are hereinafter referred to collectively as "Leases", and individually as a "Lease". Grantor shall not enter into any Lease

4910 Georgia Ave NW Washington DC 20011

without the express written consent of Beneficiary. Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all Leases. Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to operate and manage the Mortgaged Property under any and all Leases. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(c) Grantor shall enforce all terms and conditions of all Leases and shall not permit any default by a tenant thereunder to continue longer than necessary to pursue its remedies. Grantor shall perform all of its obligations under and in respect of all Leases. In the event of a default by tenant under a Lease, Grantor shall diligently exercise all rights and remedies available to Grantor therefor, including but not limited to termination, eviction and reletting.

(d) The foregoing subparagraphs (a), (b), and (c) shall not constitute, or be construed to be, Beneficiary's waiver of the requirement set forth herein and the other Loan Documents that the Mortgaged Property be and remain vacant and unoccupied during the term of the Note and so long as this Deed of Trust remains a lien upon the Mortgaged Property. Waiver of said requirement must be express and in writing separate and apart from foregoing subparagraphs (a), (b), and (c).

11.11 All Obligations.

This Deed of Trust is given to secure certain present and future Indebtedness and Obligations, including future advances, as provided in the Note. This Deed of Trust and the liens created hereby shall secure any and all Indebtedness and Obligations of Grantor to Beneficiary of every nature whatsoever, whether created heretofore or hereafter.

11.12 Security Agreement.

For the purpose of securing the Indebtedness and Obligations, this Deed of Trust shall constitute a security agreement creating a security interest in (a) all personal property of Grantor included within or located on or to be delivered to the Mortgaged Property, including all such items of personal property hereafter acquired, and the proceeds thereof, and (b) all other personal property of Grantor relating in any way to the Indebtedness, Obligations, and/or the Loan Documents. Grantor hereby authorizes and agrees to execute and/or authorize such further agreements, instruments, financing statements, continuation statements, and other documents as may be necessary or appropriate to perfect and maintain the security interest herein granted to Beneficiary. Upon the occurrence of an Event of Default hereunder, Beneficiary shall have the remedies of a secured party under the Uniform Commercial Code for the jurisdiction in which the Mortgaged Property is located, including, without limitation, the right to take immediate possession of any collateral. Any sale of such collateral may be held as a part of and in conjunction with a sale by Trustee of the Mortgaged Property.

4910 Georgia Ave NW Washington DC 20011

## ARTICLE XII

## STATUTORY PROVISIONS

12.1 Statutory Provisions.

   This Deed of Trust is made under and pursuant to the provisions of the statutes and regulations of the jurisdiction in which the Mortgaged Property is located, as amended, and shall be construed to impose and confer upon the parties hereto and Beneficiary all the rights, duties, and obligations prescribed by said statutes and regulations, as amended, except as herein otherwise restricted, expanded, or changed.

   **IN WITNESS WHEREOF**, the said Grantor has executed these presents on the year and day first above written.

**[Signature Page to Follow]**

4910 Georgia Ave NW Washington DC 20011

**GRANTOR:**

**4910 Georgia Ave Holdings LLC,**
a District of Columbia Limited Liability
Company

_____ (SEAL)
By:    Charles Paxton Paret
Its:    Member & Managing Partner

_____ (SEAL)
By:    Mel Melaku Negussie
Its:    Member & Managing Partner

COUNTY OF _~District of Columbia~_ }SS:
STATE OF _~City of Washington~_

    I hereby certify on this __5__ day of August, 2020, before me in the
jurisdiction aforesaid, did personally appear Charles Paxton Paret, Mel Melaku Negussie,
known or satisfactorily proven to be the person(s) whose name(s) is set forth in the within
instrument, and executed the within instrument and acknowledged the same instrument
to be his/her act and deed for the purposes herein contained and in the capacity herein
stated.

_____
NOTARY PUBLIC

My commission expires: _____

ROSA M. GREEN
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires September 30, 2024

4910 Georgia Ave NW Washington DC

## EXHIBIT A

## LEGAL DESCRIPTION

All that certain lot or parcel of land situate in the District of Columbia and being more particularly described as follows:

Lot numbered Eighteen (18) in Square numbered Twenty-Nine Hundred Twenty-Six (2926) in a subdivision made for Bernard L. Frishman, as per plat recorded in the Office of the Surveyor for the District of Columbia in Book 160 at page 156.

4910 Georgia Ave NW Washington DC

```
Doc #: 2020097981
Filed & Recorded
08/13/2020 09:54 AM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS
   RECORDING FEES            $150.00
   SURCHARGE                 $6.50
   RECORDATION TAX FEES      $12,366.64
TOTAL:                       $12,523.14
```

4910 Georgia Ave NW Washington DC 20011

## COMMERCIAL DEED OF TRUST NOTE

**July 31, 2020**                                                                    **$852,872.00**

### IMPORTANT NOTICE

**THIS INSTRUMENT CONTAINS A CONFESSION OF JUDGMENT PROVISION WHICH CONSTITUTES A WAIVER OF IMPORTANT RIGHTS YOU MAY HAVE AS A DEBTOR AND ALLOWS THE CREDITOR TO OBTAIN A JUDGMENT AGAINST YOU WITHOUT ANY FURTHER NOTICE.**

**1.     BORROWER'S PROMISE TO PAY**

FOR VALUE RECEIVED, the undersigned, **4910 Georgia Ave Holdings LLC**, a District of Columbia Limited Liability Company (the "Borrower"), promises to pay to the order of **WCP Fund I LLC,** a Delaware limited liability company, at 2815 Hartland Rd Suite 200, Falls Church, VA 22043, its successors and assigns (the "Lender"), at such address and place, or at such other place or places as the Lender may from time to time designate in writing, the principal sum of **$852,872.00**, together with interest at the rate hereinafter provided, from the date of this Note (as set forth above) until paid. All amounts due under this Note are secured by a Deed of Trust of even date herewith ("Deed of Trust") on the real property referenced in the Deed of Trust ("Property").

Borrower hereby assigns its right, title, and interest in and to all contracts and contract rights in connection with the Property. So long as no default or Event of Default exist under this Note or the related Deed of Trust, Lender grants a license to Borrower to use the contracts and contract rights to increase the value of the Property. However, upon a default or Event of Default under this Note or the related Deed of Trust, Borrower's license shall immediately and automatically be revoked.     **[ASSIGNMENT OF CONTRACTS]**

Borrower expressly and specifically agrees that the entire original principal balance of this Note, or any part thereof, may be withheld from Borrower at the closing on the loan memorialized by this Note and may be funded, if at all, in Lender's sole and absolute discretion. Borrower further expressly and specifically agrees that interest shall accrue on the entire original principal balance of this Note from the date this Note is made, until repaid. If the loan memorialized by this Note is not funded in whole or in part, so much of it as is unfunded shall be deemed repaid at the Maturity Date (defined below), applied in accordance with this Note. **[FUNDING]**

Borrower agrees to pay before or at the closing on the loan memorialized by this Note **$18,839.94** to DP Capital LLC as a loan origination fee, **$0.00** to DP Capital LLC for a broker price opinion, and **$0.00** to DP Capital LLC as processing fees and document prep fees. **[POINTS, FEES, AND COSTS]**

4910 Georgia Ave NW Washington DC 20011

The final version of the loan commitment between Borrower and Lender is incorporated herein by reference.  In the event of any conflict between the aforementioned loan commitment and this Note, the terms and conditions of this Note shall control. **[LOAN COMMITMENT]**

**2.      INTEREST**

Interest shall accrue hereunder at the rate of **12%** per annum on the principal.

**3.      PAYMENTS**

Payments of interest only shall be due and payable on the first day of each calendar month during the term of the loan evidenced by this Note.

If not sooner paid, the entire balance of the principal of this Note remaining unpaid, plus interest accrued thereon at the aforesaid rate not previously paid, and fees and costs, if any, shall be due and payable by Borrower in full by **January 31, 2022** (the "Maturity Date").

For purposes of computing interest on the debt evidenced hereby, interest shall be calculated on the basis of a three hundred sixty (360) day calendar year applied to the actual number of days funds are outstanding. Payments made on account hereof shall be applied first to the payment of late charges or other fees and costs owed to the Lender, next to the payment of any accrued and unpaid interest, and then to principal, or in such other order or proportion as the Lender, in its sole discretion, may elect from time to time.

The Borrower agrees to pay on demand any expenditures made by the Lender in accordance with the Deed of Trust, including, but not limited to, the payment of taxes, special assessments, condominium assessments, insurance premiums, and the cost of maintenance and preservation of the properties described in the Deed of Trust. At the option of the Lender, all such expenditures may be added to the unpaid principal balance of this Note and become a part of and on a parity with the principal indebtedness secured by the Deed of Trust and other instruments executed herewith, and shall accrue interest at the rate as may be payable from time to time on the original principal indebtedness or may be declared immediately due and payable.

All payments due hereunder shall be made in immediately available funds and constitute payment only when collected and/or the cash is actually received by the Lender.

**4.      BORROWER'S RIGHT TO PREPAY**

The Borrower is permitted to prepay the principal indebtedness evidenced hereby in whole or in part prior to the Maturity Date without premium or penalty.

**5.      BORROWER'S FAILURE TO PAY AS REQUIRED**

Before the Maturity Date, the entire principal sum outstanding, together with accrued interest thereon (as herein provided), fees and costs, if any, shall at once become

4910 Georgia Ave NW Washington DC 20011

due and payable at the option of the Lender without further notice, if any of the following occurs:

    a.  If default be made in any payment due under this Note;

    b.  If default be made in the performance of any other covenant contained in this Note;

    c.  If the legal or equitable title to any part or all of the Property becomes vested in anyone other than the Borrower without the Lender's prior written approval;

    d.  If default be made in the performance of any covenant under the Deed of Trust (the terms and provisions of which are incorporated herein by this reference as though fully set forth) which shall continue and remain uncured after any applicable grace period specified therein or in a written notice of default from the Lender to the Borrower.

Failure to exercise any of the options aforementioned or the failure to exercise any other option herein or in the Deed of Trust provided for shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. Acceleration of maturity, once claimed by the Lender, may at its option be rescinded by an instrument in writing to that effect; however, the tender and acceptance of a partial payment or partial performance shall not, by itself, affect or rescind such acceleration of maturity.

Upon a default in the payment of an amount due under this Note, after the expiration of any applicable grace period, or upon the occurrence of an "Event of Default", as that term is defined in the Deed of Trust, under the Deed of Trust, the holder of this Note may, in the holder's sole discretion and without notice or demand, in addition to any other remedy the holder of this Note may exercise, charge interest to the Borrower which shall accrue on the entire face value of this Note at the rate of **24%** per annum (the "Default Rate"). If judgment is entered against the Borrower on this Note, the amount of such judgment entered (which may include principal, interest, fees and costs) shall bear interest at such Default Rate as of the date of entry of judgment.

Lender reserves the right at its sole discretion, to extend this Note on any date the loan evidenced hereby becomes due in full, either by maturity or by default, without giving notice to junior lienholders. The foregoing shall not imply any consent to any junior liens.

In the event any payment due under this Note, including the final payment, is paid more than five (5) days after the date when the same is due, then the Lender shall be entitled to collect a "late charge" in an amount equal to **10.00%** of such installment.  In the event the payment due is the balloon payment of this Note at its maturity, then the Lender shall be entitled to collect a late charge in an amount equal to **10.00%** of the original principal amount of this Note.

In the event it shall become necessary to employ counsel to collect this obligation or to protect the security hereof, the Borrower agrees to pay reasonable attorneys' fees, whether suit be brought or not, and all other costs and expenses reasonably connected with collection, the protection of the security, the defense of any counterclaim, the enforcement (including without limitation, as a part of any proceeding brought under the Bankruptcy Reform Act of 1978, as amended) of any remedies herein provided for, or provided for in the Deed of Trust, and the enforcement of any guaranty.

4910 Georgia Ave NW Washington DC 20011

## 6.    OBLIGATIONS OF PERSONS UNDER THIS NOTE

BORROWER HEREBY CERTIFIES THAT THIS LOAN IS FOR BUSINESS OR INVESTMENT PURPOSES ONLY AND SHALL NOT BE UTILIZED FOR THE PURCHASE OF AN OWNER OCCUPIED PRINCIPAL RESIDENCE.

BORROWER FURTHER CERTIFIES THAT THIS PROPERTY SHALL NOT BE RENTED TO OTHERS OR OCCUPIED IN ANY WAY DURING THE TERM OF THIS LOAN. OCCUPANCY OF THE PROPERTY IS STRICTLY PROHIBITED AND WILL RESULT IN IMMEDIATE DEFAULT.

BORROWER ATTESTS THAT IN THE EVENT OF ANY TENANCY PRIOR TO THE CLOSING OF THIS LOAN, THAT HE/SHE/IT PROPERLY ADHERED TO ALL TENANTS RIGHTS LAWS WITH PROPER NOTICES AND PROCEDURES. ANY ACTION TAKEN TO REMEDY SUCH RIGHTS DURING THE COURSE OF THIS LOAN WILL BE FULL RESPONSIBILITY OF BORROWER, AND IN THE EVENT LENDER NEEDS TO EMPLOY COUNSEL TO REMEDY SUCH ACTIONS, LENDER HAS FULL AUTHORITY TO COLLECT ALL REASONABLE ATTORNEYS' FEES AND ADDITIONAL COSTS FROM BORROWER.

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Lender may enforce its rights under this Note against each person individually or against all of such persons together.  This means that any one of the Borrowers, guarantors, sureties or endorsers may be required to pay all of the amounts owed under this Note.

This Note shall be the obligation of the makers hereof and shall apply to and bind their respective successors, personal representatives, executors, survivors, heirs, and assigns.

## 7.    WAIVERS

The Borrower and any endorsers, guarantors and sureties jointly and severally waive the rights of Presentment, Notice of Dishonor, demand for performance, notice of nonperformance, protests, notice of protest, notice of default, demands, notice of demands, notice of non-payment and other notice and any and all lack of diligence or delays in the collection or enforcement hereof and expressly agree that this Note, or any payment hereunder, may be extended from time to time without in any way affecting the liability of the Borrower or any endorser, guarantor or surety hereof.  "Presentment" means the right to require the Lender to demand payment of amounts due.  "Notice of Dishonor" means

the right to require the Lender to give notice to other persons that amounts due have not been paid.

The Borrower and any other person who has obligations under this Note waive the benefit of the homestead exemption as to the Property described herein and in the Deed of Trust.

The Borrower hereby (i) covenants and agrees not to elect a trial by jury of any issue triable of right by a jury, and (ii) waives any right to trial by jury fully to the extent that any such right shall now or hereafter exist. This waiver of right to trial by jury is separately given, knowingly and voluntarily, by the Borrower, and this waiver is intended to encompass individually each instance and each issue as to which the right to a jury trial would otherwise accrue. The Lender is hereby authorized and requested to submit this Note to any court having jurisdiction over the subject matter and the parties hereto, so as to serve as conclusive evidence of the Borrower's waiver of the right to jury trial. Further, the Borrower hereby certifies that no representative or agent of the Lender (including the Lender's counsel) has represented, expressly or otherwise, to the Borrower that the Lender will not seek to enforce this waiver of right to jury trial provision.

## 8.    GIVING OF NOTICES

All notices, demands, requests and other communications required pursuant to the provisions of this Note shall be in writing and shall be deemed to have been properly given or served for all purposes when presented personally, or one business day after having been sent by a nationally recognized overnight delivery service or a local courier service, charges prepaid, or three (3) calendar days after having been sent by United States Registered or Certified Mail - Return Receipt Requested, postage prepaid, to the Borrower at:1140 3rd St NE , Washington, DC 20002; and to the Lender at the address stated in the first paragraph of this Note.

The Lender and Borrower may designate a change of address by notice in writing to the other party. Whenever in this Note the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the person entitled to receive such notice.

## 9.    SEVERABILITY; RULES OF CONSTRUCTION

In the event any provision of this Note (or any part of any provision) is held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Note; but this Note shall be as if such invalid, illegal or unenforceable provision (or part thereof) had not been contained in this Note, but only to the extent it is invalid, illegal or unenforceable.

As used in this Note, the singular shall include the plural and the plural shall include the singular, where the context shall so require.

4910 Georgia Ave NW Washington DC 20011

Time is of the essence as to all provisions of this Note.

## CONFESSION OF JUDGMENT

IF ANY AMOUNT PAYABLE UNDER THIS NOTE IS NOT PAID WHEN AND AS DUE, OR IF BORROWER SHALL OTHERWISE BE IN DEFAULT UNDER THIS NOTE OR UNDER ANY OF THE DOCUMENTS EVIDENCING OR SECURING THIS NOTE OR THE LOAN EVIDENCED HEREBY, BORROWER AND ANY ENDORSERS HEREOF HEREBY IRREVOCABLY APPOINT RUSSELL S. DRAZIN OR ANY OTHER ATTORNEY AUTHORIZED TO PRACTICE LAW IN THE JURISDICTION WHERE THE PROPERTY IS LOCATED TO APPEAR FOR BORROWER, AND IN BORROWER'S NAME TO CONFESS JUDGMENT AGAINST BORROWER, IN ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION IN THE JURISDICTION WHERE THE PROPERTY IS LOCATED OR OF ANY OTHER STATE, TERRITORY OR JURISDICTION OF THE UNITED STATES, OR IN ANY COURT OF COMPETENT JURISDICTION, FOR ALL PRINCIPAL, INTEREST AND OTHER AMOUNTS DUE UNDER THIS NOTE, TOGETHER WITH ALL COSTS, EXPENSES AND ACTUAL ATTORNEYS FEES AS SPECIFIED HEREIN. WITH RESPECT TO SUCH APPEARANCES, BORROWER EXPRESSLY WAIVES SUMMONS AND ALL OTHER PROCESS. THE EXEMPTION OF PERSONAL PROPERTY FROM LEVY AND SALE IS HEREBY EXPRESSLY WAIVED BY THE BORROWER AND NO BENEFIT OF EXEMPTION SHALL BE CLAIMED BY THE BORROWER UNDER ANY EXEMPTION LAW NOW IN FORCE OR WHICH MAY BE HEREAFTER ADOPTED, INCLUDING BUT NOT LIMITED TO THE BENEFIT OF ANY AND ALL HOMESTEAD EXEMPTIONS WHICH ARE HEREBY WAIVED. BORROWER WAIVES THE BENEFIT OF ANY AND EVERY STATUTE, ORDINANCE OR RULE OF COURT WHICH MAY BE LAWFULLY WAIVED CONFERRING UPON THE BORROWER ANY RIGHT OR PRIVILEGE, OR EXEMPTION, STAY OF EXECUTION, APPEAL OR SUPPLEMENTARY PROCEEDINGS, OR OTHER RELIEF FROM THE ENFORCEMENT, OR IMMEDIATE ENFORCEMENT OF A CONFESSED JUDGMENT OR RELATED PROCEEDINGS ON A JUDGMENT. BORROWER CONSENTS TO VENUE IN THE JURISDICTION WHERE THE PROPERTY IS LOCATED, WITH RESPECT TO THE INSTITUTION OF AN ACTION CONFESSING JUDGMENT HEREON, REGARDLESS OF WHERE VENUE WOULD OTHERWISE BE PROPER. ANY JUDGMENT ENTERED AGAINST BORROWER, WHETHER BY CONFESSION OR OTHERWISE, SHALL BEAR INTEREST AT A RATE WHICH IS THE HIGHEST RATE OF INTEREST BEING PAID BY BORROWER HEREUNDER ON THE DATE OF JUDGMENT. THE AUTHORITY AND POWER TO APPEAR FOR AND ENTER JUDGMENT AGAINST BORROWER SHALL NOT BE EXHAUSTED BY ONE OR MORE EXERCISES THEREOF, OR BY ANY IMPERFECT EXERCISE THEREOF, AND SHALL NOT BE EXTINGUISHED BY ANY JUDGMENT ENTERED PURSUANT THERETO; SUCH AUTHORITY AND POWER MAY BE EXERCISED ON ONE OR MORE OCCASIONS, FROM TIME TO TIME, IN THE SAME OR

4910 Georgia Ave NW Washington DC 20011

**DIFFERENT JURISDICTIONS AS OFTEN AS THE LENDER OR ITS ASSIGNS SHALL DEEM NECESSARY OR ADVISABLE UNTIL ALL SUMS DUE HEREUNDER HAVE BEEN PAID IN FULL.**

**THE VALIDITY AND CONSTRUCTION OF THIS NOTE AND ALL MATTERS PERTAINING THERETO ARE TO BE DETERMINED ACCORDING TO THE LAWS OF THE JURISDICTION WHERE THE PROPERTY IS LOCATED WITHOUT REGARD TO ITS CONFLICTS OF LAW PRINCIPLES.**

**[SIGNATURE PAGE TO FOLLOW]**

4910 Georgia Ave NW Washington DC 20011

**BORROWER:**

**4910 Georgia Ave Holdings LLC**,
a District of Columbia   Limited Liability
Company

_____(SEAL)
By:      Charles Paxton Paret
Its:      Member & Managing Partner

_____(SEAL)
By:      Mel Melaku Negussie
Its:      Member & Managing Partner

COUNTY OF _____ §§:
STATE OF _____

    I hereby certify on this ___5___ day of August, 2020, before me in the jurisdiction aforesaid, did personally appear Charles Paxton Paret, Mel Melaku Negussie, , known or satisfactorily proven to be the person(s) whose name(s) is set forth in the within instrument, and executed the within instrument and acknowledged the same instrument to be his/her act and deed for the purposes herein contained and in the capacity herein stated.

_____
NOTARY PUBLIC

ROSA M. GREEN
NOTARY PUBLIC DISTRICT OF COLUMBIA
My commission expires: _My Commission Expires September 30, 2024_

4910 Georgia Ave NW Washington DC 20011

## DEED OF TRUST

      **THIS DEED OF TRUST**, made effective as of July 31, 2020, by and between **4910 Georgia Ave Holdings LLC**, a District of Columbia Limited Liability Company, hereinafter referred to as the "Grantor" (index as Grantor), with an address of 1140 3rd St NE , Washington, DC 20002, and **Daniel Huertas**, hereinafter referred to as the "Trustee" (index as Grantee), with an address of 2815 Hartland Road, Suite 200, Falls Church, VA 22043.

      WHEREAS, Grantor is justly indebted to **WCP Fund I LLC**, a Delaware Limited Liability Company, hereinafter referred to as the "Beneficiary," with an address of 2815 Hartland Road, Suite 200, Falls Church, VA 22043, for money borrowed in the amount of **$852,872.00** ("Loan Amount"), for which amount the said Grantor has made and delivered a certain Commercial Deed of Trust Note of even date herewith, in the original principal amount of the Loan Amount payable to the order of the Beneficiary; and

      WHEREAS, the Grantor desires to secure the Beneficiary and any subsequent holder of the Note secured hereby the full and punctual payment of said debt, when and as the same shall become due and payable, as well as any and all renewals and extensions of said Note, or any part thereof, together with interest thereon, and the performance of the covenants and agreements herein and therein contained, and also to secure the reimbursement to the holder or holders of said Note or to the Trustee or substitute Trustee, and any purchaser or purchasers of said Note from the Lender, or grantee or grantees under any sale or sales conducted by the Trustee or Substitute Trustee under the provisions of this Deed of Trust for all money which may be advanced as herein provided for, and for any and all costs and expenses incurred or paid on account of any litigation at law or in equity which may arise in respect to this Deed of Trust, or in respect to the indebtedness or the property herein described, or in obtaining possession of the Mortgaged Property either before or after any sale which may be made as hereinafter provided for.

## ARTICLE I

## DEFINITIONS

1.0 Definitions.

      Grantor, Trustee and Beneficiary agree that, unless the context otherwise specifies or requires, the following terms shall have the meaning herein specified, such definitions to be applicable equally to the singular and the plural forms of such terms and to all genders:

      (a) Beneficiary - The party hereinabove designated as such, its successors and assigns.

4910 Georgia Ave NW Washington DC 20011

(b) Event(s) of Default - Any of the happenings, events, circumstances or occurrences described in Article VII of this Deed of Trust.

(c) Grantor - The party hereinabove designated as such, and that party's heirs, survivors, administrators, executors, successors and assigns.

(d) Impositions - All (i) real estate taxes, and other taxes of every kind and character; and (ii) all water and sewer rents and charges; and (iii) all other public charges, taxes, homeowners association assessments, fees, governmental and non-governmental charges, to the extent any of the foregoing are imposed or assessed upon the Grantor or the Mortgaged Property or arising in respect of the occupancy, use or possession thereof.

(e) Improvements - Any and all buildings, structures, improvements, alterations or appurtenances now erected or at any time hereafter constructed, renovated, or placed upon the Mortgaged Property or any portion thereof and any replacements thereof.

(f) Indebtedness - The principal of and the interest on, and all other amounts, payments and premiums due on account of the Note and all other indebtedness of the Grantor to the Beneficiary payable pursuant to the Note.

(g) Land - The real estate described in "<u>EXHIBIT A</u>" attached hereto and by this reference made a part hereof.

(h) Mortgaged Property - The Land and the Improvements.

(i) Note - The Commercial Deed of Trust Note made by the Grantor payable to the order of the Beneficiary of even date herewith, in the original principal amount of the Loan Amount, and all modifications, renewals, substitutions, and extensions of the aforesaid Note.

(j) Obligations - Any and all of the covenants, promises and other obligations (other than the Indebtedness) made or owing by the Grantor to the Beneficiary pursuant to or as otherwise set forth in this Deed of Trust.

(k) Trustee - The parties hereinabove designated as such, their successors and substitutes.

<u>ARTICLE II</u>

<u>GRANT</u>

2.0 Grant.

NOW, THEREFORE, the Grantor, in consideration of the premises and of the sum of TEN and NO/100 DOLLARS ($10.00) lawful money of the United States of America, the receipt of which is hereby acknowledged by the Grantor, and in order to secure the payment of the Indebtedness and the Note and the performance and discharge of the

4910 Georgia Ave NW Washington DC 20011

Obligations, does by these presents, grant, give, bargain, sell, assign, convey, release, warrant, mortgage, transfer, hypothecate, pledge, set over and confirm unto the Trustee, their successors and assigns forever, in fee simple, the Mortgaged Property, TO HAVE AND TO HOLD the said Mortgaged Property unto the said Trustee, their successors and assigns, forever;

IN TRUST, to secure (a) the payment to the Beneficiary of the Indebtedness and all other sums due under the Note and/or this Deed of Trust, (b) the performance and discharge of the Obligations and of all covenants and agreements in the Note, (c) the performance and discharge of all covenants and agreements in all documents and/or instruments evidencing, securing, or otherwise relating to the Indebtedness (collectively, "Loan Documents") other than the Note and this Deed of Trust, (d) any and all future or additional advances (whether or not obligatory) made by Beneficiary (i) to protect or preserve the Mortgaged Property or the lien or security interest created hereby on the Mortgaged Property, or (ii) for taxes, assessments, or insurance premiums as hereinafter provided, or (iii) for performance of any of Grantor's obligations hereunder or under the other Loan Documents, or (iv) for any other purpose provided herein or in the other Loan Documents (whether or not the original Grantor remains the owner of the Mortgaged Property at the time of such advances), together with interest thereon as provided for in the Note, and (e) any and all other indebtedness now owing or which may hereafter be owing by Grantor to Beneficiary, however and whenever incurred or evidenced, whether express or implied, direct or indirect, absolute or contingent, or due or to become due, and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, and extensions thereof.

2.1 Possession.

Until the occurrence of an Event of Default, the Beneficiary shall promptly permit the Grantor to possess and enjoy the Mortgaged Property.

2.2 Condition of Grant.

The condition of these presents is such that if Grantor shall pay or cause to be paid the Indebtedness as and when the same shall become due and payable under the Note, and shall observe, perform and discharge the Obligations, then Beneficiary and the Trustee shall release and reconvey unto and at the cost of Grantor the Mortgaged Property whereupon this Deed of Trust shall cease and be void and the Mortgaged Property shall be released from the lien hereof at the cost of the Grantor.

.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

3.0 Representations and Warranties.

Grantor hereby represents and warrants to Beneficiary that:

4910 Georgia Ave NW Washington DC 20011

3.1 Validity of Loan Instruments.

    (a) The execution, delivery and performance by Grantor of the Note and this Deed of Trust, (i) are within the legal powers of Grantor, and (ii) will not violate any provision of law, any order of any court or other agency of government, or any indenture, agreement or other instrument to which Grantor is a party or by which they or any of their property is bound or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its property or assets, except as contemplated herein; and (b) the Note does, and this Deed of Trust when executed and delivered by Grantor will, constitute the legal, valid and binding obligations of in accordance with their respective terms, subject to the limiting effect of applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws of general applicability relating to creditor's rights, and the exercise of judicial discretion which may limit certain remedies therein provided.

3.2 Mortgaged Property and Other Property.

    Grantor has good and marketable title in fee simple to the Mortgaged Property free and clear of any liens, charges, encumbrances, security interests and adverse claims whatsoever. This Deed of Trust is and will remain a valid and enforceable first lien on the Mortgaged Property. The Grantor has full power and lawful authority to subject the Mortgaged Property to the lien of this Deed of Trust in the manner and form herein contemplated. The Grantor will preserve such title, and will forever warrant and defend the same to the Trustee and will forever warrant and defend the validity and priority of the lien hereof against the claims of all persons and parties whomsoever.

<u>ARTICLE IV</u>

<u>AFFIRMATIVE COVENANTS</u>

4.0 Affirmative Covenants.

    Until the entire Indebtedness shall have been paid in full, Grantor hereby covenants and agrees as follows:

4.1 Compliance with Laws.

    Grantor will promptly, fully and faithfully comply with, conform to and obey all present and future laws, ordinances, rules, regulations, requirements which may be applicable to the manner of use, occupancy, possession, operation, maintenance, alteration, and repair of the Mortgaged Property.

4.2 Payment of Impositions.

4910 Georgia Ave NW Washington DC 20011

Grantor will pay and discharge, or cause to be paid and discharged, not later than the due date thereof or the date any fine, penalty, interest or cost may be added thereto or imposed by or pursuant to law for the nonpayment thereof (whichever date shall first occur) or, at the direction of the Beneficiary, as soon as the same become liens, whether or not then due and payable, any Impositions upon or assessed against the Mortgaged Property or arising in respect of the occupancy, use or possession thereof. The Grantor will, upon the request of the Beneficiary, deliver to the Beneficiary from time to time receipts evidencing the payment of all such Impositions.

4.3 Repairs and Waste.

Grantor will at all times keep and maintain the Mortgaged Property in good order, condition and repair and will promptly make, from time to time, all repairs, renewals, replacements, additions and improvements, interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen, as may be necessary or desirable to accomplish the purposes of this Section. The Grantor will not commit any waste upon the Mortgaged Property or make or permit any change in the use of the Mortgaged Property which will in any way increase any ordinary fire or other hazard arising out of the operation thereof.

4.4. Insurance.

Grantor will keep the Improvements insured against loss by fire, casualty and such other hazards as may from time to time be required by the Beneficiary for the benefit of the Beneficiary. The Grantor shall maintain such public liability and indemnity insurance as may from time to time be reasonably required by the Beneficiary. All such insurance shall be written in forms, amounts and by companies satisfactory to the Beneficiary and losses thereunder, shall be payable to the Beneficiary pursuant to a standard mortgagee's endorsement. Duplicate originals of each such policy of insurance shall be delivered to the Beneficiary and the Grantor shall provide the Beneficiary with such evidence of the payment of premiums due on account of such insurance as may from time to time be required by the Beneficiary. All such policies shall provide that the same shall not be invalidated by any waiver of the right of subrogation by any insured and shall provide that the carrier shall have no right to be subrogated to the Beneficiary. All such policies shall provide for at least thirty (30) days' prior written notice to all insureds named thereon (including, without limitation, the Beneficiary) prior to any cancellation, surrender or modification thereof, including without limitation, cancellation for nonpayment of premium. The Grantor shall give the Beneficiary prompt notice of any loss covered by such insurance and the Beneficiary shall have the right to join the Grantor in adjusting any loss. Any funds received as payment for any loss under any such insurance shall be paid over to the Beneficiary and shall be applied by the Beneficiary, should there then exist any Event of Default hereunder that is continuing and not cured by Grantor, to the prepayment of the Indebtedness, without premium or penalty, or, should no Event of Default have occurred and be continuing uncured hereunder, then to the reimbursement of Grantor for expenses actually incurred by the Grantor in the restoration or replacement of the Improvements.

4910 Georgia Ave NW Washington DC 20011

4.5 Restoration Following Casualty.

In the event of the happening of any casualty (including, without limitation, any casualty for which insurance was not obtained or obtainable) resulting in damage to or destruction of the Mortgaged Property or any part thereof, the Grantor shall give prompt written notice of the time, nature and extent thereto to the Beneficiary and, as long as no Event of Default exists hereunder that is continuing and not cured by Grantor, then the Beneficiary shall apply the proceeds of insurance to the restoration, repair or replacement of the Mortgaged Property or in the event the casualty was not insured, the Grantor shall, at the sole cost and expense of the Grantor and whether or not the proceeds of insurance, if any, are sufficient for the purpose, promptly commence and diligently continue to restore, repair and replace the Mortgaged Property as nearly as possible to its condition immediately prior to such casualty.

4.6 Performance of Other Agreements.

Grantor will comply in a timely way, and otherwise abide by and perform, all of the terms, agreements, obligations, covenants, restrictions and warranties binding upon the Grantor under any easement, right-of-way, covenant, restriction, or other agreement with respect to or in any manner affecting the Mortgaged Property or any part thereof.

4.7 Further Assurances.

Grantor, at his/her/its sole cost and expense, will make, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfer and assurances as the Trustee or the Beneficiary shall from time to time reasonably require, for the better assuring, conveying, assigning, transferring and confirming unto the Trustee the property and rights hereby conveyed or assigned or intended now or hereafter so to be, or which the Grantor may be or may hereafter become bound to convey or assign to the Trustee, or for carrying out the intention or facilitating the performance of the terms of this Deed of Trust or for filing, registering or recording this Deed of Trust.

4.8 Advances.

In the event the Grantor shall fail to perform any of the covenants contained herein then the Beneficiary, with or without notice to the Grantor, may, but shall not be required to, make advances to perform the same in its behalf, and all sums so advanced shall be a lien upon the Mortgaged Property and shall be secured hereby. Any advance so made shall be charged interest at the default rate provided herein.

4.9 Deposits for Taxes and Related Matters.

Beneficiary shall not require the Grantor to deposit with Beneficiary in escrow those amounts sufficient to discharge over time the Impositions and the premiums on the insurance required pursuant hereto unless an Event of Default has occurred.

4910 Georgia Ave NW Washington DC 20011

4.10 Indemnity - Hold Harmless.

Grantor shall forever indemnify and save the Beneficiary and the Trustee harmless from all loss, liability, damage, costs and expenses, including, without limitation, reasonable attorneys' fees, and title and survey costs, incurred by reason of any action, suit, proceeding, hearing, motion or application before any Court or administrative body in or which the Beneficiary or the Trustee may be or become a party by reason of this Deed of Trust, whether as holder of this Deed of Trust, as mortgagee-in-possession, as successor-in-interest to Grantor, by foreclosure deed or deed in lieu of foreclosure, including, without limitation, with respect to (a) any accident to, injury to or death of persons or loss of or damage to property occurring on or about the Mortgaged Property, (b)any failure on the part of the Grantor to perform or comply with any of the terms, covenants, conditions and agreements set forth in the this Deed of Trust, (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Mortgaged Property or any other part thereof for construction or maintenance or otherwise, (d) any action brought against any party attacking the validity, priority or enforceability of this Deed of Trust, and/or (e) bankruptcy. All money paid or expended by Beneficiary or Trustee in connection with any of the foregoing, together with interest thereon from day of such payment at the default rate set forth in the Note, shall be so much additional indebtedness secured hereby and, except as otherwise provided herein, shall be immediately and without notice due and payable by Grantor. The obligations of the Grantor under this Section shall survive any foreclosure, deed in lieu of foreclosure, release, termination or satisfaction of this Deed of Trust.

4.11 Lockbox Access.

Grantor to install a combination lockbox on the subject Mortgaged Property and provide said lockbox combination to the Beneficiary. Lockbox is to remain located on property at all times during term of this Deed of Trust. Grantor irrevocably grants permission to Beneficiary and/or Trustee to enter into any improvement on the Mortgaged Property at any time and for any purpose consistent with ensuring Grantor's compliance with the terms and conditions of this Deed of Trust.

4.12 Sign Installation.

Grantor hereby allows Grantee to install a 18x24 sign in the yard of the Mortgaged Property during term of this Deed of Trust.

<u>ARTICLE V</u>

<u>NEGATIVE COVENANTS</u>

5.0 Negative Covenants

Until the Indebtedness shall have been paid in full, Grantor covenants and agrees as follows:

## 5.1 Other Liens - Transfers

Grantor will not, without the prior written consent of the Beneficiary, create or permit to be created or remain, any mortgage, pledge, lien, lease, encumbrance or charge or security interest, or conditional sale or other title retention agreement, with respect to the Mortgaged Property or any part thereof or income therefrom, whether prior or subordinate to the lien of this Deed of Trust, except as otherwise consented to in writing by Beneficiary. Except for any grant, conveyance, sale, assignment or transfer of the Mortgaged Property which is conditioned upon the release of record of this Deed of Trust, the Grantor will not, without the prior written consent of the Beneficiary, make, create or consent to any grant, conveyance, sale, assignment or transfer of the Mortgaged Property or any part thereof, other than as consented to by Beneficiary.

## 5.2 Impairment of Security

Grantor will take no action which will in any manner impair the value of the Mortgaged Property or the security of this Deed of Trust.

## 5.3 Occupancy.

Unless otherwise agreed to in writing by the Beneficiary, Grantor shall not allow any person or persons to occupy the Mortgaged Property during the term of the Note.

## ARTICLE VI

## EMINENT DOMAIN – CONDEMNATION

## 6.0 Notice.

Grantor shall give the Trustee and the Beneficiary prompt written notice of the actual or threatened commencement of any proceedings under the power of condemnation or eminent domain affecting all or any part of the Mortgaged Property, and the Grantor will deliver to the Trustee and the Beneficiary true and complete copies of any and all documents and papers served upon the Grantor in connection with any such proceedings promptly following receipt thereof by the Grantor.

## 6.1 Assignment of Condemnation Awards.

Grantor hereby irrevocably assigns, transfers and sets over unto the Beneficiary all right, title, interest and estate of the Grantor in and to any award or payment made in respect of any proceeding under the power of condemnation or eminent domain relating to the Mortgaged Property and initiated subsequent to the recordation of this Deed of Trust.

4910 Georgia Ave NW Washington DC 20011

6.2 Application of Proceeds.

     All proceeds received by or for the account of the Beneficiary as a result of, or by agreement in anticipation or in lieu of, any exercise of the power of condemnation or eminent domain with respect to the Mortgaged Property, shall be applied by the Beneficiary in the following order of priority: (a) to reimburse the Beneficiary for all costs and expenses actually and reasonably incurred by the Beneficiary in connection with the collection of such award or payment, including, without limiting the generality of the foregoing, reasonable attorney's fees; and (b) to the prepayment of the amount then due on account of the Indebtedness, without premium or penalty; and (c) to the Grantor. In the event, however, that in the opinion of the Beneficiary such taking will not materially affect the value of the Mortgaged Property, then the Beneficiary may disburse the entire proceeds of the taking to the Grantor; provided, however, that the Beneficiary shall then have the right to specify the manner in which such proceeds shall be disbursed by the Grantor; and, provided further, that the payment of the proceeds to the Grantor shall not affect the lien hereof or reduce the amount of Indebtedness.

## ARTICLE VII

## EVENTS OF DEFAULT

7.0 Events of Default.

     The term "Event(s) of Default" shall mean the occurrence or happening, from time to time, of any one or more of the following or any other occurrences to/by the Grantor (both severally and/or jointly):

7.1 Payment of Indebtedness.

     If the Grantor shall default in the payment of any portion of the Indebtedness when and as the same shall become due and payable under the Note.

7.2 Performance of Obligations.

     If the Grantor shall default in the due observance or performance of any of the Obligations under the Note or this Deed of Trust.

7.3 Appointment by Receiver.

     If by the order of a court of competent jurisdiction, a trustee, receiver or liquidator of the Mortgaged Property or any part thereof, or of the Grantor, shall be appointed and such order shall not be discharged or dismissed within ninety (90) calendar days after such appointment.

7.4 Voluntary Bankruptcy.

If the Grantor shall file a petition in bankruptcy or for an arrangement or for reorganization pursuant to the Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, or if, by decree of a court of competent jurisdiction, the Grantor shall be adjudicated a bankrupt, or be declared insolvent, or shall make an assignment for the benefit of creditors, or shall admit in writing his inability to pay his debts generally as they become due, or shall consent to the appointment of a receiver or receivers of all or any part of its property.

7.5 Involuntary Bankruptcy.

If any of the creditors of the Grantor shall file a petition in bankruptcy against the Grantor, pursuant to the Federal Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, and if such petition shall not be discharged or dismissed within ninety (90) calendar days after the date on which such petition was filed.

7.6 Judgments.

If final judgment for the payment of money or the establishment of a mechanic's lien shall be rendered against the Grantor and the Grantor shall not discharge the same or cause it to be discharged within thirty (30) calendar days from the entry thereof, or shall not appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered, and secure a stay of execution pending such appeal.

7.7 Transfer of Mortgaged Property.

With the exception of the sale of the Mortgaged Property, which sale is conditioned upon the release of the Mortgaged Property from the lien of this Deed of Trust, if Grantor shall transfer, or agree to transfer, in any manner, either voluntarily or involuntarily, by operation of law or otherwise, all or any portion of the Mortgaged Property, or any interest therein without, in any such case, the prior written consent of Beneficiary. NOTICE – THE INDEBTEDNESS SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY HEREIN CONVEYED IN TRUST.

7.8 Occupancy.

Grantor represents and covenants to Trustee and Beneficiary that, as of the effective date of this Deed of Trust (at the latest), the Mortgaged Property is vacant.  Grantor further covenants to Trustee and Beneficiary that, so long as this Deed of Trust remains a lien against the Mortgaged Property, the Mortgaged Property will remain vacant and Grantor will not permit the Mortgaged Property to be occupied by anyone, including Grantor. Grantor further covenants that, to the extent that the Mortgaged Property was tenanted prior to the effective date of this Deed of Trust, Grantor properly adhered to all tenants rights laws with proper notices and procedures.

4910 Georgia Ave NW Washington DC 20011

7.9 Other Indebtedness

Any default under or breach of any document or instrument evidencing or securing any indebtedness, obligation, or liability of any kind or nature – other than the Indebtedness and the Obligations secured hereby – of Grantor or any guarantor of the Indebtedness, or any of their affiliates, to Beneficiary, whether now existing or hereafter created or arising, direct or indirect, material or immaterial, and whether absolute or contingent, joint, several or joint and severally and howsoever owned, held, or acquired.

7.10 Death or Incapacity

Upon the death or incapacity of the Grantor (if applicable) or of any guarantor of the Indebtedness (if applicable).

<u>ARTICLE VIII</u>

<u>DEFAULT AND FORECLOSURE</u>

8.0 Remedies.

If an Event of Default shall occur, then the Trustee or the Beneficiary may, at the option of the Beneficiary, exercise any or all of the following remedies:

(a) Foreclosure Sale. During the continuance of any such Event of Default, the Trustee personally or by its agents or attorneys, upon the instruction of the Beneficiary, may sell the Mortgaged Property, or any part or parts thereof, and all estate, right, title, interest, claims and demand therein, at public auction at such time and place and upon such terms and conditions as the Trustee may deem appropriate or as may be required or permitted by applicable law or rule of court, having first given, advertised, and published such notice of the time, place and terms of foreclosure/public auction by publication in at least one newspaper published or having a general circulation in the county, city or jurisdiction in which the Mortgaged Property is located, once a week for two successive weeks, or by such other methods, if any, as the Trustee or any title insurance company, insuring the lien hereof, may deem appropriate.

(b) Other Remedies. During the continuance of any Event of Default, the Trustee and the Beneficiary may take such other steps to protect and enforce their respective rights, whether by action, suit or proceeding in equity or at law, or in aid of any power granted in the Note or this Deed of Trust, or for the enforcement of any other appropriate legal or equitable remedy, or otherwise, as the Trustee or the Beneficiary may elect.

8.1 Adjournment of Sale.

The Trustee may adjourn from time to time any sale to be made under, or by virtue of this Deed of Trust by announcement at the time and place appointed for such sale or for such adjourned sale; and, except as otherwise provided by any rule of law, the Trustee,

4910 Georgia Ave NW Washington DC 20011

without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

8.2 Conveyance by Trustee.

Upon the completion of any sale or sales made by the Trustee under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Trustee or an officer of the court empowered so to do, shall execute and deliver to the purchaser or purchasers a good and sufficient instrument, or instruments, conveying, assigning and transferring all estate, right, title and interest in and to the Mortgaged Property and rights sold. The Trustee is hereby appointed the irrevocable true and lawful attorney of the Grantor in its name and stead to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold and for that purpose the Trustee may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, the Grantor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Any such sale or sales made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of the Grantor in and to the properties and rights so sold, and shall be a perpetual bar, both at law and in equity, against the Grantor and against any and all persons claiming or who may claim the same, or any part thereof from, through or under the Grantor.

8.3 Purchase by Beneficiary.

In the event of the sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Beneficiary shall be competent to bid for and acquire the Mortgaged Property or any part thereof.

8.4 Waiver of Redemption - Exemptions Waived.

Grantor will not at any time insist upon, or plead, or in any manner whatever claim or take any benefit or advantage of any stay or extension or moratorium law, any exemption from attachment, execution or sale of the Mortgaged Property or any part thereof, wherever enacted, now or at any time hereafter in force, which may affect the covenants and terms of performance of this Deed of Trust, nor claim, take or insist upon any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisal of the Mortgaged Property, or any part thereof, prior to any sale or sales thereof which may be made pursuant to any provision herein, or pursuant to the decree, judgment or order of any court of competent jurisdiction; or after any such sale or sales, claim or exercise any right under any statute heretofore or hereafter enacted to redeem the property so sold or any part thereof, and the Grantor hereby expressly waives all benefit or advantage of any such law or laws, and covenants not to hinder, delay or impede the execution of any right, power or

4910 Georgia Ave NW Washington DC 20011

remedy herein granted or delegated to the Trustee or the Beneficiary, but to suffer and permit the execution of every power as though no such law or laws had been made or enacted. The Grantor, for herself and all who claim under her, waives, to the extent that it lawfully may, the benefit of any homestead exemption and any and all right to have the Mortgaged Property marshaled upon any sale or foreclosure hereunder.

8.5 Remedies Cumulative and Concurrent.

No remedy conferred upon or reserved to the Trustee or the Beneficiary is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute. Every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary shall be concurrent and may be pursued separately, successively or together against the Grantor; and every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary may be exercised from time to time as often as may be deemed expedient by the Trustee or the Beneficiary.

8.6 Application of Proceeds.

The proceeds of any sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, together with any other sums which may then be held by the Trustee or the Beneficiary pursuant to this Deed of Trust, shall be applied as follows:

(a) First, to the payment of the costs and expenses of such sale, including, without limitation, compensation to the Trustee and the Beneficiary, their respective agents and counsel, and of any judicial or other proceeding wherein the same may be made, and of all expenses, liabilities and advances made or incurred by the Trustee or the Beneficiary under this Deed of Trust, and all taxes and assessments due upon the Mortgaged Property at the time of such sale and to discharge any other lien prior to this Deed of Trust, except any taxes, assessments or other liens subject to which the Mortgaged Property shall have been sold.

(b) Second, to the payment of whatever may then remain unpaid on account of the Indebtedness, with interest thereon to the date of payment or as otherwise provided in the Note.

(c) Third, to the payment of any other sums required to be paid by the Grantor pursuant to any provision of the Note or this Deed of Trust, including, without limitation, all expenses, liabilities and advances made or incurred by the Beneficiary under this Deed of Trust or in connection with the enforcement thereof, together with interest on all such advances.

4910 Georgia Ave NW Washington DC 20011

(d) Fourth, to the payment of the surplus, if any, to whomsoever may be lawfully entitled to receive the same upon the delivery and surrender of the Mortgaged Property sold and conveyed.

## ARTICLE IX

## THE TRUSTEE

9.0 Acceptance - Standard of Conduct

Trustee, by acceptance hereof, hereby covenants faithfully to perform and fulfill the trusts herein created; provided, however, that the Trustee shall be liable hereunder only for gross negligence, willful misconduct or bad faith. In any event, the Trustee shall be indemnified and forever held harmless by the Beneficiary for any action which the Trustee may take pursuant to and in reliance upon the written instructions of the Beneficiary.

9.1 Fees and Expenses.

Grantor shall pay all reasonable costs, fees and expenses of the Trustee, its agents and counsel, incurred in connection with the performance of the Trustee's duties hereunder. Nothing contained in this Deed of Trust shall be construed to require the Trustee to make any advances of funds for the benefit of either the Grantor or the Beneficiary for any reason or purpose.

9.2 Commissions on Sale.

In the event of any sale made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to retain as compensation a commission of 5.00% of the proceeds of such sale.

9.3 Commission on Advertisement.

Immediately upon the first publication of an advertisement of any sale to be made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceeding or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to receive as compensation from the Grantor a commission of 2.50% of the total amount then due on account of the Indebtedness and, upon the first publication of any such advertisement, such commission shall be considered earned by the Trustee, payable by the Grantor, and a part of the Indebtedness. The commissions provided for in Sections 9.2 and 9.3 shall not be cumulative.

9.4 Resignation.

Trustee may resign at any time after thirty (30) calendar days' notice in writing to the Grantor and the Beneficiary.

4910 Georgia Ave NW Washington DC 20011

9.5 Acts of Trustee.

In the event more than one person is designated as Trustee herein, then either or any of them may act without the other when the circumstances shall so require and the act of either or any of them shall be considered as the act of both or all.

9.6 Successor Trustee - Substitution.

The Beneficiary may remove the Trustee at any time or from time to time, with or without reason or cause. In the event of the death, removal, resignation, refusal to act or inability to act of the Trustee, or in the sole discretion of the Beneficiary for any reason, without notice to any party, and without application to any court, a successor or substitute Trustee may be appointed by the Beneficiary by a designation in writing of a successor Trustee by the filing for record in the office where this Deed of Trust is recorded of a Deed of Appointment. Such power of appointment may be exercised whenever and as often as the Beneficiary may consider it advisable and the exercise of such power of appointment, no matter how frequently, shall not be considered a termination thereof. Upon the recordation of any such Deed of Appointment, the successor or substitute trustee so appointed shall thereupon without further act or deed, become fully vested with the same title and estate in and to the Mortgaged Property as the Trustee, as aforesaid, and have all of the rights, powers, trusts, duties and authority of the Trustee. Whenever in the Note or this Deed of Trust reference is made to the Trustee, such reference shall be held and construed to mean the Trustee for the time being, whether original successor or substitute.

## ARTICLE X

## RELEASE

10.0 Release of Lien.

The lien of this Deed of Trust shall be released at the expense of the Grantor upon payment in full of the Indebtedness and satisfaction and discharge of the Obligations.

## ARTICLE XI

## MISCELLANEOUS

11.1 Notices.

All notices, demands, requests and other communications pursuant to the provisions of the Note and this Deed of Trust shall be in writing and shall be deemed to have been properly given or served for all purposes when presented personally, or one business day after having been sent by a nationally recognized overnight delivery service or a local courier service, charges prepaid, or three (3) calendar days after having been sent

4910 Georgia Ave NW Washington DC 20011

by United States Registered or Certified Mail - Return Receipt Requested, postage prepaid, to the respective addresses as follows:

(a) If to the Grantor, then to:  **1140 3rd St NE , Washington, DC 20002**

(b) If to the Beneficiary, then to:  **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

(c) If to the Trustee, then to them at:  **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

Any of the parties may designate a change of address by notice in writing to the other parties. Whenever in this Deed of Trust the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the person or persons entitled to receive such notice.

11.2 Severability.

In the event any one or more of the provisions of this Deed of Trust shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or operates or would prospectively operate to invalidate this Deed of Trust, then and in either of those events, at the option of the Beneficiary, such provision or provisions only shall be held for naught and the remaining provisions of the Deed of Trust shall remain operative and in full force and effect and shall in no way be affected, prejudiced or disturbed thereby.

11.3 Successors and Assigns.

All of the grants, covenants, terms, provisions and conditions of the Note and this Deed of Trust shall run with and bind the Mortgaged Property and shall apply, bind and inure to the benefit of, the successors and assigns of the Grantor, the successors in trust of the Trustee and the endorsers, transferees, successors and assigns of the Beneficiary, and all persons claiming under or through any of them.

11.4 Modification - Waiver.

None of the terms or provisions of the Deed of Trust may be changed, waived, modified, discharged or terminated except by instrument in writing executed by the party or parties against which enforcement of the change, waiver, modification, discharge or termination is asserted.

4910 Georgia Ave NW Washington DC 20011

11.5 Captions and Headings.

The captions and headings contained in this Deed of Trust are included herein for convenience of reference only and shall not be considered a part hereof and are not in any way intended to limit or enlarge the terms hereof.

11.6 Warranty.

The Grantor warrants generally the title to the Mortgaged Property.

11.7 Applicable Law.

This Deed of Trust shall be governed by and construed, interpreted and enforced in accordance with and pursuant to the laws of the jurisdiction in which the Mortgaged Property is located.

11.8 Time of Essence.

Time shall be of the essence of each and every provision of this Deed of Trust of which time is an element.

11.9 Business Purpose.

Grantor warrants that the proceeds of the Note and any and all other secured Indebtedness shall be used exclusively for the acquisition or conduct of a business or commercial enterprise and that the loan evidenced by the Note is a "commercial loan."

11.10 Tenant Leases and Rents.

(a) Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all rents, issues, income and profits from the Mortgaged Property (collectively, "Income"). Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to collect, not more than one month in advance, and as trustee for the benefit of Beneficiary, the Income. Grantor shall apply the Income so collected first to payment of any and all amounts due under the Loan Documents and second to the funding of any escrows required under the Loan Documents. Thereafter, so long as no Event of Default exists, Grantor may use the Income in any manner not inconsistent with its obligations under the Loan Documents. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(b) All leases, licenses, and rental agreements now or hereafter covering the Mortgaged Property or any part thereof are hereinafter referred to collectively as "Leases", and individually as a "Lease". Grantor shall not enter into any Lease

4910 Georgia Ave NW Washington DC 20011

without the express written consent of Beneficiary. Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all Leases. Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to operate and manage the Mortgaged Property under any and all Leases. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(c) Grantor shall enforce all terms and conditions of all Leases and shall not permit any default by a tenant thereunder to continue longer than necessary to pursue its remedies. Grantor shall perform all of its obligations under and in respect of all Leases. In the event of a default by tenant under a Lease, Grantor shall diligently exercise all rights and remedies available to Grantor therefor, including but not limited to termination, eviction and reletting.

(d) The foregoing subparagraphs (a), (b), and (c) shall not constitute, or be construed to be, Beneficiary's waiver of the requirement set forth herein and the other Loan Documents that the Mortgaged Property be and remain vacant and unoccupied during the term of the Note and so long as this Deed of Trust remains a lien upon the Mortgaged Property. Waiver of said requirement must be express and in writing separate and apart from foregoing subparagraphs (a), (b), and (c).

11.11 All Obligations.

This Deed of Trust is given to secure certain present and future Indebtedness and Obligations, including future advances, as provided in the Note. This Deed of Trust and the liens created hereby shall secure any and all Indebtedness and Obligations of Grantor to Beneficiary of every nature whatsoever, whether created heretofore or hereafter.

11.12 Security Agreement.

For the purpose of securing the Indebtedness and Obligations, this Deed of Trust shall constitute a security agreement creating a security interest in (a) all personal property of Grantor included within or located on or to be delivered to the Mortgaged Property, including all such items of personal property hereafter acquired, and the proceeds thereof, and (b) all other personal property of Grantor relating in any way to the Indebtedness, Obligations, and/or the Loan Documents. Grantor hereby authorizes and agrees to execute and/or authorize such further agreements, instruments, financing statements, continuation statements, and other documents as may be necessary or appropriate to perfect and maintain the security interest herein granted to Beneficiary. Upon the occurrence of an Event of Default hereunder, Beneficiary shall have the remedies of a secured party under the Uniform Commercial Code for the jurisdiction in which the Mortgaged Property is located, including, without limitation, the right to take immediate possession of any collateral. Any sale of such collateral may be held as a part of and in conjunction with a sale by Trustee of the Mortgaged Property.

4910 Georgia Ave NW Washington DC 20011

## ARTICLE XII

## STATUTORY PROVISIONS

12.1 Statutory Provisions.

      This Deed of Trust is made under and pursuant to the provisions of the statutes and regulations of the jurisdiction in which the Mortgaged Property is located, as amended, and shall be construed to impose and confer upon the parties hereto and Beneficiary all the rights, duties, and obligations prescribed by said statutes and regulations, as amended, except as herein otherwise restricted, expanded, or changed.

      **IN WITNESS WHEREOF**, the said Grantor has executed these presents on the year and day first above written.

**[Signature Page to Follow]**

4910 Georgia Ave NW Washington DC 20011

**GRANTOR:**

**4910 Georgia Ave Holdings LLC**,
a District of Columbia   Limited Liability
Company

_____(SEAL)
By:    Charles Paxton Paret
Its:    Member & Managing Partner

_____(SEAL)
By:    Mel Melaku Negussie
Its:    Member & Managing Partner

COUNTY OF _____ SS:
STATE OF _____

    I hereby certify on this ___5___ day of August, 2020, before me in the jurisdiction aforesaid, did personally appear Charles Paxton Paret, Mel Melaku Negussie, known or satisfactorily proven to be the person(s) whose name(s) is set forth in the within instrument, and executed the within instrument and acknowledged the same instrument to be his/her act and deed for the purposes herein contained and in the capacity herein stated.

_____
NOTARY PUBLIC

My commission expires: _____

ROSA M. GREEN
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires September 30, 2024



Page **20** of **22**

4910 Georgia Ave NW Washington DC

# EXHIBIT A

## LEGAL DESCRIPTION

All that certain lot or parcel of land situate in the District of Columbia and being more particularly described as follows:

Lot numbered Eighteen (18) in Square numbered Twenty-Nine Hundred Twenty-Six (2926) in a subdivision made for Bernard L. Frishman, as per plat recorded in the Office of the Surveyor for the District of Columbia in Book 160 at page 156.

4910 Georgia Ave NW Washington DC

# EXHIBIT F

4910 Georgia Ave NW Washington DC 20011

## COMMERCIAL DEED OF TRUST NOTE

**July 31, 2020**                                                    **$10,861,300.00**

### IMPORTANT NOTICE

**THIS INSTRUMENT CONTAINS A CONFESSION OF JUDGMENT PROVISION WHICH CONSTITUTES A WAIVER OF IMPORTANT RIGHTS YOU MAY HAVE AS A DEBTOR AND ALLOWS THE CREDITOR TO OBTAIN A JUDGMENT AGAINST YOU WITHOUT ANY FURTHER NOTICE.**

**1.    BORROWER'S PROMISE TO PAY**

FOR VALUE RECEIVED, the undersigned, **4910 Georgia Ave Holdings LLC**, a District of Columbia  Limited Liability Company (the "Borrower"), promises to pay to the order of **WCP Fund I LLC,** a Delaware  limited liability company, at 2815 Hartland Rd Suite 200, Falls Church, VA 22043, its successors and assigns (the "Lender"), at such address and place, or at such other place or places as the Lender may from time to time designate in writing, the principal sum of **$10,861,300.00**, together with interest at the rate hereinafter provided, from the date of this Note (as set forth above) until paid.  All amounts due under this Note are secured by a Deed of Trust of even date herewith ("Deed of Trust") on the real property referenced in the Deed of Trust ("Property").

Borrower hereby assigns its right, title, and interest in and to all contracts and contract rights in connection with the Property.  So long as no default or Event of Default exist under this Note or the related Deed of Trust, Lender grants a license to Borrower to use the contracts and contract rights to increase the value of the Property.  However, upon a default or Event of Default under this Note or the related Deed of Trust, Borrower's license shall immediately and automatically be revoked.  **[ASSIGNMENT OF CONTRACTS]**

Borrower expressly and specifically agrees that the entire original principal balance of this Note, or any part thereof, may be withheld from Borrower at the closing on the loan memorialized by this Note and may be funded, if at all, in Lender's sole and absolute discretion.  Borrower further expressly and specifically agrees that interest shall accrue on only the total amount of the original principal balance that is disbursed and released from Lender to Borrower, until repaid.  If the loan memorialized by this Note is not funded in whole or in part, so much of it as is unfunded shall be deemed repaid at the Maturity Date (defined below), applied in accordance with this Note.  **[FUNDING]**

Borrower agrees to pay before or at the closing on the loan memorialized by this Note **$271,532.50** to DP Capital LLC as a loan origination fee, **$500.00** to DP Capital LLC for a broker price opinion, and **$1,000.00** to DP Capital LLC as processing fees and document prep fees.  **[POINTS, FEES, AND COSTS]**

4910 Georgia Ave NW Washington DC 20011

The final version of the loan commitment between Borrower and Lender is incorporated herein by reference.  In the event of any conflict between the aforementioned loan commitment and this Note, the terms and conditions of this Note shall control. **[LOAN COMMITMENT]**

**2.     INTEREST**

   Interest shall accrue hereunder at the rate of **9.5%** per annum on the principal.

**3.     PAYMENTS**

Payments of interest only shall be due and payable on the first day of each calendar month during the term of the loan evidenced by this Note.

If not sooner paid, the entire balance of the principal of this Note remaining unpaid, plus interest accrued thereon at the aforesaid rate not previously paid, and fees and costs, if any, shall be due and payable by Borrower in full by **January 31, 2022** (the "Maturity Date").

For purposes of computing interest on the debt evidenced hereby, interest shall be calculated on the basis of a three hundred sixty (360) day calendar year applied to the actual number of days funds are outstanding. Payments made on account hereof shall be applied first to the payment of late charges or other fees and costs owed to the Lender, next to the payment of any accrued and unpaid interest, and then to principal, or in such other order or proportion as the Lender, in its sole discretion, may elect from time to time.

The Borrower agrees to pay on demand any expenditures made by the Lender in accordance with the Deed of Trust, including, but not limited to, the payment of taxes, special assessments, condominium assessments, insurance premiums, and the cost of maintenance and preservation of the properties described in the Deed of Trust. At the option of the Lender, all such expenditures may be added to the unpaid principal balance of this Note and become a part of and on a parity with the principal indebtedness secured by the Deed of Trust and other instruments executed herewith, and shall accrue interest at the rate as may be payable from time to time on the original principal indebtedness or may be declared immediately due and payable.

All payments due hereunder shall be made in immediately available funds and constitute payment only when collected and/or the cash is actually received by the Lender.

**4.     BORROWER'S RIGHT TO PREPAY**

The Borrower is permitted to prepay the principal indebtedness evidenced hereby in whole or in part prior to the Maturity Date without premium or penalty.

**5.     BORROWER'S FAILURE TO PAY AS REQUIRED**

Before the Maturity Date, the entire principal sum outstanding, together with accrued interest thereon (as herein provided), fees and costs, if any, shall at once become

4910 Georgia Ave NW Washington DC 20011

due and payable at the option of the Lender without further notice, if any of the following occurs:

a. If default be made in any payment due under this Note;

b. If default be made in the performance of any other covenant contained in this Note;

c. If the legal or equitable title to any part or all of the Property becomes vested in anyone other than the Borrower without the Lender's prior written approval;

d. If default be made in the performance of any covenant under the Deed of Trust (the terms and provisions of which are incorporated herein by this reference as though fully set forth) which shall continue and remain uncured after any applicable grace period specified therein or in a written notice of default from the Lender to the Borrower.

Failure to exercise any of the options aforementioned or the failure to exercise any other option herein or in the Deed of Trust provided for shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. Acceleration of maturity, once claimed by the Lender, may at its option be rescinded by an instrument in writing to that effect; however, the tender and acceptance of a partial payment or partial performance shall not, by itself, affect or rescind such acceleration of maturity.

Upon a default in the payment of an amount due under this Note, after the expiration of any applicable grace period, or upon the occurrence of an "Event of Default", as that term is defined in the Deed of Trust, under the Deed of Trust, the holder of this Note may, in the holder's sole discretion and without notice or demand, in addition to any other remedy the holder of this Note may exercise, charge interest to the Borrower which shall accrue on the entire face value of this Note at the rate of **24%** per annum (the "Default Rate"). If judgment is entered against the Borrower on this Note, the amount of such judgment entered (which may include principal, interest, fees and costs) shall bear interest at such Default Rate as of the date of entry of judgment.

Lender reserves the right at its sole discretion, to extend this Note on any date the loan evidenced hereby becomes due in full, either by maturity or by default, without giving notice to junior lienholders. The foregoing shall not imply any consent to any junior liens.

In the event any payment due under this Note, including the final payment, is paid more than five (5) days after the date when the same is due, then the Lender shall be entitled to collect a "late charge" in an amount equal to **10.00%** of such installment. In the event the payment due is the balloon payment of this Note at its maturity, then the Lender shall be entitled to collect a late charge in an amount equal to **10.00%** of the original principal amount of this Note.

In the event it shall become necessary to employ counsel to collect this obligation or to protect the security hereof, the Borrower agrees to pay reasonable attorneys' fees, whether suit be brought or not, and all other costs and expenses reasonably connected with collection, the protection of the security, the defense of any counterclaim, the enforcement (including without limitation, as a part of any proceeding brought under the Bankruptcy Reform Act of 1978, as amended) of any remedies herein provided for, or provided for in the Deed of Trust, and the enforcement of any guaranty.

4910 Georgia Ave NW Washington DC 20011

**6.**    **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

**BORROWER HEREBY CERTIFIES THAT THIS LOAN IS FOR BUSINESS OR INVESTMENT PURPOSES ONLY AND SHALL NOT BE UTILIZED FOR THE PURCHASE OF AN OWNER OCCUPIED PRINCIPAL RESIDENCE.**

**BORROWER FURTHER CERTIFIES THAT THIS PROPERTY SHALL NOT BE RENTED TO OTHERS OR OCCUPIED IN ANY WAY DURING THE TERM OF THIS LOAN. OCCUPANCY OF THE PROPERTY IS STRICTLY PROHIBITED AND WILL RESULT IN IMMEDIATE DEFAULT.**

**BORROWER ATTESTS THAT IN THE EVENT OF ANY TENANCY PRIOR TO THE CLOSING OF THIS LOAN, THAT HE/SHE/IT PROPERLY ADHERED TO ALL TENANTS RIGHTS LAWS WITH PROPER NOTICES AND PROCEDURES. ANY ACTION TAKEN TO REMEDY SUCH RIGHTS DURING THE COURSE OF THIS LOAN WILL BE FULL RESPONSIBILITY OF BORROWER, AND IN THE EVENT LENDER NEEDS TO EMPLOY COUNSEL TO REMEDY SUCH ACTIONS, LENDER HAS FULL AUTHORITY TO COLLECT ALL REASONABLE ATTORNEYS' FEES AND ADDITIONAL COSTS FROM BORROWER.**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under this Note against each person individually or against all of such persons together. This means that any one of the Borrowers, guarantors, sureties or endorsers may be required to pay all of the amounts owed under this Note.

This Note shall be the obligation of the makers hereof and shall apply to and bind their respective successors, personal representatives, executors, survivors, heirs, and assigns.

**7.**    **WAIVERS**

The Borrower and any endorsers, guarantors and sureties jointly and severally waive the rights of Presentment, Notice of Dishonor, demand for performance, notice of nonperformance, protests, notice of protest, notice of default, demands, notice of demands, notice of non-payment and other notice and any and all lack of diligence or delays in the collection or enforcement hereof and expressly agree that this Note, or any payment hereunder, may be extended from time to time without in any way affecting the liability of the Borrower or any endorser, guarantor or surety hereof. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means

4910 Georgia Ave NW Washington DC 20011

the right to require the Lender to give notice to other persons that amounts due have not been paid.

The Borrower and any other person who has obligations under this Note waive the benefit of the homestead exemption as to the Property described herein and in the Deed of Trust.

The Borrower hereby (i) covenants and agrees not to elect a trial by jury of any issue triable of right by a jury, and (ii) waives any right to trial by jury fully to the extent that any such right shall now or hereafter exist. This waiver of right to trial by jury is separately given, knowingly and voluntarily, by the Borrower, and this waiver is intended to encompass individually each instance and each issue as to which the right to a jury trial would otherwise accrue. The Lender is hereby authorized and requested to submit this Note to any court having jurisdiction over the subject matter and the parties hereto, so as to serve as conclusive evidence of the Borrower's waiver of the right to jury trial. Further, the Borrower hereby certifies that no representative or agent of the Lender (including the Lender's counsel) has represented, expressly or otherwise, to the Borrower that the Lender will not seek to enforce this waiver of right to jury trial provision.

## 8.    GIVING OF NOTICES

All notices, demands, requests and other communications required pursuant to the provisions of this Note shall be in writing and shall be deemed to have been properly given or served for all purposes when presented personally, or one business day after having been sent by a nationally recognized overnight delivery service or a local courier service, charges prepaid, or three (3) calendar days after having been sent by United States Registered or Certified Mail - Return Receipt Requested, postage prepaid, to the Borrower at:1140 3rd St NE , Washington, DC 20002; and to the Lender at the address stated in the first paragraph of this Note.

The Lender and Borrower may designate a change of address by notice in writing to the other party. Whenever in this Note the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the person entitled to receive such notice.

## 9.    SEVERABILITY; RULES OF CONSTRUCTION

In the event any provision of this Note (or any part of any provision) is held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Note; but this Note shall be as if such invalid, illegal or unenforceable provision (or part thereof) had not been contained in this Note, but only to the extent it is invalid, illegal or unenforceable.

As used in this Note, the singular shall include the plural and the plural shall include the singular, where the context shall so require.

4910 Georgia Ave NW Washington DC 20011

Time is of the essence as to all provisions of this Note.

## CONFESSION OF JUDGMENT

IF ANY AMOUNT PAYABLE UNDER THIS NOTE IS NOT PAID WHEN AND AS DUE, OR IF BORROWER SHALL OTHERWISE BE IN DEFAULT UNDER THIS NOTE OR UNDER ANY OF THE DOCUMENTS EVIDENCING OR SECURING THIS NOTE OR THE LOAN EVIDENCED HEREBY, BORROWER AND ANY ENDORSERS HEREOF HEREBY IRREVOCABLY APPOINT RUSSELL S. DRAZIN OR ANY OTHER ATTORNEY AUTHORIZED TO PRACTICE LAW IN THE JURISDICTION WHERE THE PROPERTY IS LOCATED TO APPEAR FOR BORROWER, AND IN BORROWER'S NAME TO CONFESS JUDGMENT AGAINST BORROWER, IN ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION IN THE JURISDICTION WHERE THE PROPERTY IS LOCATED OR OF ANY OTHER STATE, TERRITORY OR JURISDICTION OF THE UNITED STATES, OR IN ANY COURT OF COMPETENT JURISDICTION, FOR ALL PRINCIPAL, INTEREST AND OTHER AMOUNTS DUE UNDER THIS NOTE, TOGETHER WITH ALL COSTS, EXPENSES AND ACTUAL ATTORNEYS FEES AS SPECIFIED HEREIN.  WITH RESPECT TO SUCH APPEARANCES, BORROWER EXPRESSLY WAIVES SUMMONS AND ALL OTHER PROCESS.  THE EXEMPTION OF PERSONAL PROPERTY FROM LEVY AND SALE IS HEREBY EXPRESSLY WAIVED BY THE BORROWER AND NO BENEFIT OF EXEMPTION SHALL BE CLAIMED BY THE BORROWER UNDER ANY EXEMPTION LAW NOW IN FORCE OR WHICH MAY BE HEREAFTER ADOPTED, INCLUDING BUT NOT LIMITED TO THE BENEFIT OF ANY AND ALL HOMESTEAD EXEMPTIONS WHICH ARE HEREBY WAIVED. BORROWER WAIVES THE BENEFIT OF ANY AND EVERY STATUTE, ORDINANCE OR RULE OF COURT WHICH MAY BE LAWFULLY WAIVED CONFERRING UPON THE BORROWER ANY RIGHT OR PRIVILEGE, OR EXEMPTION, STAY OF EXECUTION, APPEAL OR SUPPLEMENTARY PROCEEDINGS, OR OTHER RELIEF FROM THE ENFORCEMENT, OR IMMEDIATE ENFORCEMENT OF A CONFESSED JUDGMENT OR RELATED PROCEEDINGS ON A JUDGMENT. BORROWER CONSENTS TO VENUE IN THE JURISDICTION WHERE THE PROPERTY IS LOCATED, WITH RESPECT TO THE INSTITUTION OF AN ACTION CONFESSING JUDGMENT HEREON, REGARDLESS OF WHERE VENUE WOULD OTHERWISE BE PROPER. ANY JUDGMENT ENTERED AGAINST BORROWER, WHETHER BY CONFESSION OR OTHERWISE, SHALL BEAR INTEREST AT A RATE WHICH IS THE HIGHEST RATE OF INTEREST BEING PAID BY BORROWER HEREUNDER ON THE DATE OF JUDGMENT. THE AUTHORITY AND POWER TO APPEAR FOR AND ENTER JUDGMENT AGAINST BORROWER SHALL NOT BE EXHAUSTED BY ONE OR MORE EXERCISES THEREOF, OR BY ANY IMPERFECT EXERCISE THEREOF, AND SHALL NOT BE EXTINGUISHED BY ANY JUDGMENT ENTERED PURSUANT THERETO; SUCH AUTHORITY AND POWER MAY BE EXERCISED ON ONE OR MORE OCCASIONS, FROM TIME TO TIME, IN THE SAME OR

4910 Georgia Ave NW Washington DC 20011

**DIFFERENT JURISDICTIONS AS OFTEN AS THE LENDER OR ITS ASSIGNS SHALL DEEM NECESSARY OR ADVISABLE UNTIL ALL SUMS DUE HEREUNDER HAVE BEEN PAID IN FULL.**

**THE VALIDITY AND CONSTRUCTION OF THIS NOTE AND ALL MATTERS PERTAINING THERETO ARE TO BE DETERMINED ACCORDING TO THE LAWS OF THE JURISDICTION WHERE THE PROPERTY IS LOCATED WITHOUT REGARD TO ITS CONFLICTS OF LAW PRINCIPLES.**

**[SIGNATURE PAGE TO FOLLOW]**

4910 Georgia Ave NW Washington DC 20011

**BORROWER:**

**4910 Georgia Ave Holdings LLC**,
a District of Columbia   Limited Liability
Company

_____(SEAL)
By:      Charles Paxton Paret
Its:      Member & Managing Partner

_____(SEAL)
By:      Mel Melaku Negussie
Its:      Member & Managing Partner

COUNTY OF _____ SS:
STATE OF _____

  I hereby certify on this ____ day of August, 2020, before me in the
jurisdiction aforesaid, did personally appear Charles Paxton Paret, Mel Melaku
Negussie, , known or satisfactorily proven to be the person(s) whose name(s) is set forth
in the within instrument, and executed the within instrument and acknowledged the same
instrument to be his/her act and deed for the purposes herein contained and in the
capacity herein stated.

_____
NOTARY PUBLIC

My commission expires: _____

ROSA M. GREEN
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires September 30, 2024

4910 Georgia Ave NW Washington DC 20011

## <u>DEED OF TRUST</u>

**THIS IS A HOME EQUITY CREDIT LINE DEED OF TRUST. DEFAULT ON PAYMENTS MAY RESULT IN THE LOSS OF YOUR HOME.** The noteholder and grantor have an agreement whereby the noteholder may make or contemplates making advances from time to time against the security described in this credit line deed of trust. The maximum aggregate amount of principal to be secured at any one time is $10,861,300.00. An explicit statement of the rights and obligations of the borrower (<u>i.e.</u>, grantor) and the consequences of default are set forth herein.

      **THIS DEED OF TRUST**, made effective as of July 31, 2020, by and between **4910 Georgia Ave Holdings LLC**, a District of Columbia  Limited Liability Company, hereinafter referred to as the "Grantor" (<u>index as Grantor</u>), with an address of 1140 3rd St NE , Washington, DC 20002, and **Daniel Huertas**, hereinafter referred to as the "Trustee" (<u>index as Grantee</u>), with an address of 2815 Hartland Road, Suite 200, Falls Church, VA 22043.

      WHEREAS, Grantor is justly indebted to **WCP Fund I LLC**, a Delaware  Limited Liability Company, hereinafter referred to as the "Beneficiary," with an address of 2815 Hartland Road, Suite 200, Falls Church, VA 22043, for money borrowed in the amount of **$10,861,300.00** ("Loan Amount"), for which amount the said Grantor has made and delivered a certain Commercial Deed of Trust Note of even date herewith, in the original principal amount of the Loan Amount payable to the order of the Beneficiary; and

      WHEREAS, the Grantor desires to secure the Beneficiary and any subsequent holder of the Note secured hereby the full and punctual payment of said debt, when and as the same shall become due and payable, as well as any and all renewals and extensions of said Note, or any part thereof, together with interest thereon, and the performance of the covenants and agreements herein and therein contained, and also to secure the reimbursement to the holder or holders of said Note or to the Trustee or substitute Trustee, and any purchaser or purchasers of said Note from the Lender, or grantee or grantees under any sale or sales conducted by the Trustee or Substitute Trustee under the provisions of this Deed of Trust for all money which may be advanced as herein provided for, and for any and all costs and expenses incurred or paid on account of any litigation at law or in equity which may arise in respect to this Deed of Trust, or in respect to the indebtedness or the property herein described, or in obtaining possession of the Mortgaged Property either before or after any sale which may be made as hereinafter provided for.

<u>ARTICLE I</u>

<u>DEFINITIONS</u>

1.0 Definitions.

                                                               

4910 Georgia Ave NW Washington DC 20011

Grantor, Trustee and Beneficiary agree that, unless the context otherwise specifies or requires, the following terms shall have the meaning herein specified, such definitions to be applicable equally to the singular and the plural forms of such terms and to all genders:

(a) Beneficiary - The party hereinabove designated as such, its successors and assigns.

(b) Event(s) of Default - Any of the happenings, events, circumstances or occurrences described in Article VII of this Deed of Trust.

(c) Grantor - The party hereinabove designated as such, and that party's heirs, survivors, administrators, executors, successors and assigns.

(d) Impositions - All (i) real estate taxes, and other taxes of every kind and character; and (ii) all water and sewer rents and charges; and (iii) all other public charges, taxes, homeowners association assessments, fees, governmental and non-governmental charges, to the extent any of the foregoing are imposed or assessed upon the Grantor or the Mortgaged Property or arising in respect of the occupancy, use or possession thereof.

(e) Improvements - Any and all buildings, structures, improvements, alterations or appurtenances now erected or at any time hereafter constructed, renovated, or placed upon the Mortgaged Property or any portion thereof and any replacements thereof.

(f) Indebtedness - The principal of and the interest on, and all other amounts, payments and premiums due on account of the Note and all other indebtedness of the Grantor to the Beneficiary payable pursuant to the Note.

(g) Land - The real estate described in "EXHIBIT A" attached hereto and by this reference made a part hereof.

(h) Mortgaged Property - The Land and the Improvements.

(i) Note - The Commercial Deed of Trust Note made by the Grantor payable to the order of the Beneficiary of even date herewith, in the original principal amount of the Loan Amount, and all modifications, renewals, substitutions, and extensions of the aforesaid Note.

(j) Obligations - Any and all of the covenants, promises and other obligations (other than the Indebtedness) made or owing by the Grantor to the Beneficiary pursuant to or as otherwise set forth in this Deed of Trust.

(k) Trustee - The parties hereinabove designated as such, their successors and substitutes.

<u>ARTICLE II</u>

4910 Georgia Ave NW Washington DC 20011

<u>GRANT</u>

2.0 Grant.

NOW, THEREFORE, the Grantor, in consideration of the premises and of the sum of TEN and NO/100 DOLLARS ($10.00) lawful money of the United States of America, the receipt of which is hereby acknowledged by the Grantor, and in order to secure the payment of the Indebtedness and the Note and the performance and discharge of the Obligations, does by these presents, grant, give, bargain, sell, assign, convey, release, warrant, mortgage, transfer, hypothecate, pledge, set over and confirm unto the Trustee, their successors and assigns forever, in fee simple, the Mortgaged Property, TO HAVE AND TO HOLD the said Mortgaged Property unto the said Trustee, their successors and assigns, forever;

IN TRUST, to secure (a) the payment to the Beneficiary of the Indebtedness and all other sums due under the Note and/or this Deed of Trust, (b) the performance and discharge of the Obligations and of all covenants and agreements in the Note, (c) the performance and discharge of all covenants and agreements in all documents and/or instruments evidencing, securing, or otherwise relating to the Indebtedness (collectively, "Loan Documents") other than the Note and this Deed of Trust, (d) any and all future or additional advances (whether or not obligatory) made by Beneficiary (i) to protect or preserve the Mortgaged Property or the lien or security interest created hereby on the Mortgaged Property, or (ii) for taxes, assessments, or insurance premiums as hereinafter provided, or (iii) for performance of any of Grantor's obligations hereunder or under the other Loan Documents, or (iv) for any other purpose provided herein or in the other Loan Documents (whether or not the original Grantor remains the owner of the Mortgaged Property at the time of such advances), together with interest thereon as provided for in the Note, and (e) any and all other indebtedness now owing or which may hereafter be owing by Grantor to Beneficiary, however and whenever incurred or evidenced, whether express or implied, direct or indirect, absolute or contingent, or due or to become due, and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, and extensions thereof.

2.1 Possession.

Until the occurrence of an Event of Default, the Beneficiary shall promptly permit the Grantor to possess and enjoy the Mortgaged Property.

2.2 Condition of Grant.

The condition of these presents is such that if Grantor shall pay or cause to be paid the Indebtedness as and when the same shall become due and payable under the Note, and shall observe, perform and discharge the Obligations, then Beneficiary and the Trustee shall release and reconvey unto and at the cost of Grantor the Mortgaged Property whereupon this Deed of Trust shall cease and be void and the Mortgaged Property shall be released from the lien hereof at the cost of the Grantor.

4910 Georgia Ave NW Washington DC 20011

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

3.0 Representations and Warranties.

Grantor hereby represents and warrants to Beneficiary that:

3.1 Validity of Loan Instruments.

(a) The execution, delivery and performance by Grantor of the Note and this Deed of Trust, (i) are within the legal powers of Grantor, and (ii) will not violate any provision of law, any order of any court or other agency of government, or any indenture, agreement or other instrument to which Grantor is a party or by which they or any of their property is bound or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its property or assets, except as contemplated herein; and (b) the Note does, and this Deed of Trust when executed and delivered by Grantor will, constitute the legal, valid and binding obligations of in accordance with their respective terms, subject to the limiting effect of applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws of general applicability relating to creditor's rights, and the exercise of judicial discretion which may limit certain remedies therein provided.

3.2 Mortgaged Property and Other Property.

Grantor has good and marketable title in fee simple to the Mortgaged Property free and clear of any liens, charges, encumbrances, security interests and adverse claims whatsoever. This Deed of Trust is and will remain a valid and enforceable first lien on the Mortgaged Property. The Grantor has full power and lawful authority to subject the Mortgaged Property to the lien of this Deed of Trust in the manner and form herein contemplated. The Grantor will preserve such title, and will forever warrant and defend the same to the Trustee and will forever warrant and defend the validity and priority of the lien hereof against the claims of all persons and parties whomsoever.

## ARTICLE IV

## AFFIRMATIVE COVENANTS

4.0 Affirmative Covenants.

Until the entire Indebtedness shall have been paid in full, Grantor hereby covenants and agrees as follows:

4910 Georgia Ave NW Washington DC 20011

4.1 Compliance with Laws.

Grantor will promptly, fully and faithfully comply with, conform to and obey all present and future laws, ordinances, rules, regulations, requirements which may be applicable to the manner of use, occupancy, possession, operation, maintenance, alteration, and repair of the Mortgaged Property.

4.2 Payment of Impositions.

Grantor will pay and discharge, or cause to be paid and discharged, not later than the due date thereof or the date any fine, penalty, interest or cost may be added thereto or imposed by or pursuant to law for the nonpayment thereof (whichever date shall first occur) or, at the direction of the Beneficiary, as soon as the same become liens, whether or not then due and payable, any Impositions upon or assessed against the Mortgaged Property or arising in respect of the occupancy, use or possession thereof. The Grantor will, upon the request of the Beneficiary, deliver to the Beneficiary from time to time receipts evidencing the payment of all such Impositions.

4.3 Repairs and Waste.

Grantor will at all times keep and maintain the Mortgaged Property in good order, condition and repair and will promptly make, from time to time, all repairs, renewals, replacements, additions and improvements, interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen, as may be necessary or desirable to accomplish the purposes of this Section. The Grantor will not commit any waste upon the Mortgaged Property or make or permit any change in the use of the Mortgaged Property which will in any way increase any ordinary fire or other hazard arising out of the operation thereof.

4.4. Insurance.

Grantor will keep the Improvements insured against loss by fire, casualty and such other hazards as may from time to time be required by the Beneficiary for the benefit of the Beneficiary. The Grantor shall maintain such public liability and indemnity insurance as may from time to time be reasonably required by the Beneficiary. All such insurance shall be written in forms, amounts and by companies satisfactory to the Beneficiary and losses thereunder, shall be payable to the Beneficiary pursuant to a standard mortgagee's endorsement. Duplicate originals of each such policy of insurance shall be delivered to the Beneficiary and the Grantor shall provide the Beneficiary with such evidence of the payment of premiums due on account of such insurance as may from time to time be required by the Beneficiary. All such policies shall provide that the same shall not be invalidated by any waiver of the right of subrogation by any insured and shall provide that the carrier shall have no right to be subrogated to the Beneficiary. All such policies shall provide for at least thirty (30) days' prior written notice to all insureds named thereon (including, without limitation, the Beneficiary) prior to any cancellation, surrender or modification thereof, including without limitation, cancellation for nonpayment of

4910 Georgia Ave NW Washington DC 20011

premium. The Grantor shall give the Beneficiary prompt notice of any loss covered by such insurance and the Beneficiary shall have the right to join the Grantor in adjusting any loss. Any funds received as payment for any loss under any such insurance shall be paid over to the Beneficiary and shall be applied by the Beneficiary, should there then exist any Event of Default hereunder that is continuing and not cured by Grantor, to the prepayment of the Indebtedness, without premium or penalty, or, should no Event of Default have occurred and be continuing uncured hereunder, then to the reimbursement of Grantor for expenses actually incurred by the Grantor in the restoration or replacement of the Improvements.

4.5 Restoration Following Casualty.

In the event of the happening of any casualty (including, without limitation, any casualty for which insurance was not obtained or obtainable) resulting in damage to or destruction of the Mortgaged Property or any part thereof, the Grantor shall give prompt written notice of the time, nature and extent thereto to the Beneficiary and, as long as no Event of Default exists hereunder that is continuing and not cured by Grantor, then the Beneficiary shall apply the proceeds of insurance to the restoration, repair or replacement of the Mortgaged Property or in the event the casualty was not insured, the Grantor shall, at the sole cost and expense of the Grantor and whether or not the proceeds of insurance, if any, are sufficient for the purpose, promptly commence and diligently continue to restore, repair and replace the Mortgaged Property as nearly as possible to its condition immediately prior to such casualty.

4.6 Performance of Other Agreements.

Grantor will comply in a timely way, and otherwise abide by and perform, all of the terms, agreements, obligations, covenants, restrictions and warranties binding upon the Grantor under any easement, right-of-way, covenant, restriction, or other agreement with respect to or in any manner affecting the Mortgaged Property or any part thereof.

4.7 Further Assurances.

Grantor, at his/her/its sole cost and expense, will make, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfer and assurances as the Trustee or the Beneficiary shall from time to time reasonably require, for the better assuring, conveying, assigning, transferring and confirming unto the Trustee the property and rights hereby conveyed or assigned or intended now or hereafter so to be, or which the Grantor may be or may hereafter become bound to convey or assign to the Trustee, or for carrying out the intention or facilitating the performance of the terms of this Deed of Trust or for filing, registering or recording this Deed of Trust.

4.8 Advances.

In the event the Grantor shall fail to perform any of the covenants contained herein then the Beneficiary, with or without notice to the Grantor, may, but shall not be required

4910 Georgia Ave NW Washington DC 20011

to, make advances to perform the same in its behalf, and all sums so advanced shall be a lien upon the Mortgaged Property and shall be secured hereby. Any advance so made shall be charged interest at the default rate provided herein.

4.9 Deposits for Taxes and Related Matters.

Beneficiary shall not require the Grantor to deposit with Beneficiary in escrow those amounts sufficient to discharge over time the Impositions and the premiums on the insurance required pursuant hereto unless an Event of Default has occurred.

4.10 Indemnity - Hold Harmless.

Grantor shall forever indemnify and save the Beneficiary and the Trustee harmless from all loss, liability, damage, costs and expenses, including, without limitation, reasonable attorneys' fees, and title and survey costs, incurred by reason of any action, suit, proceeding, hearing, motion or application before any Court or administrative body in or which the Beneficiary or the Trustee may be or become a party by reason of this Deed of Trust, whether as holder of this Deed of Trust, as mortgagee-in-possession, as successor-in-interest to Grantor, by foreclosure deed or deed in lieu of foreclosure, including, without limitation, with respect to (a) any accident to, injury to or death of persons or loss of or damage to property occurring on or about the Mortgaged Property, (b)any failure on the part of the Grantor to perform or comply with any of the terms, covenants, conditions and agreements set forth in the this Deed of Trust, (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Mortgaged Property or any other part thereof for construction or maintenance or otherwise, (d) any action brought against any party attacking the validity, priority or enforceability of this Deed of Trust, and/or (e) bankruptcy. All money paid or expended by Beneficiary or Trustee in connection with any of the foregoing, together with interest thereon from day of such payment at the default rate set forth in the Note, shall be so much additional indebtedness secured hereby and, except as otherwise provided herein, shall be immediately and without notice due and payable by Grantor. The obligations of the Grantor under this Section shall survive any foreclosure, deed in lieu of foreclosure, release, termination or satisfaction of this Deed of Trust.

4.11 Lockbox Access.

Grantor to install a combination lockbox on the subject Mortgaged Property and provide said lockbox combination to the Beneficiary. Lockbox is to remain located on property at all times during term of this Deed of Trust. Grantor irrevocably grants permission to Beneficiary and/or Trustee to enter into any improvement on the Mortgaged Property at any time and for any purpose consistent with ensuring Grantor's compliance with the terms and conditions of this Deed of Trust.

4.12 Sign Installation.

4910 Georgia Ave NW Washington DC 20011

Grantor hereby allows Grantee to install a 18x24 sign in the yard of the Mortgaged Property during term of this Deed of Trust.

## ARTICLE V

## NEGATIVE COVENANTS

5.0 Negative Covenants

Until the Indebtedness shall have been paid in full, Grantor covenants and agrees as follows:

5.1 Other Liens - Transfers

Grantor will not, without the prior written consent of the Beneficiary, create or permit to be created or remain, any mortgage, pledge, lien, lease, encumbrance or charge or security interest, or conditional sale or other title retention agreement, with respect to the Mortgaged Property or any part thereof or income therefrom, whether prior or subordinate to the lien of this Deed of Trust, except as otherwise consented to in writing by Beneficiary. Except for any grant, conveyance, sale, assignment or transfer of the Mortgaged Property which is conditioned upon the release of record of this Deed of Trust, the Grantor will not, without the prior written consent of the Beneficiary, make, create or consent to any grant, conveyance, sale, assignment or transfer of the Mortgaged Property or any part thereof, other than as consented to by Beneficiary.

5.2 Impairment of Security

Grantor will take no action which will in any manner impair the value of the Mortgaged Property or the security of this Deed of Trust.

5.3 Occupancy.

Unless otherwise agreed to in writing by the Beneficiary, Grantor shall not allow any person or persons to occupy the Mortgaged Property during the term of the Note.

## ARTICLE VI

## EMINENT DOMAIN – CONDEMNATION

6.0 Notice.

Grantor shall give the Trustee and the Beneficiary prompt written notice of the actual or threatened commencement of any proceedings under the power of condemnation or eminent domain affecting all or any part of the Mortgaged Property, and the Grantor will deliver to the Trustee and the Beneficiary true and complete copies of any and all

4910 Georgia Ave NW Washington DC 20011

documents and papers served upon the Grantor in connection with any such proceedings promptly following receipt thereof by the Grantor.

6.1 Assignment of Condemnation Awards.

Grantor hereby irrevocably assigns, transfers and sets over unto the Beneficiary all right, title, interest and estate of the Grantor in and to any award or payment made in respect of any proceeding under the power of condemnation or eminent domain relating to the Mortgaged Property and initiated subsequent to the recordation of this Deed of Trust.

6.2 Application of Proceeds.

All proceeds received by or for the account of the Beneficiary as a result of, or by agreement in anticipation or in lieu of, any exercise of the power of condemnation or eminent domain with respect to the Mortgaged Property, shall be applied by the Beneficiary in the following order of priority: (a) to reimburse the Beneficiary for all costs and expenses actually and reasonably incurred by the Beneficiary in connection with the collection of such award or payment, including, without limiting the generality of the foregoing, reasonable attorney's fees; and (b) to the prepayment of the amount then due on account of the Indebtedness, without premium or penalty; and (c) to the Grantor. In the event, however, that in the opinion of the Beneficiary such taking will not materially affect the value of the Mortgaged Property, then the Beneficiary may disburse the entire proceeds of the taking to the Grantor; provided, however, that the Beneficiary shall then have the right to specify the manner in which such proceeds shall be disbursed by the Grantor; and, provided further, that the payment of the proceeds to the Grantor shall not affect the lien hereof or reduce the amount of Indebtedness.

<u>ARTICLE VII</u>

<u>EVENTS OF DEFAULT</u>

7.0 Events of Default.

The term "Event(s) of Default" shall mean the occurrence or happening, from time to time, of any one or more of the following or any other occurrences to/by the Grantor (both severally and/or jointly):

7.1 Payment of Indebtedness.

If the Grantor shall default in the payment of any portion of the Indebtedness when and as the same shall become due and payable under the Note.

7.2 Performance of Obligations.

If the Grantor shall default in the due observance or performance of any of the Obligations under the Note or this Deed of Trust.

4910 Georgia Ave NW Washington DC 20011

7.3 Appointment by Receiver.

      If by the order of a court of competent jurisdiction, a trustee, receiver or liquidator of the Mortgaged Property or any part thereof, or of the Grantor, shall be appointed and such order shall not be discharged or dismissed within ninety (90) calendar days after such appointment.

7.4 Voluntary Bankruptcy.

      If the Grantor shall file a petition in bankruptcy or for an arrangement or for reorganization pursuant to the Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, or if, by decree of a court of competent jurisdiction, the Grantor shall be adjudicated a bankrupt, or be declared insolvent, or shall make an assignment for the benefit of creditors, or shall admit in writing his inability to pay his debts generally as they become due, or shall consent to the appointment of a receiver or receivers of all or any part of its property.

7.5 Involuntary Bankruptcy.

      If any of the creditors of the Grantor shall file a petition in bankruptcy against the Grantor, pursuant to the Federal Bankruptcy Reform Act of 1978, as amended, or any similar law, federal or state, and if such petition shall not be discharged or dismissed within ninety (90) calendar days after the date on which such petition was filed.

7.6 Judgments.

      If final judgment for the payment of money or the establishment of a mechanic's lien shall be rendered against the Grantor and the Grantor shall not discharge the same or cause it to be discharged within thirty (30) calendar days from the entry thereof, or shall not appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered, and secure a stay of execution pending such appeal.

7.7 Transfer of Mortgaged Property.

      With the exception of the sale of the Mortgaged Property, which sale is conditioned upon the release of the Mortgaged Property from the lien of this Deed of Trust, if Grantor shall transfer, or agree to transfer, in any manner, either voluntarily or involuntarily, by operation of law or otherwise, all or any portion of the Mortgaged Property, or any interest therein without, in any such case, the prior written consent of Beneficiary. NOTICE – THE INDEBTEDNESS SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY HEREIN CONVEYED IN TRUST.

7.8 Occupancy.

4910 Georgia Ave NW Washington DC 20011

Grantor represents and covenants to Trustee and Beneficiary that, as of the effective date of this Deed of Trust (at the latest), the Mortgaged Property is vacant. Grantor further covenants to Trustee and Beneficiary that, so long as this Deed of Trust remains a lien against the Mortgaged Property, the Mortgaged Property will remain vacant and Grantor will not permit the Mortgaged Property to be occupied by anyone, including Grantor. Grantor further covenants that, to the extent that the Mortgaged Property was tenanted prior to the effective date of this Deed of Trust, Grantor properly adhered to all tenants rights laws with proper notices and procedures.

7.9 Other Indebtedness

Any default under or breach of any document or instrument evidencing or securing any indebtedness, obligation, or liability of any kind or nature – other than the Indebtedness and the Obligations secured hereby – of Grantor or any guarantor of the Indebtedness, or any of their affiliates, to Beneficiary, whether now existing or hereafter created or arising, direct or indirect, material or immaterial, and whether absolute or contingent, joint, several or joint and severally and howsoever owned, held, or acquired.

7.10 Death or Incapacity

Upon the death or incapacity of the Grantor (if applicable) or of any guarantor of the Indebtedness (if applicable).

<u>ARTICLE VIII</u>

<u>DEFAULT AND FORECLOSURE</u>

8.0 Remedies.

If an Event of Default shall occur, then the Trustee or the Beneficiary may, at the option of the Beneficiary, exercise any or all of the following remedies:

(a) Foreclosure Sale. During the continuance of any such Event of Default, the Trustee personally or by its agents or attorneys, upon the instruction of the Beneficiary, may sell the Mortgaged Property, or any part or parts thereof, and all estate, right, title, interest, claims and demand therein, at public auction at such time and place and upon such terms and conditions as the Trustee may deem appropriate or as may be required or permitted by applicable law or rule of court, having first given, advertised, and published such notice of the time, place and terms of foreclosure/public auction by publication in at least one newspaper published or having a general circulation in the county, city or jurisdiction in which the Mortgaged Property is located, once a week for two successive weeks, or by such other methods, if any, as the Trustee or any title insurance company, insuring the lien hereof, may deem appropriate.

4910 Georgia Ave NW Washington DC 20011

(b) Other Remedies. During the continuance of any Event of Default, the Trustee and the Beneficiary may take such other steps to protect and enforce their respective rights, whether by action, suit or proceeding in equity or at law, or in aid of any power granted in the Note or this Deed of Trust, or for the enforcement of any other appropriate legal or equitable remedy, or otherwise, as the Trustee or the Beneficiary may elect.

8.1 Adjournment of Sale.

The Trustee may adjourn from time to time any sale to be made under, or by virtue of this Deed of Trust by announcement at the time and place appointed for such sale or for such adjourned sale; and, except as otherwise provided by any rule of law, the Trustee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

8.2 Conveyance by Trustee.

Upon the completion of any sale or sales made by the Trustee under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Trustee or an officer of the court empowered so to do, shall execute and deliver to the purchaser or purchasers a good and sufficient instrument, or instruments, conveying, assigning and transferring all estate, right, title and interest in and to the Mortgaged Property and rights sold. The Trustee is hereby appointed the irrevocable true and lawful attorney of the Grantor in its name and stead to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold and for that purpose the Trustee may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, the Grantor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Any such sale or sales made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of the Grantor in and to the properties and rights so sold, and shall be a perpetual bar, both at law and in equity, against the Grantor and against any and all persons claiming or who may claim the same, or any part thereof from, through or under the Grantor.

8.3 Purchase by Beneficiary.

In the event of the sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Beneficiary shall be competent to bid for and acquire the Mortgaged Property or any part thereof.

8.4 Waiver of Redemption - Exemptions Waived.

4910 Georgia Ave NW Washington DC 20011

Grantor will not at any time insist upon, or plead, or in any manner whatever claim or take any benefit or advantage of any stay or extension or moratorium law, any exemption from attachment, execution or sale of the Mortgaged Property or any part thereof, wherever enacted, now or at any time hereafter in force, which may affect the covenants and terms of performance of this Deed of Trust, nor claim, take or insist upon any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisal of the Mortgaged Property, or any part thereof, prior to any sale or sales thereof which may be made pursuant to any provision herein, or pursuant to the decree, judgment or order of any court of competent jurisdiction; or after any such sale or sales, claim or exercise any right under any statute heretofore or hereafter enacted to redeem the property so sold or any part thereof, and the Grantor hereby expressly waives all benefit or advantage of any such law or laws, and covenants not to hinder, delay or impede the execution of any right, power or remedy herein granted or delegated to the Trustee or the Beneficiary, but to suffer and permit the execution of every power as though no such law or laws had been made or enacted. The Grantor, for herself and all who claim under her, waives, to the extent that it lawfully may, the benefit of any homestead exemption and any and all right to have the Mortgaged Property marshaled upon any sale or foreclosure hereunder.

8.5 Remedies Cumulative and Concurrent.

No remedy conferred upon or reserved to the Trustee or the Beneficiary is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute. Every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary shall be concurrent and may be pursued separately, successively or together against the Grantor; and every right, power and remedy given by this Deed of Trust to the Trustee or the Beneficiary may be exercised from time to time as often as may be deemed expedient by the Trustee or the Beneficiary.

8.6 Application of Proceeds.

The proceeds of any sale made under or by virtue of this Article, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, together with any other sums which may then be held by the Trustee or the Beneficiary pursuant to this Deed of Trust, shall be applied as follows:

(a) First, to the payment of the costs and expenses of such sale, including, without limitation, compensation to the Trustee and the Beneficiary, their respective agents and counsel, and of any judicial or other proceeding wherein the same may be made, and of all expenses, liabilities and advances made or incurred by the Trustee or the Beneficiary under this Deed of Trust, and all taxes and assessments due upon the Mortgaged Property at the time of such sale and to discharge any other lien prior to this Deed of Trust, except any taxes, assessments or other liens subject to which the Mortgaged Property shall have been sold.

4910 Georgia Ave NW Washington DC 20011

(b) Second, to the payment of whatever may then remain unpaid on account of the Indebtedness, with interest thereon to the date of payment or as otherwise provided in the Note.

(c) Third, to the payment of any other sums required to be paid by the Grantor pursuant to any provision of the Note or this Deed of Trust, including, without limitation, all expenses, liabilities and advances made or incurred by the Beneficiary under this Deed of Trust or in connection with the enforcement thereof, together with interest on all such advances.

(d) Fourth, to the payment of the surplus, if any, to whomsoever may be lawfully entitled to receive the same upon the delivery and surrender of the Mortgaged Property sold and conveyed.

<u>ARTICLE IX</u>

<u>THE TRUSTEE</u>

9.0 Acceptance - Standard of Conduct

Trustee, by acceptance hereof, hereby covenants faithfully to perform and fulfill the trusts herein created; provided, however, that the Trustee shall be liable hereunder only for gross negligence, willful misconduct or bad faith. In any event, the Trustee shall be indemnified and forever held harmless by the Beneficiary for any action which the Trustee may take pursuant to and in reliance upon the written instructions of the Beneficiary.

9.1 Fees and Expenses.

Grantor shall pay all reasonable costs, fees and expenses of the Trustee, its agents and counsel, incurred in connection with the performance of the Trustee's duties hereunder. Nothing contained in this Deed of Trust shall be construed to require the Trustee to make any advances of funds for the benefit of either the Grantor or the Beneficiary for any reason or purpose.

9.2 Commissions on Sale.

In the event of any sale made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to retain as compensation a commission of 5.00% of the proceeds of such sale.

9.3 Commission on Advertisement.

Immediately upon the first publication of an advertisement of any sale to be made under or by virtue of Article VIII of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceeding or of a judgment or decree

4910 Georgia Ave NW Washington DC 20011

of foreclosure and sale, Trustee shall be entitled to receive as compensation from the Grantor a commission of 2.50% of the total amount then due on account of the Indebtedness and, upon the first publication of any such advertisement, such commission shall be considered earned by the Trustee, payable by the Grantor, and a part of the Indebtedness. The commissions provided for in Sections 9.2 and 9.3 shall not be cumulative.

9.4 Resignation.

Trustee may resign at any time after thirty (30) calendar days' notice in writing to the Grantor and the Beneficiary.

9.5 Acts of Trustee.

In the event more than one person is designated as Trustee herein, then either or any of them may act without the other when the circumstances shall so require and the act of either or any of them shall be considered as the act of both or all.

9.6 Successor Trustee - Substitution.

The Beneficiary may remove the Trustee at any time or from time to time, with or without reason or cause. In the event of the death, removal, resignation, refusal to act or inability to act of the Trustee, or in the sole discretion of the Beneficiary for any reason, without notice to any party, and without application to any court, a successor or substitute Trustee may be appointed by the Beneficiary by a designation in writing of a successor Trustee by the filing for record in the office where this Deed of Trust is recorded of a Deed of Appointment. Such power of appointment may be exercised whenever and as often as the Beneficiary may consider it advisable and the exercise of such power of appointment, no matter how frequently, shall not be considered a termination thereof. Upon the recordation of any such Deed of Appointment, the successor or substitute trustee so appointed shall thereupon without further act or deed, become fully vested with the same title and estate in and to the Mortgaged Property as the Trustee, as aforesaid, and have all of the rights, powers, trusts, duties and authority of the Trustee. Whenever in the Note or this Deed of Trust reference is made to the Trustee, such reference shall be held and construed to mean the Trustee for the time being, whether original successor or substitute.

## ARTICLE X

## RELEASE

10.0 Release of Lien.

The lien of this Deed of Trust shall be released at the expense of the Grantor upon payment in full of the Indebtedness and satisfaction and discharge of the Obligations.

Rev 5.2016

4910 Georgia Ave NW Washington DC 20011

## ARTICLE XI

## MISCELLANEOUS

11.1 Notices.

All notices, demands, requests and other communications pursuant to the provisions of the Note and this Deed of Trust shall be in writing and shall be deemed to have been properly given or served for all purposes when presented personally, or one business day after having been sent by a nationally recognized overnight delivery service or a local courier service, charges prepaid, or three (3) calendar days after having been sent by United States Registered or Certified Mail - Return Receipt Requested, postage prepaid, to the respective addresses as follows:

(a) If to the Grantor, then to: **1140 3rd St NE , Washington, DC 20002**

(b) If to the Beneficiary, then to: **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

(c) If to the Trustee, then to them at: **2815 Hartland Rd Suite 200, Falls Church, VA 22043, with a courtesy copy to Pardo & Drazin, LLC, Attn: Russell S. Drazin, Esquire, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015**

Any of the parties may designate a change of address by notice in writing to the other parties. Whenever in this Deed of Trust the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the person or persons entitled to receive such notice.

11.2 Severability.

In the event any one or more of the provisions of this Deed of Trust shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or operates or would prospectively operate to invalidate this Deed of Trust, then and in either of those events, at the option of the Beneficiary, such provision or provisions only shall be held for naught and the remaining provisions of the Deed of Trust shall remain operative and in full force and effect and shall in no way be affected, prejudiced or disturbed thereby.

11.3 Successors and Assigns.

All of the grants, covenants, terms, provisions and conditions of the Note and this Deed of Trust shall run with and bind the Mortgaged Property and shall apply, bind and inure to the benefit of, the successors and assigns of the Grantor, the successors in trust of the Trustee and the endorsers, transferees, successors and assigns of the Beneficiary, and all persons claiming under or through any of them.

4910 Georgia Ave NW Washington DC 20011

11.4 Modification - Waiver.

None of the terms or provisions of the Deed of Trust may be changed, waived, modified, discharged or terminated except by instrument in writing executed by the party or parties against which enforcement of the change, waiver, modification, discharge or termination is asserted.

11.5 Captions and Headings.

The captions and headings contained in this Deed of Trust are included herein for convenience of reference only and shall not be considered a part hereof and are not in any way intended to limit or enlarge the terms hereof.

11.6 Warranty.

The Grantor warrants generally the title to the Mortgaged Property.

11.7 Applicable Law.

This Deed of Trust shall be governed by and construed, interpreted and enforced in accordance with and pursuant to the laws of the jurisdiction in which the Mortgaged Property is located.

11.8 Time of Essence.

Time shall be of the essence of each and every provision of this Deed of Trust of which time is an element.

11.9 Business Purpose.

Grantor warrants that the proceeds of the Note and any and all other secured Indebtedness shall be used exclusively for the acquisition or conduct of a business or commercial enterprise and that the loan evidenced by the Note is a "commercial loan."

11.10 Tenant Leases and Rents.

(a) Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all rents, issues, income and profits from the Mortgaged Property (collectively, "Income"). Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property.  Beneficiary hereby grants to Grantor a license to collect, not more than one month in advance, and as trustee for the benefit of Beneficiary, the Income.  Grantor shall apply the Income so collected first to payment of any and all amounts due under the Loan Documents and second to the funding of any escrows required under the Loan Documents.  Thereafter, so long

4910 Georgia Ave NW Washington DC 20011

as no Event of Default exists, Grantor may use the Income in any manner not inconsistent with its obligations under the Loan Documents. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(b) All leases, licenses, and rental agreements now or hereafter covering the Mortgaged Property or any part thereof are hereinafter referred to collectively as "Leases", and individually as a "Lease". Grantor shall not enter into any Lease without the express written consent of Beneficiary. Grantor does hereby absolutely and irrevocably assign, convey, transfer and set over to Beneficiary all of Grantor's right, title, estate and interest in and to all Leases. Such assignment shall not impose upon Beneficiary any duty to produce income from the Mortgaged Property. Beneficiary hereby grants to Grantor a license to operate and manage the Mortgaged Property under any and all Leases. The license granted hereby shall be revoked automatically upon the occurrence of an Event of Default hereunder.

(c) Grantor shall enforce all terms and conditions of all Leases and shall not permit any default by a tenant thereunder to continue longer than necessary to pursue its remedies. Grantor shall perform all of its obligations under and in respect of all Leases. In the event of a default by tenant under a Lease, Grantor shall diligently exercise all rights and remedies available to Grantor therefor, including but not limited to termination, eviction and reletting.

(d) The foregoing subparagraphs (a), (b), and (c) shall not constitute, or be construed to be, Beneficiary's waiver of the requirement set forth herein and the other Loan Documents that the Mortgaged Property be and remain vacant and unoccupied during the term of the Note and so long as this Deed of Trust remains a lien upon the Mortgaged Property. Waiver of said requirement must be express and in writing separate and apart from foregoing subparagraphs (a), (b), and (c).

11.11 All Obligations.

This Deed of Trust is given to secure certain present and future Indebtedness and Obligations, including future advances, as provided in the Note. This Deed of Trust and the liens created hereby shall secure any and all Indebtedness and Obligations of Grantor to Beneficiary of every nature whatsoever, whether created heretofore or hereafter.

11.12 Security Agreement.

For the purpose of securing the Indebtedness and Obligations, this Deed of Trust shall constitute a security agreement creating a security interest in (a) all personal property of Grantor included within or located on or to be delivered to the Mortgaged Property, including all such items of personal property hereafter acquired, and the proceeds thereof, and (b) all other personal property of Grantor relating in any way to the Indebtedness, Obligations, and/or the Loan Documents. Grantor hereby authorizes and agrees to execute and/or authorize such further agreements, instruments, financing statements, continuation

4910 Georgia Ave NW Washington DC 20011

statements, and other documents as may be necessary or appropriate to perfect and maintain the security interest herein granted to Beneficiary.  Upon the occurrence of an Event of Default hereunder, Beneficiary shall have the remedies of a secured party under the Uniform Commercial Code for the jurisdiction in which the Mortgaged Property is located, including, without limitation, the right to take immediate possession of any collateral.  Any sale of such collateral may be held as a part of and in conjunction with a sale by Trustee of the Mortgaged Property.

ARTICLE XII

STATUTORY PROVISIONS

12.1 Statutory Provisions.

This Deed of Trust is made under and pursuant to the provisions of the statutes and regulations of the jurisdiction in which the Mortgaged Property is located, as amended, and shall be construed to impose and confer upon the parties hereto and Beneficiary all the rights, duties, and obligations prescribed by said statutes and regulations, as amended, except as herein otherwise restricted, expanded, or changed.

**IN WITNESS WHEREOF**, the said Grantor has executed these presents on the year and day first above written.

**[Signature Page to Follow]**

4910 Georgia Ave NW Washington DC 20011

**GRANTOR:**

**4910 Georgia Ave Holdings LLC**,
a District of Columbia   Limited   Liability
Company

_____(SEAL)

By:    Charles Paxton Paret
Its:    Member & Managing Partner

_____(SEAL)

By:    Mel Melaku Negussie
Its:    Member & Managing Partner

COUNTY OF _____ ss.
STATE OF _____

    I hereby certify on this _5th_ day of August, 2020, before me in the jurisdiction aforesaid, did personally appear Charles Paxton Paret, Mel Melaku Negussie, known or satisfactorily proven to be the person(s) whose name(s) is set forth in the within instrument, and executed the within instrument and acknowledged the same instrument to be his/her act and deed for the purposes herein contained and in the capacity herein stated.

_____
NOTARY PUBLIC

ROSA M. GREEN
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires September 30, 2024

My commission expires: _____

4910 Georgia Ave NW Washington DC 20011

**EXHIBIT A**

**LEGAL DESCRIPTION**

All that certain lot or parcel of land situate in the District of Columbia and
being more particularly described as follows:

Lot numbered Eighteen (18) in Square numbered Twenty-Nine Hundred Twenty-Six (2926)
in a subdivision made for Bernard L. Frishman, as per plat recorded in the Office
of the Surveyor for the District of Columbia in Book 160 at page 156.

4910 Georgia Ave NW Washington DC 20011

# EXHIBIT G

Previous editions are obsolete                                                                                      form HUD-1 (3/86) ref Handbook 4305.2

## A. Settlement Statement

B. Type of Loan

U.S. Department of Housing and Urban Development
OMB Approval No. 2502-0265                                                      **FINAL**

| 1. ☐FHA | 2. ☐FmHA | 3. ☒Conv. Unins. | 6. File Number | 7. Loan Number | 8. Mortgage Insurance Case Number |
|---|---|---|---|---|---|
| 4. ☐VA | 5. ☐Conv. Ins. | | 20-1617SMS | | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown.
Items marked "(p.o.c.)" were paid outside the closing; they are shown here for information purposes and are not included in the totals.
WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon
conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

TitleExpress Settlement System
Printed 08/05/2020 at 17:09 SMS

| D. NAME OF BORROWER: | 4910 Georgia Ave Holdings LLC |
|---|---|
| ADDRESS: | 1215 1st Street NE, Washington, DC 20002 |
| E. NAME OF SELLER: | N/A |
| ADDRESS: | |
| F. NAME OF LENDER: | WCP Fund I LLC |
| ADDRESS: | 2815 Hartland Rd, Suite 200, Falls Church, VA 22043 |
| G. PROPERTY ADDRESS: | 4910 Georgia Avenue, NW, Washington, DC 20011 |
| | 2926 0018 |
| H. SETTLEMENT AGENT: | District Title, A Corporation |
| PLACE OF SETTLEMENT: | 1150 Connecticut Avenue, NW, Suite 201, Washington DC 20036 |
| I. SETTLEMENT DATE: | 07/31/2020 |

| J. SUMMARY OF BORROWER'S TRANSACTION: | | K. SUMMARY OF SELLER'S TRANSACTION: | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER** | | **400. GROSS AMOUNT DUE TO SELLER** | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 9,511,165.80 | 403. | |
| 104. Payoff of First Mortgage Loan | 1,041,000.00 | 404. | |
| Mid Atlantic IRA, LLC FBO Susa | | | |
| 105. Payoff-5607 | 2,374,336.10 | 405. | |
| Capital Bank, NA | | | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 12,926,501.90 | **420. GROSS AMOUNT DUE TO SELLER** | |
| **200. AMOUNTS PAID BY OR ON BEHALF OF BORROWER** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER** | |
| 201. Deposit or earnest money | | 501. Excess Deposit (see instructions) | |
| 202. Principal amount of new loans | 10,861,300.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. | |
| 205. Tx from 20-1617A | 810,169.71 | 505. | |
| 20-1617A | | | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes | | 511. County taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 11,671,469.71 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | |
| **300. CASH AT SETTLEMENT FROM OR TO BORROWER** | | **600. CASH AT SETTLEMENT TO OR FROM SELLER** | |
| 301. Gross amount due from borrower (line 120) | 12,926,501.90 | 601. Gross amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | 11,671,469.71 | 602. Less reduction amount due seller (line 520) | |
| **303. CASH FROM BORROWER** | 1,255,032.19 | **603. CASH TO SELLER** | 0.00 |

SUBSTITUTE FORM 1099 SELLER STATEMENT: The information contained herein is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return,
a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. The Contract Sales Price described on
line 401 above constitutes the Gross Proceeds of this transaction.

You are required by law to provide the settlement agent (Fed. Tax ID No: 68-0547548,except VA: VA Fed. Tax ID No: 30-0283179) with your correct taxpayer identification number. If you do not provide your correct taxpayer
number, you may be subject to civil or criminal penalties imposed by law. Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

TIN: ____-____-____ / ____-____-____ - SELLER(S) SIGNATURE(S): _____ / _____

SELLER(S) NEW MAILING ADDRESS: _____

SELLER(S) PHONE NUMBERS: _____ (H) _____ (W)

Previous editions are obsolete

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

form HUD-1 (3/86) ref Handbook 4305.2

**SETTLEMENT STATEMENT**

File Number: 20-1617

TitleExpress Settlement System  Printed 08/05/2020 at 17:09 SMS

FINAL    PAGE 2

**L. SETTLEMENT CHARGES**

| | | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|
| **700. TOTAL SALES/BROKER'S COMMISSION** based on price $ = | | | | |
| Division of commission (line 700) as follows: | | | | |
| 701. $ | to | | | |
| 702. $ | to | | | |
| 703. Commission paid at Settlement | | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | | |
| 801. Loan Origination Fee | % DP Capital LLC | | | |
| 802. Loan Discount | % | | 271,532.50 | |
| 803. Appraisal Fee | | | | |
| 804. Credit Report | | | | |
| 805. Construction Draw | to WCP Fund I LLC | LR | | |
| 806. Loan Processing Fee | to DP Capital LLC | | 7,950,000.00 | |
| 807. Valuation fee | to Archstone Group | | 1,000.00 | |
| 808. | | | 500.00 | |
| 809. | | | | |
| 810. | | | | |
| 811. | | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | | |
| 901. Interest From  07/31/2020 to 08/01/2020   @$  768.2597 /day | | 1 Days  LR | 768.26 | |
| 902. Mortgage Insurance Premium for  months to | | | | |
| 903. Hazard Insurance Premium for  years  to  Chenault Insurance Service, LLC | | | 30,560.00 | |
| 904. Pre-Paid Interest | to WCP Fund I LLC | LR | 715,000.00 | |
| 905. | | | | |
| **1000. RESERVES DEPOSITED WITH LENDER FOR** | | | | |
| 1001. Hazard Insurance | mo. @ $ | /mo | | |
| 1002. Mortgage Insurance | mo. @ $ | /mo | | |
| 1003. City Property Taxes | mo. @ $ | /mo | | |
| 1004. County Property Taxes | mo. @ $ | /mo | | |
| 1005. Annual Assessments | mo. @ $ | /mo | | |
| 1009. Aggregate Analysis Adjustment | | | 0.00 | 0.00 |
| **1100. TITLE CHARGES** | | | | |
| 1101. Settlement or Closing Fee | to District Title, A Corporation | | 395.00 | |
| 1102. Abstract or Title Search | to Executive Abstracting Company | | 150.00 | |
| 1103. Doc Prep | to District Title, A Corporation | | 500.00 | |
| 1104. Title Insurance Binder | to District Title, A Corporation | | 495.00 | |
| 1105. Draw Fees | to District Title, A Corporation | | 2,500.00 | |
| 1106. Notary Fees | to Bancserv | | 300.00 | |
| 1107. Attorney's fees | | | | |
| (includes above items No: | ) | | | |
| 1108. Title Insurance | to Fidelity National Title Insurance Company | | 17,455.45 | |
| (includes above items No: | ) | | | |
| 1109. Lender's Policy | 13,576,625.00  - 17,405.45 | | | |
| 1110. Owner's Policy | | | | |
| 1111. | | | | |
| 1112. | | | | |
| 1113. Release Tracking Fee | to reQuire | | 70.00 | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | | |
| 1201. Recording Fees Deed $  ; Mortgage $ 161.27  ; Release $ | | | 161.27 | |
| 1202. City Transfer Tax | Deed $  ; Mortgage $ | | | |
| 1203. City Recordation Tax | Deed $  ; Mortgage $ 198,750.00 | | 198,750.00 | |
| 1204. | Deed $  ; Mortgage $ 5,036.27 | | 5,036.27 | |
| 1205. | | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | | |
| 1301. Survey | | | | |
| 1302. Property Taxes GT 08/28/2020 | to D.C. Treasurer | | 129,797.77 | |
| 1303. WASA Lien - EST | to DC Water | | 11,194.28 | |
| 1304. Equity Brokerage Fee | to Altered State Properties, LLC | | 50,000.00 | |
| 1305. Equity Brokerage Fee | to DH Partners, LLC | | 50,000.00 | |
| 1306. Invoice | to Balagan Partners LLC | | 75,000.00 | |
| **1400. TOTAL SETTLEMENT CHARGES** | (enter on lines 103, Section J and 502, Section K) | | 9,511,165.80 | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement. In the event a monetary adjustment is required in my account, I agree to reimburse the settlement agent for such adjustment.

By signing below, I also acknowledge that District Title is best to ensure that the above numbers are correct and accurate numbers per the terms of the contract, loan commitment and/or county/state recording fees. However, in the event that any of the above figures differ from the contract, loan commitment and/or county/state recording fees I agree to within seven (7) days, provide District Title with the correct monies. I also understand that District Title is relying upon my agreement and if District Title has to bring legal action that I shall be responsible for actual damage (including interest) court costs and reasonable attorneys fees.

Finally because of the administrative burden of refunding excess release money, any monies not necessary for the recording of releases on line 1201 may be retained, as profit, by District Title.
4910 Georgia Ave Holdings LLC

By: Charles Paret, Director/Sole Member

WARNING: IT IS A CRIME TO KNOWINGLY MAKE FALSE STATEMENTS TO THE UNITED STATES ON THIS OR ANY SIMILAR FORM. PENALTIES UPON CONVICTION CAN INCLUDE A FINE AND IMPRISONMENT. FOR DETAILS SEE TITLE 18:

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

# EXHIBIT H

## ASSIGNMENT OF DEED OF TRUST

**When Recorded Return To:**

WCP Fund 1 LLC
2815 Hartland Rd, Ste 200
Falls Church, VA 22043

## ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, **WCP Fund I LLC**, a Delaware limited liability company, having an office located at 2815 Hartland Road, Suite 200, Falls Church, VA 22043 ("Assignor") hereby assigns and transfers to SF NU, LLC, a New Mexico limited liability company, having an office located at 1455 Research Blvd, Ste 510, Rockville, Maryland 20850 ("Assignee"), its successors and assigns, Assignor's rights, title and interests in and to that certain Deed of Trust dated July 31, 2020 and recorded on August 13, 2020 in Book _____ at Page _____ as Instrument No. 2020097981 among the land records of The District of Columbia from 4910 Georgia Ave Holdings LLC, a District of Columbia limited liability company, as grantor, to Daniel Huertas, as trustee, for the benefit of Assignor, as beneficiary ("Deed of Trust"), as well as all other documents memorializing, securing, or relating to the indebtedness secured by the Deed of Trust.

The real property and improvements thereon encumbered by the Deed of Trust is as follows:

All that certain lot or parcel of land situate in the District of Columbia and being more particularly described as follows:

Lot numbered Eighteen (18) in Square numbered Twenty-Nine Hundred Twenty-Six (2926) in a subdivision made for Bernard L. Frishman, as per plat recorded in the Office of the Surveyor for the District of Columbia in Book 160 at page 156.

**IN WITNESS WHEREOF,** the undersigned has executed this Assignment of Deed of Trust as of October 20, 2020.

WCP FUND I LLC,
a Delaware limited liability company

By: _____
Name: Christina Araujo
Title: Director of Finance

## ACKNOWLEDGEMENT

State of Virginia                          :
                                           :   ss:
County of Fairfax                          :

I HEREBY CERTIFY that on this 20th day of October, 2020, before me, the subscriber, a Notary Public of the jurisdiction aforesaid, personally appeared Christina Araujo, and acknowledged herself to be the Director of Finance of **WCP FUND I LLC**, a Delaware limited liability company, and acknowledged that he, being authorized so to do, executed the foregoing instrument in the aforesaid capacity for the purposes therein contained.

IN WITNESS MY Hand and Notarial Seal.

_____
NOTARY PUBLIC                              (SEAL)

My Commission Expires:

September 30, 2021

- 2 -

```
Doc #: 2022041883
Filed & Recorded
04/18/2022 11:07 AM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS
   RECORDING FEES          $25.00
   SURCHARGE               $6.50
TOTAL:                     $31.50
```

# EXHIBIT I

Doc #: 2022041134
04/21/2022 02:31 PM



**Government of the
District of Columbia**
Office of Tax and Revenue
Recorder of Deeds
**1101 4th Street, SW
Washington, DC 20024
Phone (202) 727-5374**

### AFFIDAVIT OF NON-RESIDENTIAL MORTGAGE FORECLOSURE

4910 GEORGIA AVE HOLDINGS LLC
Property Owner's Last Name

Property Owner's First Name

Defaulted Borrower(s) Name
(If Different From Property Owner's Above)

0018/2926
Lot/Square Number:

I, Christina Araujo  [name], Director of Finance [title]

of WCP Fund I LLC as servicer for SF NU, LLC
[name of institution] ("Lender"), make oath and say that:

1. I have personal knowledge of the matters referred to herein.

2. The subject property is located at

   4910 Georgia Avenue, NW, Washington, DC 20011

3. SF NU, LLC                                   is the holder of the mortgage
   recorded as Instrument Number 2020097981               in the District
   of Columbia Recorder of Deeds ("Mortgage").

4. The subject property identified above is not secured by a residential mortgage as defined by D.C. Official Code § 42-815.01(a).

5. For the reason(s) set forth above, foreclosure of the Mortgage is not subject to mandatory mediation and, therefore, does not require a Mediation Certificate issued by the Mediation Administrator.

I declare and affirm under penalty of perjury that the statements made herein are true and correct to the best of my knowledge, information and belief.

Signature: _____

Printed Name: Christina Araujo

Title: Director of Finance

Date: April 21, 2022

State of Virginia

County of Fairfax

SSL:

2926/0018

Recording requested by:

Russell S. Drazin
Pardo & Drazin LLC
4400 Jenifer Street, NW
Suite 2
Washington, DC 20015

When recorded mail to:

Russell S. Drazin
Pardo & Drazin, LLC
4400 Jenifer Street, NW
Suite 2
Washington, DC 20015

This Affidavit of Non-Residential Mortgage Foreclosure was acknowledged before me on this 21 day of April , 20 22

by Christina Araujo                          (name of person) as

Director of Finance                          (type of authority, e.g. officer,

trustee, etc.) of WCP Fund I LLC as servicer for SF NU, LLC
(name of party on behalf of whom instrument was executed).

Notary Public _____

My Commission Expires: 09/30/2025

*(Notary seal)*
MELISSA LAKESHA JONES
NOTARY PUBLIC
REG # 344869
MY COMMISSION EXPIRES
9/30/2025
COMMONWEALTH OF VIRGINIA

```
Doc #: 2022044134
Filed & Recorded
04/21/2022 02:31 PM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS
  RECORDING FEES          $25.00
  SURCHARGE               $6.50
TOTAL:                    $31.50
```

# EXHIBIT J

Doc #: 2022044538
04/22/2022 10:27 AM



**Government of the
District of Columbia**
Office of Tax
and Revenue
Recorder of Deeds
1101 4th Street, SW
Washington, DC 20024
Phone (202)727-5374

Affidavit of
Non-Residential
Mortgage
Foreclosure
recorded on
April 21, 2022
as Instrument
No. 2022044134

## NOTICE OF FORECLOSURE SALE OF REAL PROPERTY OR CONDOMINIUM UNIT

(Pursuant to Public Low 90-566, approved October 12, 1968)

Square [2926]   Suffix [     ]   Lot [0018]
List Name and adress of each owner of the real property encumbered by said deed of trust, mortgage, or security instrument.)

TO: [4910 GEORGIA AVE HOLDINGS LLC]
[See Exhibit A]
[     ]
[     ]

FROM: [SF NU, LLC]   PHONE: [(703) 727-5464]

YOU ARE HEREBY NOTIFIED THAT IN ORDER TO SATISFY THE DEBT SECURED BY THE DEED OF TRUST, MORTGAGE, OR OTHER SECURITY INSTRUMENT, THE REAL PROPERTY OR CONDOMINIUM UNIT HEREIN DESCRIBED WILL BE SOLD AT A FORECLOSURE SALE TO BE HELD ON [May 24], 20[22], AT THE OFFICE OF [Harvey West Auctioneers, Inc.]
[5335 Wisconsin Avenue, NW, Suite 440, Washington, DC 20015]
[2:00] P.M.   THIS SALE DATE IS SUBJECT TO POSTPONEMENT FOR A PERIOD NOT TO EXCED THIRTY (30) CALENDAR DAYS FROM THE ORIGINAL DATE OF FORECLOSURE SALE, AFTER WHICH THIS NOTICE OF FORECLOSURE SHALL EXPIRE.

Security Instrument recorded in the land records of the District of Columbia at the Recorder of Deed on [August 13], 20[20].

Liber: [     ]   Folio: [     ]   Instrument No: [2020097981]
Maker(s) of the Note secured by the instrument: [4910 GEORGIA AVE HOLDINGS LLC]
[See Exhibit A]          [See Exhibit A]
    Phone              Last Known Address

Description
of Property: [partially constructed multi-family building]
(two-story brick, dwelling, apartment building, vacant lot condominium unit, etc.)

Address: [4910 Georgia Avenue, NW, Washington, DC 20011]

Square: [2926]   Lot: [0018]   or Parcel No: [     ]

Holder of the Note (Name): [SF NU, LLC]
Phone: [(703) 727-5464]   Address: [2815 Hartland Road, Suite 200, Falls Church, VA 22043]

Balance owed on the Note: $ [          1,001,840.33]*
Minimum balance required to cure default obligation pursuant to D.C. Law 5-82 íRight to Cure a Residential Mortgage Foreclosure DefaultAct of 1984.î
$ [N/A commercial loan]

Name of person to contact to stop foreclosure sale: [Russell S. Drazin, Esquire]
Address: [4400 Jenifer Street, N.W., Suite 2, Washington DC 20015]   Phone: [(202) 223-7900]

** as of April 22, 2022



**Government of the
District of Columbia**
Office of Tax
and Revenue
Recorder of Deeds
1101 4th Street, SW
Washington, DC 20024
Phone (202)727-5374

## NOTICE OF FORECLOSURE SALE OF REAL PROPERTY OR CONDOMINIUM UNIT

Square 2926     Suffix     Lot 0018

I hereby certify that a Notice of Foreclosure Sale was sent to the present owner(s) of the real property encumbered by the said deed of trust, mortgage, or other security instrument described above, by certified mail, return receipt required on April 22 ,20 22 ; and I further certify that I understand that Public Law 90-566 prohibits any foreclosure sale under a power of sale provision contained in any deed of trust, mortgage, or other security instrument until after the owner(s) of the real property encumbered by the said deed of trust, mortgage, or security instrument has been given written notice of such sale, and the Recorder of Deeds, D.C. has received a copy of such notice at least 30 days in advance of such sale.

04/21/2022
Date

RD
(Signature of Noteholder or his agent)

I, Deborah A. Stewart , a Notary Public in and for the District of Columbia ,
DO HEREBY CERTIFY THAT Russell S. Drazin
who is personally well known to me as a party(ies) to this Notice of Foreclosure Sale bearing the 21st day of April , 20 22 , personally appeared before me and executed the said Notice of Foreclosure Sale and acknowledged the same to be his act and deed.

Given under my hand and seal this 21st day of April , 20 22 .

Deborah Stewart
Notary Public

My Commission Expires: 09/30/2025
mmddyyyy



**EXHIBIT A**

<u>Borrower/Grantor/Record Owner</u>:

**4910 GEORGIA AVE HOLDINGS LLC,** a District of Columbia limited liability company

4910 Georgia Avenue, NW, Washington, DC 20011

1140 3rd Street, NE, Washington, DC 20002-6274

1140 3rd Street, NE, Suite 2172, Washington, DC 20002

1710 Connecticut Ave NW, 3rd Floor, Washington, DC 20009

340 First Street, Berryville, VA 22611

343 First Street, Berryville, VA 22611

3621 Upton Street, NW, Washington, DC 20008

3631 Upton Street, NW, Washington, DC 20008

1629 K Street, NW, Suite 300, Washington, DC 20006

c/o Balagan Partners LLC, Registered Agent, 1710 Connecticut Ave NW, 3rd Floor, Washington, DC 20009

(202) 834-7673
(202) 775-0457
(202) 244-4245

```
Doc #: 2022044538
Filed & Recorded
04/22/2022 10:27 AM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS
  RECORDING FEES          $25.00
  SURCHARGE               $6.50
TOTAL:                    $31.50
```

# EXHIBIT K

**AFTER RECORDING, RETURN TO:**

Russell S. Drazin, Esquire
Pardo & Drazin, LLC                                    4910 Georgia Avenue, NW
4400 Jenifer Street, NW, Suite 2                       Washington, DC 20011
Washington, DC  20015                                  Lot 0018 in Square 2926

<u>SUBSTITUTE TRUSTEE'S DEED</u>

THIS SUBSTITUTE TRUSTEE'S DEED is made as of the 19th day of August, 2022,

by and between **RUSSELL S. DRAZIN** ("Grantor"), Substitute Trustee, whose mailing address

is Pardo & Drazin, LLC, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015, on the one

hand, and **SF 4910 GEORGIA AVE NW LLC** ("Grantee"), a District of Columbia limited

liability company, whose mailing address is c/o Washington Capital Partners, 2815 Hartland

Road, Suite 200, Falls Church, VA 22043, on the other hand.

<u>RECITALS</u>

A.    By that certain Deed of Trust (the "Deed of Trust") from 4910 Georgia Ave

Holdings LLC ("Borrower"), as grantor, to Daniel Huertas ("Original Trustee"), as trustee, for

the benefit of WCP Fund 1 LLC ("Original Lender"), as beneficiary, dated July 31, 2020 and

recorded on August 13, 2020 as Instrument No. 2020097981 among the Land Records of the

District of Columbia, Borrower conveyed to Original Trustee that certain real property

(the "Property") located at **4910 Georgia Avenue, NW, Washington, DC 20011 (Lot 0018 in**

**Square 2926)**, and more particularly described on **EXHIBIT A** appended hereto. The Deed of

Trust secures unto Original Lender payment of the principal amount of $852,872.00, as

evidenced by that certain Commercial Deed of Trust Note (the "Note") dated July 31, 2020 made

by Borrower and payable to the order of Original Lender.

B.    By that certain Assignment of Deed of Trust dated October 20, 2020 and recorded

on April 18, 2022 as Instrument No. 2022041883 among the Land Records of the District of

Columbia, Original Lender sold and assigned the Note, the Deed of Trust, and all related rights to SF NU, LLC ("Lender").

      C.      By that certain Deed of Appointment of Substitute Trustee dated April 21, 2022 and recorded on April 21, 2022 as Instrument No. 2022044133 among the Land Records of the District of Columbia, Lender removed Original Trustee as trustee under the Deed of Trust and appointed Grantor as substitute trustee under the Deed of Trust.

      D.      Pursuant to the power of sale contained in the Deed of Trust (default having occurred thereunder), Grantor was directed by Lender to offer the Property for sale at public auction.

      E.      The date, time, place, and terms of the aforesaid foreclosure sale were advertised in The Washington Post, a newspaper published and having a general circulation in Washington, DC, in its issues of May 10, 12, 16, 18, and 20, 2022, the date of the aforesaid foreclosure sale having been fixed for May 24, 2022 at 2:00 PM, at the offices of Harvey West Auctioneers, Inc., 5335 Wisconsin Avenue, NW, Suite 440, Washington, DC 20015.

      F.      No fewer than thirty (30) days prior to May 24, 2022, an Affidavit of Non-Residential Mortgage Foreclosure (the "Affidavit") dated April 21, 2022 was recorded on April 21, 2022 as Instrument No. 2022044134 among the Land Records of the District of Columbia.

      G.      No fewer than thirty (30) days prior to May 24, 2022, a Notice of Foreclosure Sale of Real Property or Condominium Unit (the "Notice") dated April 21, 2022 was recorded on April 22, 2022 as Instrument No. 2022044538 among the Land Records of the District of Columbia.

H.      No fewer than thirty (30) days prior to May 24, 2022, the Affidavit and the Notice were mailed by United States Certified Mail, Return Receipt Requested and Postage Prepaid, and by United States Regular Mail, First Class and Postage Prepaid, to the last known addresses of Borrower, the grantor under the Deed of Trust, the borrower under the Note, and the then record owner of the Property.

I.      No fewer than ten (10) days prior to May 24, 2022, written notice of the date, time, place, and terms of the aforesaid foreclosure sale of the Property was mailed by United States Certified Mail, Return Receipt Requested and Postage Prepaid, and by United States Regular Mail, First Class and Postage Prepaid, to the last known addresses of all known subordinate lienholders, if any.

J.      In compliance with the terms and conditions of the Deed of Trust, as well as District of Columbia law, Grantor did offer the Property for sale at public auction at the offices of Harvey West Auctioneers, Inc., 5335 Wisconsin Avenue, NW, Suite 440, Washington, DC 20015, on May 24, 2022, at 2:00 PM.

K.      The highest bid received for the Property was a bid by Lender in the amount of **$10,000.00** and subject to that certain Deed of Trust dated July 31, 2020 and recorded on August 13, 2020 as Instrument No. 2020097980 among the Land Records of the District of Columbia.

L.      Grantee is an affiliate and/or wholly-owned subsidiary of Lender designated by Lender to take title to the Property.

**NOW THEREFORE**, in consideration of the aforesaid purchase money, and other good and valuable consideration, receipt of which is hereby acknowledged, the recitals set forth above being incorporated as if fully restated, Grantor does hereby grant, bargain, sell, and convey unto

- 3 -

Grantee all of Grantor's right, title, and interest in and to the Property, if any, with no warranties and no covenants of any kind whatsoever.

**IN WITNESS WHEREOF**, and intending to be legally bound, the undersigned, Russell S. Drazin, Substitute Trustee, has executed and delivered this Substitute Trustee's Deed under seal as of the date first hereinabove written.

_____(SEAL)
Russell S. Drazin, Substitute Trustee

DISTRICT OF          )
                     )   ss:
COLUMBIA             )

     **I HEREBY CERTIFY**, that on this 18th day of August, 2022, before me, the undersigned Notary Public of the jurisdiction aforesaid, personally appeared **RUSSELL S. DRAZIN**, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that, being authorized to do so, he executed the same for the purposes and in the capacity contained therein.

     **IN WITNESS WHEREOF**, I have hereunto set my hand and official seal the day and year last above mentioned.

_____
Notary Public

My commission expires: 09-30-2025

[NOTARIAL SEAL]



- 5 -

## EXHIBIT A

(Legal Description)

**Lot numbered Eighteen (0018) in Square numbered Twenty-Nine Hundred Twenty-Six (2926) in a subdivision made for Bernard L. Frishman, as per plat recorded in the Office of the Surveyor for the District of Columbia in Book 160 at Page 156.**

4910 Georgia Avenue, NW
Washington, DC 20011

Lot 0018 in Square 2926

```
Doc #: 2022094880
Filed & Recorded
09/15/2022 10:13 AM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS
   RECORDING FEES          $25.00
   SURCHARGE               $6.50
   RECORDATION TAX FEES    $116,586.80
   TRANSFER TAX FEES       $116,586.80
TOTAL:                     $233,205.10
```

# EXHIBIT L

File No.: **22-0939**
DEED – SHORT FORM D.C.

# This Deed, made this **30th day of September, 2022**, by and between SF 4910 Georgia Ave NW LLC, a District of Columbia Limited Liability Company, party of the first part, and WCP 4910 Georgia Ave NW LLC, a District of Columbia Limited Liability Company, party of the second part.

      WITNESSETH, that in consideration of the sum of NINE MILLION EIGHT THOUSAND FOUR HUNDRED SIXTY AND 72/100 DOLLARS (**$9,008,460.72**), the party of the first part does hereby grant unto the party of the second part, in fee simple, all that piece or parcel of land, together with the improvements, rights, privileges and appurtenances to the same belonging, situate in the District of Columbia, described as follows, to wit:

      All that certain lot or parcel of land situate in the District of Columbia and being more            particularly            described            as            follows:

      Lot numbered Eighteen (0018) in Square numbered Twenty-Nine Hundred Twenty-Six (2926) in a subdivision made for Bernard L. Frishman, as per plat recorded in the Office of the Surveyor for the District of Columbia in Book 160 at page 156.

      Being the same property conveyed to SF 4910 Georgia Ave NW LLC by Deed dated August 19, 2022, and recorded on September 15, 2022 as Instrument No 2022094880.

**Title Insurer: Fidelity National Title Insurance Company**

      AND the said party of the first part covenant that he will warrant specially the property hereby conveyed; and that he will execute such further assurances of said land as may be requisite.

LEFT INTENTIONALLY BLANK

WITNESS the hand and seal the day and year first hereinbefore written.

IN PRESENCE OF:                          **SF 4910 GEORGIA AVE NW LLC**
                                         **By : SF NU, LLC, Its Sole Member**


_____    _____ {SEAL}
                                         Jason Shrensky, Sole Member

~~DISTRICT OF COLUMBIA~~  Maryland

I, _David Butler_, a Notary Public, in and for the jurisdiction aforesaid, do hereby certify that Jason Shrensky, Sole Member of SF NU, LLC, a New Mexico Limited Liability Company, who is the Sole Member of SF 4910 Georgia Ave NW LLC, a District of Columbia Limited Liability Company, personally known to me as the grantor in, and the person who executed the foregoing deed, bearing the date of September 30, 2022 and personally appeared before me in the said District and acknowledged the said deed to be its act and deed.


Given under my hand and seal this _30th_ day of _September_, 2022.


_____
Notary Public


My Commission Expires: _2/__


After Recording MAIL TO:          Grantee's Address:
**2815 Hartland Road**            **2815 Hartland Road**
**Suite 200**                     **Suite 200**
**Falls Church, VA 22043**        **Falls Church, VA 22043**

```
Doc #: 2022101771
Filed & Recorded
10/06/2022 01:46 PM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS
   RECORDING FEES           $25.00
   SURCHARGE                $6.50
   RECORDATION TAX FEES     $130,622.68
   TRANSFER TAX FEES        $130,622.68
TOTAL:                      $261,276.86
```

# EXHIBIT M

---------- Forwarded message ---------
From: **Charles Paret** <cpp@colomariver.com>
Date: Mon, Jul 27, 2020 at 6:04 PM
Subject: Re: District Title Wire Instructions- $800k Eung Kim -4910 Georgia Ave NW
To: David Murnane <dm@colomariver.com>
CC: Hal Boles <hal@dhp.email>, Dominic Boles <dom@dhp.email>, Steve Sushner
<steve@districttitle.com>, Karlen Blomquist <karlen@districttitle.com>,
<eung.kim@usat.edu>, Chapman Paret <cb@colomariver.com>

Karlen / Steve,

We have our investors wiring money to be held in escrow tomorrow for the closing of 4910
Georgia Ave NW.   Can you please assist them with this and explain this process?

Escrow is held in their name and released upon the go-ahead from all parties to close.

Finally glad this is coming together.

Talk soon.

On Mon, Jul 27, 2020, 5:50 PM David Murnane <dm@colomariver.com> wrote:
Attached, just confirmed with them.

--

David A. Murnane
Director of Capital Markets
e. dm@colomariver.com
m. 410.353.5764
D C  |  N Y C  |  A T L  |  L A

This communication, including attachments, is for the exclusive use of the named recipient and may contain proprietary, confidential or privileged information. If you are not the intended recipient, any use, copying, disclosure, dissemination or distribution is strictly prohibited. If you are not the intended recipient, please notify the sender immediately by return email and delete this communication and destroy all copies. Unless specifically noted, the views, opinions and statements contained within this communication should not be construed to be the official position of  Coloma River Holdings, LLC.

--

## Dominic A. Boles
Managing Member



**DH Partners, LLC**
1629 K St. #300
Washington, DC 20006
m: (202) 893-6543
e: [dom@dhp.email](mailto:dom@dhp.email)

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

# EXHIBIT N

---------- Forwarded message ---------
From: **Charles Paret** <cpp@colomariver.com>
Date: Mon, Jul 27, 2020 at 8:36 PM
Subject: Re: District Title Wire Instructions- $800k Eung Kim -4910 Georgia Ave NW 20-1617
To: Steve Sushner <steve@districttitle.com>
CC: David Murnane <dm@colomariver.com>, Hal Boles <hal@dhp.email>, Dominic Boles <dom@dhp.email>, eung.kim@usat.edu <eung.kim@usat.edu>, Chapman Paret <cb@colomariver.com>, Joel R. Gonzales <Joel@districttitle.com>

One wire is from Eung Kim and the other is from Nasir Shah.

To All: We need to provide conditions for the release ie. "written authorization from Eung Kim to release the capital etc")

Thank you Steve.

---



Charles Paxton Paret
Managing Partner
e cpp@colomariver.com
m. 202.834.7673
D C | N Y C | A T L | L A

This communication, including attachments, is for the exclusive use of the named recipient and may contain proprietary, confidential or privileged information. If you are not the intended recipient, any use, copying, disclosure, dissemination or distribution is strictly prohibited. If you are not the intended recipient, please notify the sender immediately by return email and delete this communication and destroy all copies. Unless specifically noted, the views, opinions and statements contained within this communication should not be construed to be the official position of Coloma River Holdings, LLC.

On Mon, Jul 27, 2020 at 8:34 PM Steve Sushner <steve@districttitle.com> wrote:

I spoke to Charlie and I will make an exception. I understand that I am receiving 2 wires. Please provide me an email with the wire and the conditions for me to apply it to this transaction by no later than 5pm Tuesday 7/28. If no conditions are received by that time I shall presume that the funds are capable of being applied to the transaction once Charlie

signs.



Steven M. Sushner, Esq.*
President
District Title
1150 Connecticut Avenue, NW #201
Washington, DC 20036
202.518.9300 PHONE
202.518.9301 FAX

Steve@DistrictTitle.com

Settlements throughout DC, DE, MD, NJ, VA and WV.

*admitted to practice law in DC and MD

**From:** Charles Paret <cpp@colomariver.com>
**Sent:** Monday, July 27, 2020 7:16 PM
**To:** Steve Sushner <steve@districttitle.com>
**Cc:** David Murnane <dm@colomariver.com>; Hal Boles <hal@dhp.email>; Dominic Boles <dom@dhp.email>; eung.kim@usat.edu; Chapman Paret <cb@colomariver.com>; Joel R. Gonzales <Joel@districttitle.com>
**Subject:** Re: District Title Wire Instructions- $800k Eung Kim -4910 Georgia Ave NW 20-1617

**CAUTION:** This email did not originate from inside of District Title.  Use caution when replying, following links, or opening attachments.

Steve,

Funds received will need authorization of sending party prior to closing and be held in the name of the sender.

This is what I've relayed to all investors, but would be applied to settlement once I sign and all parties have approved.

Thanks.

On Mon, Jul 27, 2020, 7:07 PM Steve Sushner <steve@districttitle.com> wrote:

The parties sending wires should call to verify the authenticity of the attached wiring instructions (dial extension 309# to confirm the instructions, once the automated attendant picks up), send the wire and then email Wires@DistrictTitle.com for let them know that it was sent. Wired funds will automatically be applied toward the purchase once Charlie signs the settlement statement.



Steven M. Sushner, Esq.*
President
District Title
1150 Connecticut Avenue, NW #201
Washington, DC 20036
202.518.9300 PHONE
202.518.9301 FAX

Steve@DistrictTitle.com

Settlements throughout DC, DE, MD, NJ, VA and WV.

*admitted to practice law in DC and MD

**From:** Charles Paret <cpp@colomariver.com>
**Sent:** Monday, July 27, 2020 6:04 PM
**To:** David Murnane <dm@colomariver.com>
**Cc:** Hal Boles <hal@dhp.email>; Dominic Boles <dom@dhp.email>; Steve Sushner <steve@districttitle.com>; Karlen Blomquist <karlen@districttitle.com>; eung.kim@usat.edu; Chapman Paret <cb@colomariver.com>

**Subject:** Re: District Title Wire Instructions- $800k Eung Kim -4910 Georgia Ave NW

> **CAUTION:** This email did not originate from inside of District Title. Use caution when replying, following links, or opening attachments.

Karlen / Steve,

We have our investors wiring money to be held in escrow tomorrow for the closing of 4910 Georgia Ave NW.   Can you please assist them with this and explain this process?

Escrow is held in their name and released upon the go-ahead from all parties to close.

Finally glad this is coming together.

Talk soon.

On Mon, Jul 27, 2020, 5:50 PM David Murnane <dm@colomariver.com> wrote:

> Attached, just confirmed with them.
>
> --
>
> ...



David A. Murnane

Director of Capital Markets

e. dm@colomariver.com

m. 410.353.5764

D C | N Y C | A T L | L A

This communication, including attachments, is for the exclusive use of the named recipient and may contain proprietary, confidential or privileged information. If you are not the intended recipient, any use, copying, disclosure, dissemination or distribution is strictly prohibited. If you are not the intended recipient, please notify the sender immediately by return email and delete this communication and destroy all copies. Unless specifically noted, the views, opinions and statements contained within this communication should not be construed to be the official position of

Coloma River Holdings

, LLC.

--
**Dominic A. Boles**
Managing Member


L

**DH Partners, LLC**
1629 K St. #300
Washington, DC 20006
m: (202) 893-6543
e: dom@dhp.email

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

# EXHIBIT O

---------- Forwarded message ---------
From: **Dominic Boles** <dom@dhp.email>
Date: Thu, Jul 30, 2020 at 2:16 PM
Subject: 4910 Georgia Ave NW Wire
To: wires@districttitle.com <wires@districttitle.com>
CC: Charles Paret <cpp@colomariver.com>, David Murnane <dm@colomariver.com>,
eung.kim@usat.edu <eung.kim@usat.edu>

On behalf of my father-in-law - Dr. Eung Kwon Kim, he has wired $500,000 into your escrow account for Charlie Paret's project on 4910 Georgia Ave NW.

Dr. Kim will be wiring an additional $100,000 tomorrow to make a total of $600,000.

These funds are not to be released into the deal until all parties have signed off on the contracts and approved by Dr. Kim tomorrow.

Always available by phone if you need me.

Dominic Boles
202-893-6543


--
**Dominic A. Boles**
Managing Member




---

**DH Partners, LLC**
1629 K St. #300
Washington, DC 20006
m: (202) 893-6543
e: dom@dhp.email

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.
--
**Dominic A. Boles**
Managing Member



**DH Partners, LLC**
1629 K St. #300
Washington, DC 20006
m: (202) 893-6543
e: dom@dhp.email

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

# EXHIBIT P



J. Chapman
Petersen
jcp@petersenfirm.com
Direct: 571-459-
2510

J. Chapman Petersen+*
Sharon Kim Petersen
+also admitted in DC
*also admitted in MD
^admitted in NY

Won Y. Uh
Ibnul A. Khan*^
Janice M. Jang+^
Chris T. Robertson+
Federico J. Zablah
Dylan M. Phillips

November 29, 2022

*Via electronic and first-class mail*

Washington Capital Partners
8401 Greensboro Drive, Suite 960
McLean, VA 22102
legal@wcp.team

     Re:    4910 Georgia Avenue NW, Washington, DC, 20011

Dear Washington Capital Partners,

     Please be advised that our firm represents Dr. Eung Kim and Kim Georgia Ave, LLC (hereafter jointly referred to as "Dr. Kim"). I am writing to you regarding the property located at 4910 Georgia Avenue NW, Washington, DC, 20011, formerly owned by 4910 Georgia Ave Holdings, LLC and now currently owned by WCP 4910 Georgia Ave Holdings, LLC, a wholly owned subsidiary of Washington Capital Partners (hereafter jointly referred to as "WCP").

     We understand that the property was recently foreclosed upon by WCP and purchased at a foreclosure auction held on or about May 24, 2022. Based on the sale documents recorded with the District of Columbia, we understand the WCP was the primary lender on the property prior to foreclosure and has taken title via foreclosure. *See* Exhibit A.

     The purpose of the letter is to inform you of Dr. Kim's intent to enforce a New Construction Pre-Sales agreement entered into with 4910 George Ave Holdings, LLC in July 2020 in which Dr. Kim purchased three (3) Condo Units in exchange for a one-time payment of $600,000. *See* Exhibit B. This agreement is binding on WCP, as the successors in interest to 4910 George Ave Holdings, LLC as the record title owner of the property.

     We are requesting that WCP formally and in writing recognize the purchase by Dr. Kim of three condo units, both now and once construction is completed, as well as his larger ownership interest in 4910 Georgia Avenue NW, Washington, DC, 20011 via the owned condo units.

Letter to Washington Capital Partners.
November 29, 2022
Page 2 of 2


    Please respond to our request within fourteen (14) days of this letter.  If we do not hear back from you, we will have no choice but to pursue this matter against WCP to the full extent allowed under the law.

    Thank you for your time and attention to this matter. If you would like to discuss this matter further, please feel free to contact me or my associate, Federico Zablah at fjz@petersenfirm.com or 571-459-2520.


    Very truly yours,



    J. Chapman Petersen


Enclosures as stated
cc:      client

# EXHIBIT A

Doc #: 2022094880
09/15/2022 10:15 AM

**AFTER RECORDING, RETURN TO:**

Russell S. Drazin, Esquire
Pardo & Drazin, LLC                                         4910 Georgia Avenue, NW
4400 Jenifer Street, NW, Suite 2                           Washington, DC 20011
Washington, DC 20015                                       Lot 0018 in Square 2926

<u>SUBSTITUTE TRUSTEE'S DEED</u>

**THIS SUBSTITUTE TRUSTEE'S DEED** is made as of the 19th day of August, 2022,
by and between **RUSSELL S. DRAZIN** ("Grantor"), Substitute Trustee, whose mailing address
is Pardo & Drazin, LLC, 4400 Jenifer Street, NW, Suite 2, Washington, DC 20015, on the one
hand, and **SF 4910 GEORGIA AVE NW LLC** ("Grantee"), a District of Columbia limited
liability company, whose mailing address is c/o Washington Capital Partners, 2815 Hartland
Road, Suite 200, Falls Church, VA 22043, on the other hand.

<u>RECITALS</u>

A.     By that certain Deed of Trust (the "Deed of Trust") from 4910 Georgia Ave
Holdings LLC ("Borrower"), as grantor, to Daniel Huertas ("Original Trustee"), as trustee, for
the benefit of WCP Fund I LLC ("Original Lender"), as beneficiary, dated July 31, 2020 and
recorded on August 13, 2020 as Instrument No. 2020097981 among the Land Records of the
District of Columbia, Borrower conveyed to Original Trustee that certain real property
(the "Property") located at **4910 Georgia Avenue, NW, Washington, DC 20011 (Lot 0018 in
Square 2926)**, and more particularly described on **EXHIBIT A** appended hereto. The Deed of
Trust secures unto Original Lender payment of the principal amount of $852,872.00, as
evidenced by that certain Commercial Deed of Trust Note (the "Note") dated July 31, 2020 made
by Borrower and payable to the order of Original Lender.

B.     By that certain Assignment of Deed of Trust dated October 20, 2020 and recorded
on April 18, 2022 as Instrument No. 2022041883 among the Land Records of the District of

Columbia, Original Lender sold and assigned the Note, the Deed of Trust, and all related rights to SF NU, LLC ("Lender").

      C.      By that certain Deed of Appointment of Substitute Trustee dated April 21, 2022 and recorded on April 21, 2022 as Instrument No. 2022044133 among the Land Records of the District of Columbia, Lender removed Original Trustee as trustee under the Deed of Trust and appointed Grantor as substitute trustee under the Deed of Trust.

      D.      Pursuant to the power of sale contained in the Deed of Trust (default having occurred thereunder), Grantor was directed by Lender to offer the Property for sale at public auction.

      E.      The date, time, place, and terms of the aforesaid foreclosure sale were advertised in The Washington Post, a newspaper published and having a general circulation in Washington, DC, in its issues of May 10, 12, 16, 18, and 20, 2022, the date of the aforesaid foreclosure sale having been fixed for May 24, 2022 at 2:00 PM, at the offices of Harvey West Auctioneers, Inc., 5335 Wisconsin Avenue, NW, Suite 440, Washington, DC 20015.

      F.      No fewer than thirty (30) days prior to May 24, 2022, an Affidavit of Non-Residential Mortgage Foreclosure (the "Affidavit") dated April 21, 2022 was recorded on April 21, 2022 as Instrument No. 2022044134 among the Land Records of the District of Columbia.

      G.      No fewer than thirty (30) days prior to May 24, 2022, a Notice of Foreclosure Sale of Real Property or Condominium Unit (the "Notice") dated April 21, 2022 was recorded on April 22, 2022 as Instrument No. 2022044538 among the Land Records of the District of Columbia.

H.      No fewer than thirty (30) days prior to May 24, 2022, the Affidavit and the Notice were mailed by United States Certified Mail, Return Receipt Requested and Postage Prepaid, and by United States Regular Mail, First Class and Postage Prepaid, to the last known addresses of Borrower, the grantor under the Deed of Trust, the borrower under the Note, and the then record owner of the Property.

I.      No fewer than ten (10) days prior to May 24, 2022, written notice of the date, time, place, and terms of the aforesaid foreclosure sale of the Property was mailed by United States Certified Mail, Return Receipt Requested and Postage Prepaid, and by United States Regular Mail, First Class and Postage Prepaid, to the last known addresses of all known subordinate lienholders, if any.

J.      In compliance with the terms and conditions of the Deed of Trust, as well as District of Columbia law, Grantor did offer the Property for sale at public auction at the offices of Harvey West Auctioneers, Inc., 5335 Wisconsin Avenue, NW, Suite 440, Washington, DC 20015, on May 24, 2022, at 2:00 PM.

K.      The highest bid received for the Property was a bid by Lender in the amount of **$10,000.00** and subject to that certain Deed of Trust dated July 31, 2020 and recorded on August 13, 2020 as Instrument No. 2020097980 among the Land Records of the District of Columbia.

L.      Grantee is an affiliate and/or wholly-owned subsidiary of Lender designated by Lender to take title to the Property.

**NOW THEREFORE**, in consideration of the aforesaid purchase money, and other good and valuable consideration, receipt of which is hereby acknowledged, the recitals set forth above being incorporated as if fully restated, Grantor does hereby grant, bargain, sell, and convey unto

- 3 -

Grantee all of Grantor's right, title, and interest in and to the Property, if any, with no warranties and no covenants of any kind whatsoever.

**IN WITNESS WHEREOF**, and intending to be legally bound, the undersigned, Russell S. Drazin, Substitute Trustee, has executed and delivered this Substitute Trustee's Deed under seal as of the date first hereinabove written.

_____(SEAL)
Russell S. Drazin, Substitute Trustee

DISTRICT OF      )
                 )   ss:
COLUMBIA         )

    **I HEREBY CERTIFY**, that on this 18th day of August, 2022, before me, the undersigned Notary Public of the jurisdiction aforesaid, personally appeared **RUSSELL S. DRAZIN**, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that, being authorized to do so, he executed the same for the purposes and in the capacity contained therein.

    **IN WITNESS WHEREOF**, I have hereunto set my hand and official seal the day and year last above mentioned.

_____
Notary Public

My commission expires: 09-30-2025

[NOTARIAL SEAL]



- 5 -

**EXHIBIT A**

(Legal Description)

**Lot numbered Eighteen (0018) in Square numbered Twenty-Nine Hundred Twenty-Six (2926) in a subdivision made for Bernard L. Frishman, as per plat recorded in the Office of the Surveyor for the District of Columbia in Book 160 at Page 156.**

4910 Georgia Avenue, NW
Washington, DC 20011

Lot 0018 in Square 2926

```
Doc #: 2022094880
Filed & Recorded
09/15/2022 10:13 AM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS
    RECORDING FEES          $25.00
    SURCHARGE               $6.50
    RECORDATION TAX FEES    $116,586.80
    TRANSFER TAX FEES       $116,586.80
TOTAL:                      $233,205.10
```

# EXHIBIT B

# NEW CONSTRUCTION PRE-SALES AGREEMENT

1.  **Purchase and Sale.**  For and in consideration of the mutual covenants herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned buyer _____Kim Georgia Ave , LLC or its assigns_____ ("Buyer") agrees to buy and the undersigned seller 4910 Georgia Ave Holdings LLC ("Seller") agrees to sell the land described below, with such improvements as are located thereon:

Lot #____0018____ of _____Square 2926_____ subdivision

_____4910 Georgia Ave NW, 3 Units_____  ___  _____ (Street Address)
_____Washington_____ (City), DC  _____20011____ (Zip Code)

together with all fixtures, landscaping, improvements, and appurtenances, all being hereinafter collectively referred to as the "Property."
Buyer will receive an average value of approximately $400,000 per Unit.

2.  **Purchase Price, Method of Payment and Closing Expenses.** Buyer warrants that, except as may be otherwise provided herein, Buyer will at Closing have sufficient cash to complete the purchase of the Property under the terms of this New Construction Purchase and Sale Agreement (hereinafter "Purchase and Sale Agreement" or "Agreement").  The purchase price to be paid is:

$____600,00.00____, _____ U.S.
Dollars, ("Purchase Price")

which shall be disbursed at Buyer's expense and paid to Seller or Seller's Closing Agency       by: wire transfer or cashier's check; OR (iii) such other form as is approved by the Seller in writing.

**A. APPRAISAL:** This Agreement IS CONTINGENT upon the appraised value either equaling or exceeding the agreed upon the Units being valued at approximately $400,000 per Unit (the "Unit Value"). If the appraised value does not equal or exceed the Unit Value, Buyer may terminate this Agreement by providing written notice to Seller and providing written proof of the same (for example, this written proof could include, but is not limited to, a copy of appraisal or a signed letter from Lender).  Upon Termination, Buyer is entitled to refund of the Purchase Price plus a 25% penalty unless the appraised value to equal or exceed the Unit Value may be attributed to Change Orders and/or Upgrades and/or Closing Costs requested by the Buyer. The Buyer is not entitled to a refund of any money deposited for Change Orders and/or Upgrades and/or Closing Costs.  In the event the Property does not appraise due to Change Orders and/or Upgrades and/or Closing Costs, Buyer shall either assume responsibility for producing the additional funds necessary to Close or may either terminate the Agreement. **Closing Costs and Discount Points.**

1.  **Seller Expenses.**  Seller shall pay all existing loans and/or liens affecting the Property, including all penalties, release preparation costs, and applicable recording costs; any accrued and/or outstanding association dues or property management companies, mortgage holders or other liens affecting the Property; Seller's closing fee, document preparation fee and/or attorney's fees; fee for preparation of deed; and
notary fee on deed;
fees; fees (if any) to obtain lien payoff/estoppel letters/statement of accounts from any and all associations, Seller is not a foreign person subject to tax withholding under the Foreign Investment and Real Property Tax Act and shall sign, as a condition of Closing, appropriate affidavits certifying that Seller is not subject to the same.

2.  **Buyer Expenses.**  Seller shall pay up to $_____ of Buyer's closing cost expenses including pre-paids.
If these expenses are less than the amount provided for by the preceding sentence, Buyer cannot apply any surplus funds to any other fee not considered a closing cost (i.e., origination fee, discount points, rate points,

1

etc.). Buyer shall pay all other expenses and any closing costs in excess of the amount paid by Seller to include transfer taxes and recording fees on deed of conveyance and deed of trust; document preparation fee and/or attorney's fees; preparation of note, deed of trust, and other loan documents; mortgage loan inspection or boundary line survey; credit report; required premiums for private mortgage, hazard and flood insurance; required reserved deposits for insurance premiums and taxes; prepaid interest; re-inspection fees pursuant to appraisal; and any costs incident to obtaining and closing a loan, including but not limited to: appraisal, origination, discount points, application, commitment, underwriting, document review, courier, assignment, photo, tax service and notary fees. Buyer's closing fee

3. **Title Expenses.** Cost of title search of abstract, mortgagee's policy and owner's policy shall be paid by Buyer.

Title Company for Buyer: _District Title_

Closing Agency/Title Company for Seller: _Southland Title_

C. **Financial Contingency – Loan To Be Obtained**: This Agreement is conditioned upon Buyer's ability to obtain a loan(s) in the principal amount up to _____% of the Purchase Price listed above to be secured by a deed of trust on the Property. "Ability to obtain" as used herein means that Buyer is qualified to receive the loan based upon Lender's customary and standard underwriting criteria. In the event Buyer, having acted in good faith, is unable to obtain financing by the Closing Date, Buyer may terminate this Agreement by providing written notice and a copy of Lender's loan denial letter. Upon termination, Buyer is entitled to a refund of the Purchase Price less the cost of any unfunded Change Orders or Upgrades already performed, installed, or in the process of being performed or installed by the Seller on or for the Property.

Buyer shall be obligated to Close this transaction if Buyer has the ability to obtain a loan for which Buyer has applied and been approved.

**Type of loan (select box)**
☐ FHA: Addendum attached ☐ USDA ☐ Conventional ☐ VA: Addendum attached ☒ OTHER: _____

Loan Obligations: The Buyer agrees and/or certifies as follows:

(1) Within _____ days after the Agreement Date, Buyer shall make application for the loan and shall instruct Lender to order a credit report. Buyer shall immediately notify Seller or Seller's representative, in writing, of having applied for the loan, provide Lender's name and contact information, and verify that Buyer has instructed Lender to order a credit report;

(2) Within _____ days after the Agreement Date, Buyer shall provide Seller with a pre-approval letter from the Lender for an amount not less than the Purchase Price. In the event Buyer fails to timely provide the pre-approval letter to Seller, Buyer acknowledges and agrees that the Purchase Price shall be nonrefundable should Buyer ultimately be unable to obtain financing by the Closing Date.

(3) Within 15 (fifteen) days before Closing Date, Buyer shall warrant and represent to Seller in writing that:
   a. Buyer has secured evidence of hazard insurance which will be effective at Closing and Buyer shall notify Seller of the name of the hazard insurance company;
   b. Buyer has notified Lender of an Intent to Proceed with Lender and has available funds to Close per the signed Loan Estimate; and
   c. Buyer has requested that the appraisal be ordered and affirms that the appraisal fee has been paid.

(4) Buyer shall pursue qualification for and approval of the loan diligently and in good faith;

(5) Buyer shall continually and immediately provide requested documentation to Lender;

(6) Unless otherwise stated in this Agreement, Buyer represents that this loan is not contingent upon the lease or sale of any other real property and the same shall not be used as the basis for loan denial; and

(7) Buyer shall not intentionally make any material changes in Buyer's financial condition which would adversely affect Buyer's ability to obtain the loan referenced herein.

Buyer's failure to timely comply with Sections 2.C.(1) or 2.C.(3) above and to provide required notices to Seller shall be considered a default by the Buyer and Seller's obligation to sell shall be terminated.

KEK
CP

**THE BELOW FINANCING CONTINGENCY WAIVER SHALL ONLY BE A PART OF THIS AGREEMENT IF THE BOX IS CHECKED.**

☐   **Financing Contingency Waived** (e.g. "All Cash", etc.): Buyer's obligation to close shall not be subject to any financial contingency. Buyer reserves the right to obtain a loan. Buyer will furnish proof of available funds to close by either bank statement or Lender's commitment letter within five (5) days after Agreement Date. Should Buyer fail to do so, Buyer shall be considered in default and Seller's obligation to sell shall be terminated. Failure to Close due to lack of funds shall be considered default by Buyer.

3.   **Purchase Price.** ___District Title___ Buyer has paid or will pay within __3__ days after the Agreement Date to (name of Holder) ("Holder") located at _1150 Connecticut Ave NW, WDC 20036_ (address of Holder) a deposit of $ _600,000_ by wire ("Purchase Price"). In the event the transaction does not close on July 31, 2020 the Purchase Price shall be returned to Buyer.

A.   **Failure to Receive Purchase Price.** In the event Purchase Price is not timely received by Holder or Purchase Price check or other instrument is not honored for any reason by the bank upon which it is drawn, Holder shall promptly notify Buyer and Seller of Buyer's failure to deposit the agreed upon Purchase Price. Buyer shall then have one (1) day to deliver Purchase Price in immediately available funds to Holder. In the event Buyer does not deliver such funds, Buyer is in default and Seller shall have the right to terminate this Agreement by notifying Buyer in writing. In the event Buyer delivers the Purchase Price in immediately available funds to Holder before Seller elects to terminate, Seller shall be deemed to have waived his right to terminate, and the Agreement shall remain in full force and effect.

B.   **Handling of Purchase Price upon Receipt by Holder.** Purchase Price is to be deposited promptly after the Agreement Date or as specified in the Special Stipulations paragraph contained at paragraph 21 herein. Holder shall disburse Purchase Price only as follows:

(a) at Closing to be applied as a credit toward Buyer's Purchase Price;
(b) upon a written agreement signed by all parties having an interest in the funds;
(c) upon a reasonable interpretation of the Agreement; or
(d) upon order of a court having jurisdiction over the matter or to the clerk upon the filing of an interpleader action.

In the event of an interpleader action, Holder shall be reimbursed for, and may deduct from any funds interpleaded, its costs and expenses, including reasonable attorney's fees. Purchase Price shall not be disbursed prior to fourteen (14) days after deposit unless written evidence of clearance by bank is provided.

4.   **Closing, Prorations, Special Assessments and Warranties Transfer.**
A.   **Closing Date; Third Party Delays.** Unless otherwise provided herein, the consummation of the purchase and sale of the Property shall occur upon "Completion" of the Improvements as provided herein, which is to be on ___July 31, 2020___, (the "Closing" or "Closing Date", which shall be evidenced by delivery of ~~warranty deed~~ Deed of Trust and payment of Purchase Price). Buyer has the right to choose any mortgage company or title company for this transaction; however, if Buyer chooses a title company other than Southland Title or a mortgage company other than Movement Mortgage and the chosen title company causes a delay or the mortgage company cannot fund the loan and complete the transaction on Closing Date, at Seller's discretion, Seller has the option to not extend this Agreement and Property shall be re-listed on the market.

B.   **Possession.** Possession of the Property is to be given with delivery of warranty deed and payment of Purchase Price. If the parties agree to permit early occupancy by stipulation in Paragraph 21 below, such occupancy shall be conditioned upon Buyer having obtained appropriate hazard insurance and transferring all utilities into the name of Buyer prior to such occupancy.

C.   **Household Goods.** The movement of any household goods or other materials by Buyer into the Property will not be permitted until the Property has been completed and Seller gives written permission for Buyer to move household goods prior to closing date.

3

D. **Prorations.** Real estate taxes, rents, dues, maintenance fees, and association fees on said Property for the calendar year in which the sale is Closed shall be prorated as of the Closing Date. In the event of a change or reassessment of taxes for the calendar year after Closing, the parties agree to pay their recalculated share. Real estate taxes, rents, dues, maintenance fees, and association fees for prior years and roll back taxes, if any, will be paid by Seller.

E. **Impact Fees or Adequate Facilities Taxes.** Seller has paid <u>0$</u> (zero dollars) in adequate facility taxes or impact fees on the property.

F. **Special Assessments.** Special assessments approved or levied prior to the Closing Date shall be paid by the Seller at or prior to Closing.

G. **Closing Certifications.** Buyer and Seller shall execute and deliver such certifications, affidavits, and statements as are required at Closing to meet the requirements of the Lender and of federal and state law.

H. **Warranties Transfer.** Seller, at the option of Buyer and at Buyer's cost, agrees to transfer Seller's interest in any manufacturer's warranties, service contracts, termite bond or treatment guarantee and/or similar warranties which by their terms may be transferable to Buyer.

5. **Title and Conveyance.**
    A.    Seller warrants that at the time of Closing, Seller will convey or cause to be conveyed to Buyer good and marketable title to the Property by general warranty deed, subject only to:

    (1)    Zoning;
    (2)    Setback requirements and general utility, sewer, and drainage easements of record on the Agreement Date upon which the improvements do not encroach; and
    (3)    Subdivision declarations, covenants, restrictions, and easements of record on the Agreement Date.

    If title examination, closing or loan survey, boundary line survey, or other information discloses material defects, Buyer may, at Buyer's discretion:

    (1)    accept the Property with the defects OR
    (2)    require Seller to remedy such defects prior to the Closing Date. Buyer shall provide Seller with written notice of such defects. If defects are not remedied by the Closing Date or any mutually agreed upon extension thereof, this Agreement shall terminate, and Buyer shall be entitled to refund of Purchase Price.

    Good and marketable title as used herein means title which a title insurance company licensed to do business in _DC_ will insure at its regular rates, subject only to standard exceptions. Seller agrees to execute such appropriate affidavits and instruments as may be required by the issuing title insurance company.

    B.    Deed is to be made in the name(s) of ____ *TBD* _____.

6. **Limitations.** The home shall be constructed in accordance with good building practices and substantial accordance with the plans and specifications selected and approved by the Buyer. Seller expressly reserves the right to make such changes or substitutions in the construction of the home:

    (a) as may be required, authorized, or approved by governmental agencies having jurisdiction therefore, without the Buyer's consent;
    (b) as Seller may deem appropriate so long as materials of equal or better quality are used, without the Buyer's consent; and/or
    (c) as may be otherwise reasonably required as long as changes which affect the aesthetics or livability of the home shall be subject to Buyer's written approval.

4

7. **Contractors and/or Suppliers.** All work and materials to be performed or supplied under this Agreement shall be performed and supplied by Seller's own contractors, subcontractors, employees, agents, materialmen and suppliers. Buyer shall not have the right to have any work performed or supplies delivered to the Property at Buyer's own direction prior to Closing without written approval and consent of Seller. Seller agrees to transfer to Buyer, at Closing, subject to Buyer's acceptance thereof, Seller's interest in any manufacturer's warranties, service contracts, and/or other similar warranties which by their terms may be transferable to Buyer.

8. **Decorative Selections.** If there are decorative selections yet to be selected in the completion of the residence, Buyer shall have the option to make those selections from available stock at Seller's normal sources of supply. Buyer understands that it is Buyer's responsibility to make all selections on or before _____ (if left blank, Buyer will be informed via phone call, email, or text by Seller or Seller's decorator of date) and further understands that if the selections have not been made by said date, that Seller may make such selections. Seller choices are hereby deemed agreed to and acceptable to Buyer.

9. **Nonrefundable Deposits.** Buyer agrees that any request for changes or alterations ("Change Orders") to the residence will be set forth in writing and delivered to Seller. Any requested Change Order must be in writing and signed by Buyer and Seller in order to be binding. No subcontractor, workman or materialman has authority to agree on behalf of Seller to any Change Order. Buyer agrees that all Change Order requests must be presented to Seller so as to allow Seller adequate lead time to schedule the Change Orders into the normal building sequence. Seller has the right to refuse to make requested changes or alterations. Buyer agrees to pay Seller in advance of the performance of work necessitated by agreed Change Orders which will include the cost for both labor and materials and further understands that there will be no refunds, under any circumstances, of payments made by Buyer for Change Orders. Buyer further acknowledges that any work done on the home pursuant to Change Orders or additions may not increase the appraised value of the Property. Seller shall not be responsible if increases in the price of the Property due to Change Orders or additions are not reflected in the appraised value of (and resulting available loan for) the Property. In the event the Property does not appraise due to Change Orders and upgrade items, Buyer shall be responsible for producing the additional funds needed to Close.

10. **Delays.** Seller shall have no liability for any delays in construction caused by strikes, acts of God or nature, or delays directly caused by Buyer's Change Orders and/or selection of materials. In the event of such delays, the Closing Date may be extended by the number of days resulting from such delays, not to exceed <u>10</u> calendar days; Seller shall notify Buyer of any such delays.

11. **Homeowner Association.** TBD

12. **Inspection by Buyer.** At a point in time when Seller deems the Improvements upon the Property to be complete, Seller shall give Buyer notice of such. Buyer and/or Buyer's designated inspector/representative shall, at a mutually agreeable time within <u>five (5)</u> days of Closing, completely inspect the improvements ("Improvements"). Following the inspection, Buyer shall submit a written list of matters which Buyer reasonably deems to be incomplete or defective, hereinafter referred to as the "Punch List". Subject to Seller's acceptance, Seller shall diligently attempt to complete or repair items identified on the Punch List within <u>seven (7)</u> days of receipt. In the event Seller does not agree with Buyer's Punch List items, the parties agree to negotiate in good faith to resolve such disagreement. No changes to the Punch List may be made after its submission to Seller. If Buyer subsequently discovers any matter s/he believes incomplete or defective, Buyer may identify such defects to Seller for repair under the Builder's Limited Warranty as provided in Paragraph 16 below.

13. **Completion.** Seller will provide Buyer with copies of all building codes inspections and the final Use and Occupancy Letter from the appropriate Codes Authority, if applicable. The construction shall be deemed to be completed at such time as such inspections and approvals have been supplied and Buyer has inspected and confirmed that the contract is substantially completed. "Substantial Completion" shall mean that all matters of substance except minor touch-up matters have been completed. The construction shall be completed in accordance with all applicable governmental regulations, ordinances and codes, and shall be in compliance with all applicable restrictions, covenants and

conditions, including, without limitation, any public or private architectural controls and restrictions. If the reasonable cost of completion of the Punch List items exceeds $1,000.00, the job shall not be deemed to be substantially complete.

14. **Insurability.** It is the right and responsibility of Buyer to determine the insurability, coverage and the cost of insuring the Property. It is also the responsibility of Buyer to determine whether any exclusions will apply to the insurability of said Property.

15. **Limited Builder Warranty.** Seller warrants the Property against defective workmanship or materials (normal wear and tear excepted) for a period of one (1) year from Closing Date and against major structural defects. Seller agrees to correct any covered defects identified by Buyer by repair list timely submitted via Seller's website or mail during one of two allotted callback periods. The first callback period shall be ninety (90) days following Closing. The second callback period shall begin thirty (30) days prior to the one-year period ending on the first anniversary of Closing and end on the first anniversary of Closing. Seller shall deliver a copy of this warranty in written form to Buyer at Closing. Seller, at option of Buyer, shall further transfer all warranties and guaranties of manufacturers covering any of the Property which are, by their nature, transferable to Buyer. After receiving Buyer's 90 Day List via website submittal or mail, Seller will contact Buyer to schedule repairs. Repairs will take place during regular business hours Monday-Friday.

16. **Brokers Disclaimer.** It is understood and agreed that the real estate firms and real estate licensee(s) representing or assisting Seller and/or Buyer, their brokers, and the real estate firms (collectively referred to as "Brokers") are not parties to this Agreement and do not have or assume liability for the performance or nonperformance of Seller or Buyer.

17. **Default.** Should Buyer default hereunder, the Earnest Money shall be forfeited as damages to Seller and shall be applied as a credit against Seller's damages. Seller may elect to sue, in contract or tort, for additional damages or specific performance of the Agreement, or both. Should Seller default, Buyer's Earnest Money shall be refunded to Buyer. In addition, Buyer may elect to sue, in contract or tort, for damages or specific performance of this Agreement, or both. In the event that any party hereto shall file suit for breach or enforcement of this Agreement (including suits filed after Closing which are based on or related to the Agreement), the prevailing party shall be entitled to recover all costs of such enforcement, including reasonable attorney's fees. In the event that any party exercises its right to terminate due to the default of the other pursuant to the terms of this Agreement, the terminating party retains the right to pursue any and all legal rights and remedies against the defaulting party following termination. In the event the Units are delivered more than 32 months after the commencement of construction, Seller shall pay Buyer a penalty of 1% of the Purchase Price per month.

18. **Other Provisions.**

   A. **Binding Effect, Entire Agreement, Modification, Assignment, and Agreement Date.** This Agreement shall be for the benefit of, and be binding upon, the parties hereto, their heirs, successors, legal representatives and assigns. This Agreement constitutes the sole and entire agreement between the parties hereto and no modification of this Agreement shall be binding unless signed by all parties or assigns to this Agreement. No representation, promise, or inducement not included in this Agreement shall be binding upon any party hereto. Any assignee shall fulfill all the terms and conditions of this Agreement. The Agreement Date shall be the date upon which this Agreement is signed by the last party thereto.

   B. **Survival Clause.** Any provision contained herein, which by its nature and effect is required to be performed after Closing shall survive the Closing and delivery of the deed, and shall remain binding upon the parties to this Agreement and shall be fully enforceable thereafter.

   C. **Governing Law and Venue.** This Agreement is intended as a contract for the purchase and sale of real property and shall be interpreted in accordance with the laws and in the courts of the State of Tennessee.

   D. **Time of Essence.** Time is of the essence in this Agreement.

   E. **Terminology.** As the context may require in this Agreement: (1) the singular shall mean the plural and vice versa; (2) all pronouns shall mean and include the person, entity, firm or corporation to which they relate; (3) the masculine shall mean the feminine and vice versa; and (4) the term day(s) used throughout this Agreement shall be deemed to be calendar day(s) ending at 11:59 p.m. local time unless otherwise specified in this Agreement.

6

KER
CP

Local time shall be the current time applicable to Knoxville, Tennessee. In the event a performance deadline, other than the Closing Date (as defined in paragraph 4 herein) or Date of Possession (as defined in paragraph 4 herein), occurs on a Saturday, Sunday or legal holiday, the performance deadline shall extend to the next following business day. Holidays as used herein are those days deemed federal holidays. In calculating any time period under this Agreement, the commencement day shall be the day following the initial date (e.g. Agreement Date).

F. **Responsibility to Cooperate.** Buyer and Seller agree to timely take such actions and produce, execute, and/or deliver such information and documentation as is reasonably necessary to carry out the responsibilities and obligations of this Agreement. Except as to matters which are occasioned by clerical errors or omissions or erroneous information, the approval of the Closing documents by the parties shall constitute their approval of any differences between this Agreement and the Closing. Buyer and Seller agree that if requested after Closing, they will correct any documents and pay any amounts due where such corrections or payments are appropriate by reason of mistake, clerical errors or omissions, or the result of erroneous information.

G. **Notices.** Except as otherwise provided herein, all notices and demands required or permitted hereunder shall be in writing and delivered either (1) in person, (2) by a prepaid overnight delivery service, (3) by facsimile transmission (FAX), (4) by the United States Postal Service, postage prepaid, registered or certified, return receipt requested or (5) Email. NOTICE shall be deemed to have been given as of the date and time it is actually received. Receipt of notice by the real estate licensee or their Broker assisting a party as a client or customer shall be deemed to be notice to that party for all purposes under this Agreement as may be amended, unless otherwise provided in writing.

H. **Risk of Loss.** The risk of hazard or casualty loss or damage to Property shall be borne by Seller until transfer of title. If casualty loss prior to Closing exceeds 10% of the Purchase Price, Seller or Buyer may elect to terminate this Agreement with a refund of Purchase Price to Buyer.

I. **Equal Housing.** This Property is being sold without regard to race, color, sex, religion, handicap, familial status, or national origin.

J. **Severability.** If any portion or provision of this Agreement is held or adjudicated to be invalid or unenforceable for any reason, each such portion or provision shall be severed from the remaining portions or provisions of this Agreement, and the remaining portions or provisions shall be unaffected and remain in full force and effect. In the event that the contract fails due to the severed provisions, then the offending language shall be amended to be in conformity with state and federal law.

K. **Contract Construction.** This Agreement or any uncertainty or ambiguity herein shall not be construed against any party but shall be construed as if all parties to this Agreement jointly prepared this Agreement.

L. **Other.** A party seeking to invoke his/her right to terminate this Agreement pursuant to a contingency stated herein shall, upon request of the other party, provide copies of documentation supporting the invoking party's right to exercise said contingency. Such supporting documents shall be for the use of the requesting party to determine if the conditions of the contingency have been met and shall not be disseminated to third parties.

19. **Exhibits and Addenda.** All exhibits and/or addenda attached hereto, listed below, or referenced herein are made a part of this Agreement:
Addendum 1: Confirmation of Agency Status
Addendum 2: Residential Property Condition Exemption Notification
Addendum 3: Affiliated Business Disclosure Statement
Addendum 4: Construction Policy (Buyer contact information is required)

20. **Special Stipulations.** The following Special Stipulations, if conflicting with any preceding paragraph, shall control:

_____
_____
_____
_____
_____

21. **Contingency Contract:** If the parties stipulate to an additional contingency making the Buyer's obligation to finalize the purchase of Property contingent upon the sale of Buyer's current home, Seller shall have the right to terminate this Agreement and sell the Property to another buyer if Buyer fails to waive this contingency within twenty-four (24) hours of receiving notification via email or text that Seller has received a competing offer on Property. In the event of Seller's termination, Buyer shall receive a full refund of Earnest Money. It is acknowledged that payments to Seller for "Change Orders" which include any upgraded items shall be non-refundable and retained by Seller.

If applicable; List, the address of the buyer's contingent property and choose one of the following options:

Address of Buyer's Contingent Property:

_____ (Street Address)
_____ (City), _____ (State), _____ (Zip Code)

☐  Buyer's Contingent Property is NOT currently listed on local MLS.

☐  Buyer's Contingent Property is currently listed on local MLS but not under contract.

☐  Buyer's Contingent Property is currently listed on the local MLS and/or is under contract with a closing date of _____.

22. **Method of Execution.** The parties agree that signatures and initials transmitted by facsimile, other photocopy transmittal, or by transmittal of digital signature as defined by the applicable State or Federal law will be acceptable and may be treated as originals and that the final Purchase and Sale Agreement containing all signatures and initials may be executed partially by original signature and partially on facsimile, other photocopy documents, or by digital signature as defined by the applicable State or Federal law.

23. **Time Limit of Offer:** This offer may be withdrawn at any time before the acceptance with Notice. Offer terminates if not counted or accepted by __ o'clock __ on _____.

NOTE: Any provisions of this Agreement which are preceded by a box "☐" must be marked to be a part of this Agreement. By affixing your signature below, you also acknowledge that you have reviewed each page and have received a copy of this Agreement.

Buyer hereby makes this offer:

_____ DATE _4/21/20_   EUN51 KWON KIM  DATE _4/21/20_
BUYER                                         BUYER

Seller hereby:

☒ ACCEPTS   ☐ COUNTERS   ☐ REJECTS

4910 Georgia Ave Holdings LLC

SELLER
By: _____            Executed by: _____  DATE _____

8

# EXHIBIT Q



8401 Greensboro Dr, Suite 960
McLean, Virginia 22102
www.wcp.team

December 2, 2022

VIA EMAIL ONLY
J. Chapman Petersen
3970 Chain Bridge Rd.
Fairfax, VA 22030
fjz@petersenfirm.com

RE: 4910 Georgia Avenue NW, Washington, DC, 20011

Dear Mr. Petersen,

I am in receipt of you November 29, 2022 letter to Washington Capital Partners with respect to a July 2020 contract ("Contract") entered into by your clients with respect to 4910 Georgia Avenue NW, Washington, DC, 20011 ("Property").

The contract was made by contract-seller, 4910 Georgia Ave Holdings, LLC, the previous owner of the Property ("Contract-Seller") and your clients ("Contract-Purchaser"). Please be advised that Washington Capital Partners ("WCP") is not in privity of contract with the Contract-Purchaser. WCP is not an assignee of the sales contract. WCP is not a successor-in-interest to the Contract-Seller. Any interest your clients may have had in the Property was extinguished by virtue of the foreclosure sale.

Any potential claim or remedy should be directed to the Contract-Seller, 4910 Georgia Ave Holdings, LLC. WCP is not a proper party and is taking no further action with respect to this matter.

Sincerely,

*Lisa Brennan*

Lisa H. Brennan, Esq.
In-House Counsel, Washington Capital Partners